UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BRIAN HUSSEY,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CAMBRIDGE and<br>BRANVILLE BARD, *individually and*<br>*in his capacity as Commissioner of the*<br>*Cambridge Police Department*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 21-CV-11868-AK |

**MEMORANDUM AND ORDER**

**A. KELLEY, D.J.**

Brian Hussey ("Hussey"), a police officer for the City of Cambridge Police Department ("CPD"), brings this action, pursuant to 42 U.S.C. § 1983, against the City of Cambridge (the "City") and Branville Bard ("Bard"), the previous Commissioner of the CPD, in his individual and official capacities, alleging that the defendants violated his First Amendment right to freedom of speech.  The defendants filed a motion to dismiss [Dkt. 9], which Hussey opposes.  For the reasons that follow, the defendants' motion to dismiss [Dkt. 9] is **GRANTED IN PART** and **DENIED IN PART**.

**I.      Factual and Procedural Background**

Unless otherwise noted, the facts are recited as alleged in Hussey's complaint.  [See Dkt. 1 ("Complaint")].  Hussey has worked as a police officer for the CPD for twenty-four years.  [Id. at ¶ 1].  Hussey maintains a private Facebook page, which does not identify him as a police officer, where he occasionally posts personal and political comments or articles.  [Id. at ¶ 9].  On

1

or about February 25, 2021, while off duty, Hussey posted an article titled "House Democrats Reintroduce Police Reform Bill Named in Honor of George Floyd," along with the comment, "This is what its [sic] come to 'honoring' a career criminal, a thief and druggie . . . the future of this country is bleak at best."  [Id. at ¶¶ 10-11].  Hussey states that the motivation behind this post was his "concern[] as a private citizen that an important act of Congress would be named 'in honor' of someone who was reported to have a criminal record."  [Id.].  Hussey took the post down approximately two hours after posting.  [Id. at ¶ 12].  In March 2021, Bard informed Hussey that he was being placed on administrative leave because of the Facebook post.  [Id. at ¶ 13].  Hussey was on administrative leave for two months before receiving a four-day suspension.  [Id.].  Hussey claims that this punishment violated his First Amendment right to the freedom of speech and seeks monetary damages in addition to declaratory and injunctive relief.  [Id. at ¶¶ 14-16].

The defendants moved to dismiss Hussey's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  [Dkt. 9].  Hussey opposed that motion.  [Dkt. 13].  The Court held a motion hearing on September 26, 2022.[1]

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl.

---

[1] Shortly after filing his opposition, Hussey moved to supplement and amend his complaint. [Dkt. 14]. In his proposed amended complaint, Hussey does not allege any new underlying facts related to the Facebook post or suspension. Instead, he adds claims that he was denied a promotion to sergeant in April 2022, after filing this suit, because of the discipline he received in response to the Facebook post. [Dkt. 14-1 at ¶ 18]. At the motion hearing on September 26, 2022, counsel informed the Court that Hussey had since been promoted to sergeant and Hussey's counsel therefore intended to withdraw the motion to amend the complaint. As such, the Court denied as moot Hussey's motion to amend. [See Dkt. 24].

Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements.  Id.  Factual allegations must be accepted as true, while legal conclusions are not entitled to credit.  Id.  A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable.  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  Dismissal is appropriate when the complaint fails to allege a "plausible entitlement to relief."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)).  When resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court is generally limited to "the complaint, documents attached to it, and documents expressly incorporated into it," Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71-72 (1st Cir. 2014), though the Court may also consider "matters of public record[] and other matters susceptible to judicial notice," Newton Covenant Church v. Great Am. Ins. Co., 956 F.3d 32, 35 (1st Cir. 2020).

**III.    Discussion**

Hussey brings this action pursuant to 42 U.S.C. § 1983.  Section 1983 provides that "[e]very person" acting "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia" who subjects or causes to subject someone "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States shall be liable to the injured party.  42 U.S.C. § 1983.  An individual asserting a

3

Section 1983 claim must show that the challenged conduct is "attributable to a person acting under color of state law" and that the conduct was a "denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997); see Graham v. Connor, 490 U.S. 386, 393-94 (1989) (explaining that Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred" (citation omitted)). In this case, the defendants do not dispute that they were acting "under color of state law." Rather, they contend that the injuries alleged do not amount to a violation of Hussey's First Amendment rights because he was not engaged in protected speech.[2] In the alternative, they argue that Bard did not have final policymaking authority over the disciplinary action taken, and the City therefore cannot be held liable pursuant to Section 1983, and that Bard is entitled to qualified immunity, which "protects government officials . . . from suit and liability for monetary damages under [Section] 1983," as to the individual capacity claim against him. Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 10 (1st Cir. 2000)). Hussey counters that he was engaged in protected speech and that Bard was the final policymaking authority as to officer discipline and is not entitled to qualified immunity. [Dkt. 13 at 1-4].

**A. Protected Speech**

The threshold question is whether Hussey has alleged facts sufficient to plead a First Amendment violation, which requires the speech at issue to be protected. Although public employees like Hussey "do not forfeit all of their First Amendment rights by undertaking public employment," the protection public employees enjoy "against speech-based reprisals is qualified." Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (citing Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 25-26 (1st Cir. 2010)). Government employees "often occupy

---

[2] The First Amendment was incorporated against the states by the Due Process Clause of the Fourteenth Amendment. See Grosjean v. Am. Press Co., 297 U.S. 233, 243 (1936).

4

trusted positions in society" and when they speak out "they can express views that contravene governmental policies or impair the proper performance of governmental functions." Garcetti v. Ceballos, 547 U.S. 410, 419 (2006); see Curran v. Cousins, 509 F.3d 36, 47 (1st Cir. 2007). Consequently, when a citizen "enters government service, the citizen by necessity must accept certain limitations on his or her freedom." Garcetti, 547 U.S at 418. The Court must apply a three-part test to determine whether a government employer has violated an employee's right to free speech by taking an adverse action against him, considering whether (1) the employee spoke as a citizen on "a matter of public concern"; (2) the government employer had an "adequate justification for treating the employee differently from any other member of the general public," that is, whether the interests of the employee and public "outweigh the government's interest in functioning efficiently"; and (3) whether the protected speech "was a substantial motivating factor in the adverse action" against the employee. Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 135, 138 (1st Cir. 2022); see also Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 34 (1st Cir. 2020) (citing Rosado-Quiñones v. Toledo, 528 F.3d 1, 15 (1st Cir. 2008)); Decotiis, 635 F.3d at 29.

      The parties here do not dispute the first and third elements. Therefore, the Court's analysis will focus on the second element, often referred to as the "Pickering test": balancing the employee and the public's interests in the employee's speech against the "interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." Jordan v. Carter, 428 F.3d 67, 73 (1st Cir. 2005) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). The resolution of this inquiry is a matter of law for the Court to decide, id., though it does require a "look at the facts of the case, including the nature of the employment and the context in which the employee spoke," Hayes v. Mass. Bay Transp.

Auth., 498 F. Supp. 3d 224, 232 (D. Mass. 2020).  As part of this inquiry, the Court considers the "time, place, and manner of the employee's speech" and the interests of the government, including its motivation, when making the adverse employment decision.  Bruce, 34 F.4th at 138 (citing Decotiis, 635 F.3d at 35).  This balancing test reflects the fact that government employers "like private employers, need a significant degree of control over their employees' words and actions," because "without it, there would be little chance for the efficient provision of public services."  Garcetti, 547 U.S. at 418.

The defendants argue that Hussey's Facebook post does not constitute protected speech because the interests of the City in "maintaining a police department free of bias and in maintaining public trust far outweigh" Hussey's interests.  [Dkt. 10 at 5-10].   Hussey counters that he has alleged facts sufficient to survive dismissal, namely, that his Facebook post is protected speech, and the defendants have not shown that his speech caused or risked causing any disruption to their government interest.  [Dkt. 13 at 6, 12-13].

1. **Hussey's Interest**

At the heart of Hussey's speech is the murder of George Floyd, an African-American man, who was killed by then-Officer Derek Chauvin ("Chauvin") on May 25, 2020, while in the custody of the Minneapolis Police Department.[3]  See Armstrong v. City of Minneapolis, 525 F. Supp. 3d 954, 957 (D. Minn. 2021); see also How George Floyd Died, and What Happened Next, N.Y. Times, https://www.nytimes.com/article/george-floyd.html [hereinafter "N.Y. Times Article"]; House Democrats Reintroduce Police Reform Bill Named in Honor of George Floyd,

---

[3] Officer Chauvin was found guilty of second-degree murder, third-degree murder, and second-degree manslaughter for the death of George Floyd on April 20, 2021.  See State v. Chauvin, No. 27-cr-20-12646 (Minn. Apr. 20, 2021); see also N.Y. Times Article (noting that Chauvin was found guilty of second-degree murder, third-degree murder, and second-degree manslaughter after "a weekslong trial" and sentenced to 22.5 years in prison).

6

CNN (February 25, 2021), https://whdh.com/news/politics/house-democrats-reintroduce-police-reform-bill-named-in-honor-of-george-floyd/ [hereinafter "CNN WHDH Article"].[4]  The cell phone video of Chauvin, a white police officer, "kneeling on George Floyd's neck for several minutes" while George Floyd was handcuffed, pinned to the ground, and "begged for his life" as other officers stood by and watched was "circulated nationwide and ignited protests across the country" and internationally.  Black Lives Matter L.A. v. City of L.A., No. 20-cv-05027, 2021 WL 3163309, at *1 (C.D. Cal. May 10, 2021); see also N.Y. Times Article; CNN WHDH Article.  Although Chauvin and the other officers involved were eventually arrested and charged with George Floyd's murder, protests peaceful and violent continued throughout the country and abroad in the following months.  See N.Y. Times Article; CNN WHDH Article.  While the majority of the protests were peaceful, some turned violent.  Law enforcement was criticized by some for responding to the majority peaceful protests with force, including the use of tear gas and shooting of rubber bullets, and with mass arrests.  N.Y. Times Article.  The National Guard was activated in at least twenty-one states, and cities enacted curfews as protestors and law enforcement clashed.  See id.  Businesses were set on fire and vandalized, and a Minneapolis police station was burned down.  Id.

These "large protests against police brutality and systematic racism" led "to a racial justice movement not seen since the civil rights protests of the 1960s."  N.Y. Times Article; see CNN WHDH Article; see also Huffman v. City of Boston, No. 21-cv-10986-ADB, 2022 WL

---

[4] The parties did not object when the Court informed them at the motion hearing that it intended to take judicial notice of these two articles, the first of which is referenced in the defendants' papers, and the second of which is referenced in the plaintiff's complaint.  See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (noting that courts may consider "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to [the plaintiff's] claims," and "documents sufficiently referred to in the complaint" when evaluating a motion to dismiss); see also Madison v. Cruz, 393 F. Supp. 3d 135, 137 n.2 (D. Mass. 2019) (noting that "[o]ther courts have also taken judicial notice of newspaper articles and press releases . . . when their conten[t]s cannot be reasonably questioned").

2308937, at *1 (D. Mass. June 27, 2022) ("[George Floyd's] unjust death at the hands of police sparked protests around the country that called attention to the disparate treatment of people of color by law enforcement and demanded justice and police reform."). The bill introduced by Congress—the subject of the article posted by Hussey—included provisions to overhaul the qualified immunity defense for law enforcement and establish a national registry of police misconduct; prohibitions on racial profiling and no-knock warrants in federal drug cases; and a ban on chokeholds at the federal level, classifying them as a civil rights violation. CNN WHDH Article.

Considering the impact of George Floyd's murder on American society, Hussey's Facebook post spoke broadly to several topics—use of force by law enforcement, police reform, and racial justice—on which "free and open debate is vital to informed decision-making." Pickering, 391 U.S. at 571. Viewed in that light, the value of the speech is high, as the public "also had a non-trivial interest in the information" conveyed. Decotiis, 635 F.3d at 36. However, the Court must also "factor in particulars such as the nature of the comments and the motivation behind the speech." Jordan, 428 F.3d at 74. Here, Hussey "put [the] pejorative labels" of "career criminal," "thief," and "druggie" on George Floyd, a victim of murder at the hands of those obliged to protect and serve the public, and whose unjust death sparked a global movement calling for police reform and racial justice. Curran, 509 F.3d at 45 (citing Jordan, 428 F.3d at 74). Employee speech that is done in a "vulgar, insulting, and defiant" manner is generally "entitled to less weight in the Pickering balance." Jordan, 428 F.3d at 74 (citing Stanley v. City of Dalton, 219 F.3d 1280, 1290 (11th Cir. 2000)); see Snipes v. Volusia County, 704 Fed. Appx. 848, 854 (11th Cir. 2017) (noting that there "are many ways to communicate ones' thoughts, and the vulgar, derogatory phrases used by [the employee] weigh against him").

Still, the Court acknowledges that George Floyd's past, who is at the center of Hussey's speech, is "potentially of public concern" as it relates to any perceived message sent by the federal legislature.  Jordan, 428 F.3d at 74.

Hussey's motive for speaking must also be considered.  Id.  Hussey claims that his Facebook post was intended to express his concern "that an important act of Congress would be named 'in honor' of someone who was reported to have a criminal record." [Complaint at ¶ 11]. At this stage, the Court must accept Hussey's statement as true without evaluating his credibility. See García-Catalán, 734 F.3d at 103.  Hussey's speech, then, intended to express disapproval of Washington politics, including legislative naming conventions, a "topic[] of value in the civil discourse," and "provid[ed] information in which there was a legitimate public interest."  Curren, 509 F.3d at 48.  Still, on its face, Hussey's post was "open to [] many controversial interpretations" and "was likely offensive to some members of the public" and fellow officers in the CPD.  Duke v. Hamil, 997 F. Supp. 2d 1291, 1302 (N.D. Ga. 2014) (dismissing a veteran police officer's First Amendment claim where the officer posted an image of the Confederate flag accompanied by the phrase, "It's time for the second revolution," on his private Facebook page).  The very fact that his message could be misinterpreted by the public and police staff speaks to the defendants' interests in regulating such speech.  See id.

As to the time and place of Hussey's Facebook post, Hussey uploaded the article and his comment to his private Facebook page, which he states does not identify him as a police officer, while off duty, and he removed the post a few hours later.  [Complaint at ¶¶ 9-12].  This generally weighs in Hussey's favor.  Yet the post clearly came to Bard's attention despite Hussey's efforts to delete the post, which "illustrates the very gamble individuals take in posting content on the Internet and the frequent lack of control one has over its further dissemination."

9

Duke, 997 F. Supp. 2d at 1302. Hussey could not prevent anyone from sharing, copying, or forwarding his message to others, even if he set his Facebook page at the strictest privacy settings. Moreover, Hussey's post came less than a year after George Floyd's murder and the summer of unprecedented worldwide protests and barely a week before Chauvin's Minnesota trial for George Floyd's murder began. See State v. Chauvin, No. 27-cr-20-12646 (Minn.) (trial beginning on March 8, 2021).

As a whole, the value of Hussey's speech, including his use of derogatory, pejorative labels, was not particularly high, though it was also not without any value. See McGunigle v. City of Quincy, 132 F. Supp. 3d 155, 172 (D. Mass. 2015) (noting that the "greater the value of the subject of the speech to the public, the more the balance tilts" in the employee's favor (citing Guilloty Perez v. Pierluisi, 339 F.3d 43, 53 (1st Cir. 2003))). The question is whether the government's interest outweighs Hussey's.

### 2. The Government's Interest

When evaluating the government's interest in regulating employee speech, the Court must consider "the government's interest in the effective and efficient fulfillment of its responsibilities to the public" and its "legitimate purpose" in promoting "efficiency and integrity in the discharge of official duties" and "proper discipline in the public service." Connick, 461 U.S. 138, 150-51 (1983) (citing Ex parte Curtis, 106 U.S. 371, 373 (1882)). The First Circuit and other courts have recognized that the government's interest is "particularly acute in the context of law enforcement," where there is a "heightened interest" in "maintaining discipline and harmony among employees." Jordan, 428 F.3d at 74 (citing Moore v. Wynnewood, 57 F.3d 924, 934 (10th Cir. 1995)); see, e.g., O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998) ("[B]ecause of the special degree of trust and discipline required in a police force there may be a

10

stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees."). The defendants contend that they have "a strong interest in maintaining a police department free of bias and maintaining public trust" and that the defendants can "effectively provide the critical public safety services of its police department" only if "its officers are unbiased and the public has trust in the officers." [Dkt. 10 at 8-9]. Hussey counters that the defendants' "speculation about workplace disruption is not sufficient" and "language that is considered to be inflammatory is simply not enough to establish that the speech will sufficiently impact the operations of a public employer." [Dkt. 13 at 13-14].

Hussey's Facebook post "on its face . . . could convey a drastically different message with different implications" than his intended disapproval of Washington politics and legislative naming conventions. Duke, 997 F. Supp. 2d at 1301. George Floyd's murder is inextricably tied to discussions about police brutality and racial justice, and it is a topic that may be deemed "controversial, divisive, and prejudicial." Id. It is not unreasonable to conclude that Hussey's comments could sow discord among his fellow officers, and his senior status on the force could only heighten this friction. See id. at 1303. Indeed, Hussey's Facebook post came to Bard's attention, which suggests that at least one person was concerned about its effect on the CPD. When trust among officers can literally save—or ruin—lives, law enforcement understandably must be careful to monitor charged statements that risk dividing the force's ranks.

Also of tantamount importance to any police department is ensuring that the public perceives its officers and their enforcement of the law to "be even-handed and fair," McGunigle, 132 F. Supp. 3d at 173, as the "promotion of safety of persons and property is unquestionably at the core of the State's police power," Kelley v. Johnson, 425 U.S. 238, 247 (1976). Police officers "are quintessentially public servants" and "part of their job is to safeguard the public's

11

opinion of them, particularly with regard to a community's view of the respect that police officers . . . accord the members of that community." Locurto v. Giuliani, 447 F.3d 159, 178-79 (2d Cir. 2006); see Duke, 997 F. Supp. 2d at 1301.  Hussey's Facebook post had the potential to damage CPD's reputation and to undermine the community's confidence in CPD's willingness to fulfill its duty to protect all members of the community and respect the constitutional rights of those in its custody.  See Snipes, 704 Fed. Appx. at 853.  People in the community could take offense to Hussey's speech "not just because they disapprove of it, but because it raises concerns of [Hussey's] prejudice—and the [police] [d]epartment's." Duke, 997 F. Supp. 2d at 1302.  A police department and the public must be able to trust that officers will not justify the use of unlawful force or other illicit disparate treatment or targeting of individuals because of their race and backgrounds.

Still, the Court must consider whether the defendants' predictions about the disruption Hussey's speech would have on their interests were reasonable.  See Curran, 509 F.3d at 49 (noting that a government employer "need not show an actual adverse effect" on the public employer's operations to terminate an employee for something that employee said); see also Sabatini v. Las Vegas Metro. Police Dept., 369 F. Supp. 3d 1066, 1077, 1091 (D. Nev. 2019); Venable v. Metro. Gov't of Nashville, 430 F. Supp. 3d 350, 360 (M.D. Tenn. 2019); Buker v. Howard Cty., No. MJG-12-cv-03046, MJG-13-cv-03747, 2015 WL 3456750, at *12-13 (D. Md. May 27, 2015).  Hussey's complaint does not allege that any actual disruption or harm resulted from Hussey's Facebook post, nor do the defendants describe any such consequences.  There is nothing to indicate that Hussey's Facebook post was reported by local media, see Locurto, 447 F.3d at 165, undermined CPD outreach to the community, see Venable, 430 F. Supp. 3d at 360, violated any CPD policies or diversity initiatives, see Hernandez v. City of Phx., 432 F. Supp. 3d

1049, 1067-68 (D. Ariz. 2020), or was talked about by his fellow officers, see Buker, 2015 WL 3456750, at *12, all of which could support the government's prediction that Hussey's speech would harm its strong interest in maintaining the public trust and a bias-free police department. While Hussey's post could undermine the community's trust in the CPD and relationships between officers, resulting in "significant disruption and inefficiency," the Court cannot, based on the facts in the complaint before it, definitively resolve the close constitutional question of whether "such a risk" outweighs the interests served by Hussey's speech. Decotiis, 635 F.3d at 36; Jordan, 428 F.3d at 74; see Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009) (noting that the court must "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiffs" at the motion to dismiss stage). Given that the Court must "indulge all inferences in favor of" Hussey at this stage, the complaint sufficiently states a plausible claim to relief. Id. The Court cannot grant the defendants' motion to dismiss in its entirety.

### B. Bard's Final Policymaking Authority

The defendants alternatively argue that Bard did not have final policymaking authority over the discipline of officers, and the City therefore cannot be held liable pursuant to Section 1983. [Dkt. 10 at 11-13]. A municipality can be liable for a constitutional violation "only if the violation occurs pursuant to an official policy or custom," where the existence of an official policy can be established by "showing that the alleged constitutional injury was caused by . . . a person with final policymaking authority." Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008) (citations omitted). A "single decision by municipal policymakers" can lead to municipal liability when "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986).

Although the defendants claim that, as a matter of law, the City Manager, not Bard, had final policymaking authority over Hussey's discipline, the municipal charter provisions they cite in support of that argument reference only appointments and removals. [See Dkt. 10 at 11-12]. They say nothing of disciplinary decisions—and Hussey's complaint challenges a suspension, not a termination—and the defendants do not point to any other City official who does have the final say in police officer discipline. See Welch, 542 F.3d at 942 ("We are bound by Pembaur and conclude that a single decision by a final policymaker can result in municipal liability."). The defendants' arguments regarding final policymaking authority fall short, and the Court denies the defendants' motion to dismiss the claim against the City.[5]

### C. Qualified Immunity

The defendants also argue that the claim against Bard in his individual capacity must be dismissed as he is entitled to qualified immunity. [Dkt. 10 at 13-15]. Hussey responds that Bard is not entitled to qualified immunity because he has asserted a valid First Amendment claim against Bard, and his rights were clearly established at the time of the alleged violation. [Dkt. 13 at 17-19]. Qualified immunity provides that "government officials performing discretionary functions" are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Floyd v. Farrell, 765 F.2d 1, 4 (1st Cir. 1985) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity applies to claims against government officials in their individual capacities, and not to official capacity claims.[6] Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87,

---

[5] Because the Court has denied the defendants' request to dismiss Hussey's claim against the City, it will not dismiss the official capacity claim against Bard. [See Dkt. 10 at 12].

[6] The Court notes that the official capacity claim against Bard "in essence, is simply a claim against the [m]unicipality," as "an official capacity suit is, in reality, a suit against the governmental entity, [and] not against the governmental actor." Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 n.3 (1st Cir. 1994) (citations omitted).

14

91 n.3 (1st Cir. 1994) (citations omitted).  The Court must decide "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009)).  To answer the second question, the Court must evaluate whether, "in the specific context of the case," Decotiis, 635 F.3d at 36, the law was "sufficiently clear" such that "every reasonable official would understand that what he is doing is unlawful," Eves v. LePage, 927 F.3d 575, 583 (1st Cir. 2019) (citation and internal quotation marks omitted).  In other words, immunity "exists even where the abstract 'right' invoked by the plaintiff is well-established, so long as the official could reasonably have believed 'on the facts' that no violation existed." Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69 (1st Cir. 2002) (citations omitted).  Courts need not follow the two-step analysis sequentially.  Maldonado, 568 F.3d at 270.

"The Supreme Court has 'repeatedly told courts' not to define the qualified immunity inquiry 'at a high level of generality,'" Eves, 927 at 583 (citing City & Cty. of S.F. v. Sheehan, 575 U.S. 600, 613 (2015), and the First Circuit has observed that "[b]ecause Pickering's constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of qualified immunity," Fabiano v. Hopkins, 352 F.3d 447, 457 (1st Cir. 2003) (citation omitted).  Though the Court has concluded that Hussey stated a plausible claim to relief such that it survives the defendants' motion to dismiss, the Court's discussion of whether Hussey was engaged in protected speech, and therefore whether Bard violated his First Amendment right, illustrates that the "state of the law at the time of the alleged constitutional violation was not clear enough in the circuits generally, and in this circuit particularly, to put [Bard] on fair notice that [his] actions constituted a constitutional deprivation." Decotiis, 635 F.3d at 38.  A reasonable person in Bard's position could have believed that he was not violating Hussey's rights by suspending him for his Facebook post.  See id.  Bard is entitled to qualified immunity here.  As such, the Court grants the defendants' motion

to dismiss as to Bard in his individual capacity, though the official capacity claim against Bard survives dismissal.

## IV. Conclusion

For the foregoing reasons, the defendants' motion to dismiss [Dkt. 9] is **GRANTED IN PART** and **DENIED IN PART**.  The claim against Bard in his individual capacity is **DISMISSED**.  Hussey's claim against the City of Cambridge remains, as does his claim against Bard in his official capacity.

**SO ORDERED.**

Dated: October 11, 2022                                     /s/ Angel Kelley
                                                                               Hon. Angel Kelley
                                                                               United States District Judge