UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                       )
BRIAN HUSSEY,                          )        C.A. No.: 1:21-CV-11868-AK
     Plaintiff,                       )
                                       )
v.                                     )
                                       )
CITY OF CAMBRIDGE and                  )
BRANVILLE BARD, individually and       )
in his capacity as Commissioner of the )
Cambridge Police Department            )
     Defendant[s].                    )
_____)

**CONCISE STATEMENT OF MATERIAL FACTS IN CONNECTION WITH
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

     Pursuant to Local Rule 56.1, the City of Cambridge (hereinafter the "City") and Dr.

Branville G. Bard, Jr. (hereinafter "Bard"), in his capacity as former Commissioner of the

Cambridge Police Department (collectively, the "Defendants") hereby submit this Concise

Statement of Material Facts in support of their Motion for Summary Judgment.

**CONCISE STATEMENT OF MATERIAL FACTS**[1]

1. On February 25, 2021, the Plaintiff was paid by the Cambridge Police Department to

    attend online training. (See Ex. 1, Hussey Dep., p. 41.)

2. On February 25, 2021, the Plaintiff posted, "[t]his is what it's come to…'honoring' a

    career criminal, a thief and druggie…the future of this country is bleak at best" and

    attached a news article about a House of Representatives police reform bill being named

---

[1] The facts stated herein are accepted as true by the Defendants for the purposes of their Motion for Summary Judgment, **only**, with respect to the claims asserted against them by the Plaintiff. The Defendants reserve all rights with respect to their defenses to the Plaintiff's claims and their right to dispute his allegations at trial.

in honor of George Floyd. (See Ex.1, Hussey Dep., pp. 41-42 and Ex. 4, Hussey Dep. Ex. 1.)

3. The term "druggie" is a derogatory term referring to individuals with substance abuse issues. For a police officer to use that term "it dehumanizes, and it in some ways demonizes. It makes it easier to not to care about the outcomes for an individual. And historically when you dehumanize an individual, then it's easier to perpetrate atrocities against them. So it's inappropriate for a police officer to be using that term." (See Ex. 3, Bard Dep. pp. 40 and 47.)

4. The Plaintiff drove with his wife and two children, aged seven months and five years old, to the New England Aquarium (the "Aquarium") later in the morning on February 25, 2021. (See Ex. 1, Hussey Dep., p. 43.)

5. The Aquarium was very crowded with children and the Plaintiff and his wife had his seven-month-old daughter in a stroller. (See Ex. 1, Hussey Dep. pp. 43-44.)

6. Despite having two small children at the very crowded Aquarium, the Plaintiff took the time to delete his post regarding George Floyd, either while walking to the Aquarium from his car or shortly after arriving at the Aquarium. (See Ex. 1, Hussey Dep. p. 44.)

7. The Plaintiff claims he deleted the post because it did not generate much conversation, despite the fact that two people commented on the post within 52 minutes of the Plaintiff posting it on his Facebook page. (See Ex. 1, Hussey Dep. pp. 44-45.)

8. On April 1, 2021, the Plaintiff estimated that he had 674 Facebook friends. (See Ex. 1, Hussey Dep. p. 36 and Ex. 4, Hussey Dep. Ex. 1, p. 6.)

9.  The Plaintiff was able to list 535 of his Facebook friends in 2023. (See Ex. 1 Hussey Dep. p. 34 and Ex. 4, Hussey Dep. Ex. 1.)

10. The Plaintiff estimated that 91 of his 535 Facebook friends are either retired or active members of the Cambridge Police Department and only 30 of his 535 Facebook friends may be unaware of the Plaintiff's employment with the Cambridge Police Department. (See Ex. 1, Hussey Dep. pp. 38-39 and Ex. 2, Hussey Dep. Ex. 2.)

11. The Plaintiff joined the Cambridge Police Department in 1998. (See Ex. 1, Hussey Dep. pp. 8-9.)

12. For the first decade of his career as a Cambridge Police Officer, the Plaintiff worked as a patrol officer, mostly in sectors one, two, and three, which encompass lower Cambridge. (See Ex. 1, Hussey Dep. pp. 12-13.)

13. Once the Plaintiff had enough seniority to start getting assigned to his sector of choice, the Plaintiff chose to work in sector two, which encompassed Central Square and the housing developments of Washington Elms and Newtowne Court. (See Ex. 1, Hussey Dep. pp. 13-14.)

14. In June 2009, the Plaintiff applied to and joined the Special Investigations Unit ("SIU") where he investigated drug and vice crimes. (See Ex. 1, Hussey Dep. p. 15.)

15. For the ten years the Plaintiff was assigned to the SIU, he took part in hundreds of drug crime investigations. (See Ex. 1, Hussey Dep. p. 16.)

16. During the Plaintiff's time in the SIU, he worked with confidential informants and otherwise spoke with drug users throughout the City of Cambridge. (See Ex. 1, Hussey Dep. pp. 16-19.)

17. In order to secure the cooperation of confidential informants and other drug users who provided information to the Cambridge Police Department, the Plaintiff "had to reassure them that…we were going to protect them, mothering would happen to them, we would do whatever we could to help them." (See Ex. 1, Hussey Dep. p. 20.)

18. The Plaintiff spent a lot of his time in the SIU convincing drug users to trust him. (See Ex. 1, Hussey Dep. p. 21.)

19. In early March 2021, Bard met via Zoom with former City Manager Louis DePasquale, Richard Harding from the NAACP, former Mayor Ken Reeves, and Mo Barbosa about the Plaintiff's February 25, 2021 Facebook post, including the Plaintiff's disparaging comments about George Floyd and individuals with substance abuse disorders. (See Ex. 3, Bard Dep. pp. 26-27.)

20. Former Mayor Reeves expressed his concern that the Plaintiff's post called into question the ability of the Cambridge Police Department to serve in a biased-free manner and it "runs afoul of what we purport to embody." (See Ex. 3, Bard Dep. pp. 29 and 49.)

21. After Bard's meeting with former City Manager DePasquale and the members of the public complaining about Hussey's disparaging and biased Facebook post, Bard obtained a copy of the Plaintiff's February 25, 2021 Facebook post and forwarded it to the Professional Standards Unit ("PSU") for investigation. (See Ex. 3, Bard Dep. pp. 26-27.)

22. PSU conducted an investigation and found that the Plaintiff violated Cambridge Police Department Rules and Regulations Chapter 2, Section III, Paragraph B, which prohibits "discourtesy, rudeness, or insolence to any member of the public" and Cambridge Police Department Policies and Procedures Policy 230, Section V, Paragraph A, Part 1 which

orders the Plaintiff to "be courteous and act professionally at all times." (See Ex. 2, Hussey Dep. Ex. 2 pp. 10-11.)

23. The City Manager is the appointing authority for the City of Cambridge and has final authority over discipline of all City of Cambridge employees, including police officers. (See Ex. 3, Bard Dep. pp. 8-9.)

24. Bard was concerned that the Plaintiff, with his February 25, 2021 Facebook post, disparaged George Floyd and was insensitive to individuals with substance use issues, would cause irreparable harm to the Cambridge Police Department's reputation. (See Ex. 3, Bard Dep. pp. 30, 32.)

25. The Cambridge Police Department disciplined Hussey for his February 25, 2021 Facebook post because "it had negative connotations and it tore at the fabric of trust that we spent a long time building in the community. Folks viewed the Cambridge Police Department as one who favors prevention, intervention, and diversion over more serious or more punitive methods traditionally associated with the criminal justice system. You know, we pride ourselves on the fact that we believe that individuals are better served through a social justice approach than through your traditional criminal justice approaches. And when you have that approach, that means that you're often working hand in hand with individuals who have, you know, fallen in life and are working towards better outcomes. Some of those individuals have substance use issues." (See Ex. 3, Bard Dep. p. 41.)

26. Bard viewed the post as "disparaging, it was dehumanizing, and that it, particularly in the context of the national climate, tore at the fabric of the trust that we spent a long time building. You know, the old saying trust takes a lifetime to build and just a moment to

tear down. Well, any individual associated with the Cambridge Police Department could in a moment tear down, you know, that trust we've spent a long time building with community..." (See Ex. 3, Bard Dep. pp. 41-42.)

27. Bard, with his thirty years of police experience, believed it was important for the Cambridge Police Department to have the public's trust because that is "the only way we can function properly and do our job. We have to be seen as trustworthy and legitimate and bias free." (See Ex. 3, Bard Dep. p. 46.)

<div style="margin-left:40%">

DEFENDANTS,
CITY OF CAMBRIDGE
DR. BRANVILLE G. BARD, JR.
By their attorney,

/s/ Kate M. Kleimola_____
Kate M. Kleimola (BBO# 664978)
City of Cambridge Law Department
Cambridge City Hall
795 Massachusetts Avenue
Cambridge, MA 02139
Tel. (617) 349-4121
kkleimola@cambridgema.gov

</div>

Dated: June 8, 2023

## CERTIFICATE OF SERVICE

I, Kate M. Kleimola, hereby certify that on June 8, 2023, I served a true copy of the above document upon Plaintiff's counsel, Benjamin Weber, Esq., via ECF:

<div style="margin-left:40%">

/s/ Kate M. Kleimola_____
Assistant City Solicitor

</div>

# EXHIBIT 1

1

<pre>
1                                    VOLUME:  I
                                     PAGES:  1-99
2                                    EXHIBITS:  1-4

3               UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
4
                             C.A. NO. 1:21-CV-11868-AK
5
           BRIAN HUSSEY,                    )
6                  Plaintiff,              )
                                            )
7          v.                               )
                                            )
8          CITY OF CAMBRIDGE and            )
           BRANVILLE BARD,                  )
9          in his capacity as              )
           Commissioner of the             )
10         Cambridge Police Department,     )
                   Defendants.              )
11
</pre>

12    **DEPOSITION OF BRIAN HUSSEY,** a witness

13    called on behalf of the Defendants, pursuant to the

14    applicable provisions of the Massachusetts Rules of

15    Civil Procedure, before Margaret G. Oliver, a

16    Professional Shorthand Reporter and Notary Public in

17    and for the Commonwealth of Massachusetts, at the

18    offices of City of Cambridge Law Department, City

19    Hall, 795 Massachusetts Avenue, Cambridge,

20    Massachusetts, on Thursday, April 6, 2023,

21    commencing at 10:04 a.m.

22              ***COPLEY COURT REPORTING, INC.***
                   *The Mercantile Building*
23           *71 Commercial St., Suite 700*
                 *Boston, Massachusetts 02109*
24                  *Tel:  617.423.5841*

2

1    APPEARANCES:

2

3      LAW OFFICE OF BENJAMIN J. WEBER
       50 Federal Street
4      Suite 208
       Boston, Massachusetts 02110
5      BY:   Benjamin J. Weber, Esquire
             bweber@benweberlaw.com
6             617.202.6270
             Attorney for the Plaintiff

7

8      CITY OF CAMBRIDGE LAW DEPARTMENT
9      City Hall
       795 Massachusetts Avenue
10     Cambridge, Massachusetts 02139
       BY:   Kate M. Kleimola, Esquire
11            kkleimola@cambridgema.gov
              617.349.4121
12            Attorney for the Defendants

13

14

15

16

17

18

19

20

21

22

23

24

3

1                         I N D E X

2   Testimony of:                              Page

3   BRIAN HUSSEY

4    By MS. KLEIMOLA                              4

5

6

7                      E X H I B I T S

8   No.                  Description              Page

9   1           List of Facebook Friends          33

10  2           Final PSU Report                   35

11  3           Facebook Post                      47

12  4           Screen Shots of Text Messages      50

13  (Exhibits retained by Attorney Kleimola.)

14

15

16

17

18

19

20

21

22

23

24

4

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | BRIAN HUSSEY, a witness called for |
| 3 | examination by counsel for the Defendants, having |
| 4 | been satisfactorily identified by the production of |
| 5 | his driver's license, being first sworn by the |
| 6 | Notary Public, was examined and testified as |
| 7 | follows: |
| 8 | MS. KLEIMOLA:  I'm assuming stipulate that |
| 9 | all objections will be reserved, except as to form? |
| 10 | MR. WEBER:  Yes. |
| 11 | MS. KLEIMOLA:  Okay.  Do you want to review |
| 12 | and sign? |
| 13 | MR. WEBER:  Yes. |
| 14 | MS. KLEIMOLA:  All right.  Anything else |
| 15 | before we get started? |
| 16 | MR. WEBER:  No. |
| 17 | THE WITNESS:  No. |
| 18 | DIRECT EXAMINATION |
| 19 | BY MS. KLEIMOLA: |
| 20 | Q.  Can you introduce yourself for the record |
| 21 | and spell your last name. |
| 22 | A.  Brian Hussey, H-U-S-S-E-Y. |
| 23 | Q.  And at any time if you don't understand any |
| 24 | of the questions I ask you, if you can just please |

5

```
1    let me know.  And I'm happy to rephrase it.
2         A.   Okay.
3         Q.   Can you tell us your date of birth.
4         A.   February 3rd, 1976.
5         Q.   And where do you live?
6         A.   Peabody, Massachusetts.
7         Q.   Who do you live with?
8         A.   My wife, my two children, my dog.
9         Q.   What's your wife's name?
10        A.   Lindsay.
11        Q.   And how old is she?
12        A.   Thirty-nine.
13        Q.   And you said you have two children?
14        A.   Yes.
15        Q.   What are their names and ages?
16        A.   Declan is seven and Devin is two.
17        Q.   How long have you lived in Peabody?
18        A.   About 12 years.
19        Q.   Have you ever been deposed before?
20        A.   Yes.
21        Q.   How many times?
22        A.   Not many.  Maybe it's one or two.
23        Q.   And in what context were you deposed,
24   meaning were you being sued or were you suing
```

6

1    somebody else?

2        A.   No.  I was a witness to a -- it was a

3    lawsuit against the City.

4        Q.   Do you remember when that was?

5        A.   It was a few -- just a few years ago.

6    Maybe five years ago.

7        Q.   Were you a party to that suit?

8        A.   I was just a witness.

9        Q.   All right.  For that case was that the only

10   time you've been deposed before?

11       A.   The only one I can think of off the top of

12   my head.

13       Q.   Have you ever been sued before?

14       A.   Yes.

15       Q.   And was that in relation to your work as a

16   Cambridge police officer?

17       A.   Yes.

18       Q.   And when were you sued?

19       A.   I'm trying to guess.  It was probably 15 or

20   so years ago, maybe a little bit longer.

21       Q.   Was it just the one time, or has it been

22   more than one time that you --

23       A.   I believe it was just the once.

24       Q.   Do you recall who sued you, who the

```
 1   plaintiff was?

 2        A.   Max Strahan.

 3        Q.   Do you remember how it was resolved?

 4        A.   I believe it was settled with the City, I

 5   believe.

 6        Q.   And were you deposed as part of that

 7   lawsuit?

 8        A.   I don't think so.

 9        Q.   Are you today on any medications or drugs

10   that would affect your ability to testify truthfully

11   and accurately?

12        A.   No.

13        Q.   Did you prepare for today's deposition at

14   all?

15        A.   I did.

16        Q.   And other than any conversations that you

17   had with Counsel, how did you prepare?

18        A.   Just reviewed my -- my paperwork, my notes.

19        Q.   Do you know what paperwork and what notes

20   you reviewed?

21        A.   I reviewed the interrogatories that I

22   submitted.  And I reviewed my response to the

23   initial investigation, the -- the response that I

24   wrote for Professional Standards.
```

8

1     Q.   Your P650?

2     A.   Yes.

3     Q.   Okay.  Did you -- other than Counsel, did

4 you speak with anyone else in preparation for today?

5     A.   No.  I mean, just general speaking about

6 today with my wife and a couple of friends, but

7 nothing to prepare myself.

8     Q.   Were any of those conversations about what

9 your testimony would be?

10    A.   No.

11    Q.   Can you tell us about your education.

12    A.   I graduated from Cambridge Rindge and Latin

13 in 1993.  And I graduated from Suffolk University in

14 1997 with a bachelor of science degree.

15    Q.   And what was your bachelor of science in?

16    A.   Criminology and law.

17    Q.   Have you had any other either on-the-job

18 training or any other education since you've joined

19 the Cambridge Police Department?

20    A.   I've had extensive training with the

21 department.

22    Q.   When did you join -- first join the

23 Cambridge Police Department?

24    A.   I started the academy in June 1998.  And I

9

```
1   hit the streets around October I think, '98.
2       Q.   Before joining Cambridge Police Department,
3   did you hold any other full-time jobs?
4       A.   I worked for the Middlesex Sheriff's
5   Office.
6       Q.   In what capacity?
7       A.   I was a corrections officer.
8       Q.   And when did you work for the Middlesex
9   Sheriff's Office as a corrections officer?
10      A.   From '97 to '98.
11      Q.   When you joined the -- when you went to the
12  academy, which academy did you go to?
13      A.   Lowell.
14      Q.   And when did you graduate the academy?
15      A.   1998.
16      Q.   Did you immediately start working as a
17  Cambridge police officer after your graduation?
18      A.   I did.
19      Q.   And you said that you've had extensive
20  training while you've been a Cambridge police
21  officer.  Can you tell us what some of your training
22  has been.
23      A.   Legal training, laws, first aid, CPR.  I
24  was in the drug unit.  I had extensive drug
```

1    training, things of that nature.

2        Q.   When you were in the drug unit, what kind

3    of drug training did you receive?

4        A.   I was drug -- I was trained by the DEA and

5    many other institutions.  Drug investigations, drug

6    identification, drug packaging, distribution of

7    drugs, proper handling of informants, things of that

8    nature.

9        Q.   Did you receive any training on addiction?

10       A.   Yes.

11       Q.   Could you tell us about that training.

12       A.   It was just -- I don't know if it was

13   specifically addiction, but it was more the effects

14   of drugs on people.

15       Q.   Could you tell us when you had that

16   training.

17       A.   It was in the beginning when I first got in

18   the drug unit.  So that would have been 2009, right

19   around then.

20       Q.   When you first joined the Cambridge Police

21   Department in I think you said it was 1998, what was

22   your assignment?

23       A.   The first year I was on probation, so I

24   kind of bounced around a little bit.  I was in both

1   night and day traffic and night and day patrol.

2       Q.   And can you explain to us the different

3   geographic areas that Cambridge Police divides the

4   City into, how that works.

5       A.   For patrol purposes it's separated into the

6   five different sectors, one, two, three, four and

7   five.

8       Q.   And how does an officer get assigned to a

9   particular sector?

10      A.   It's based on seniority.  And it's your

11  choice of where you want to work.

12      Q.   How often are assignments made?

13      A.   I believe it's on a six-month basis.

14      Q.   So if you, say, got assigned to sector one,

15  you'd be assigned to that sector for six months?

16      A.   Yes.

17      Q.   And then depending on your seniority, you

18  get to pick what you want the next sector to be?

19      A.   Yes.

20      Q.   And what about the patrol shifts?  Can you

21  tell us what the patrol shifts are.

22      A.   For patrol they're seven a.m. to three

23  p.m., three p.m. to eleven p.m., and eleven p.m. to

24  seven a.m.

1      Q.   And have those shifts existed since you

2   joined in 1998?

3      A.   They were briefly a little different when I

4   started.  They were just -- the hours moved back one

5   hour.  They were four to 12, 12 to eight, eight to

6   four.  But shortly after I got on, they just changed

7   by one hour.  The times moved back one hour on the

8   shifts.

9      Q.   And have the five sectors remained the same

10   since you joined?

11      A.   Yes.

12      Q.   How many -- for a typical day shift during

13   the week, how many patrol officers are assigned to

14   each sector?  Is it always the same for every

15   sector, or does it vary by sectors?

16      A.   It varies.  Usually, more officers working

17   what we call the lower half of the City, which is

18   this side of Harvard Square, tend to be a few more

19   officers assigned to this area than the other half

20   of the City.

21      Q.   Do you -- how long did you work as a patrol

22   officer after you first joined the Cambridge Police

23   Department?

24      A.   About ten years.  A little over ten years.

1      Q.   And do you recall which sectors you worked

2   in in those ten years?

3      A.   I kind of bounced around between all of

4   them because I had little seniority at that time.

5   So I kind of bounced around a lot.  I'd say the

6   majority of the time though was spent on this side

7   of Harvard Square in sectors one, two and three

8   which are this side of Harvard Square.

9      Q.   So sectors one, two and three encompass all

10   of what you call lower Cambridge?

11      A.   Yes.

12      Q.   Did you work in any particular sector more

13   often in those ten years?

14      A.   I don't -- not that I can recall.

15      Q.   When you did have some seniority and you

16   were able to start getting the sector of your

17   choice, was there any particular sector that you

18   tried to get?

19      A.   I usually worked in sector two.

20      Q.   And what's sector two?

21      A.   It's kind of the area around Central

22   Square, Washington Elms, Newtowne Court up to the

23   high school, that area.

24      Q.   And why did you want to work in sector two?

       A.   It was a busy area.  I enjoyed keeping busy
at work.  And kind of the area -- I grew up in East
Cambridge, so it's kind of close to East Cambridge.
And I knew the area very well.

       Q.   You mentioned Washington Elms.  Can you
tell us what Washington Elms is.

       A.   It's a housing development bordered by
Harvard, Portland, Washington and Windsor Streets.

       Q.   Does Washington Elms housing development
still exist?

       A.   Yes.

       Q.   And what about Newtowne Court?  What is
that?

       A.   It's a housing development right next to
Washington Elms bordered by all the same streets,
except Harvard Street is bordered by Main Street on
the other side.

       Q.   And does Newtowne Court still exist?

       A.   Yes.

       Q.   You said that you worked in patrol for
about ten years.  What was your assignment after
patrol?

       A.   I was in the Special Investigations Unit.

       Q.   When did you join the Special

15

1    Investigations Unit?

2        A.   June 2009.

3        Q.   Did you have to -- was there an application

4    process, or did you have to do anything to join the

5    Special Investigations Unit?

6        A.   Yeah.   There is an application process.

7    Submit a resume, had an interview.

8        Q.   Who did you interview with?

9        A.   If I recall correctly, it was -- and I

10   don't know their ranks at the time.   It was Steve

11   DeMarco and Bobby Gray I believe were the two.

12       Q.   Did either one of them head up the SIU at

13   the time?

14       A.   At the time it was Gray.   Gray would have

15   been the sergeant at that time.   So it was Sergeant

16   Gray.

17       Q.   And what is the Special Investigations

18   Unit?

19       A.   It's a plainclothes unit.   Consisted of

20   about ten detectives, one sergeant.   Primarily

21   investigated drug and vice crimes.

22       Q.   When you were assigned to the Special

23   Investigations Unit, what was your rank?

24       A.   I was a patrol officer.

1      Q.   And so detective with the Cambridge police

2    is an assignment, not a rank?

3      A.   Correct.

4      Q.   You said "primarily drug and vice crimes."

5    Can you tell us what you mean by vice crimes.

6      A.   Prostitution, human trafficking.

7      Q.   Was there any -- would you say your time

8    was spent more with drug crimes, vice crimes, or was

9    it split equally?

10     A.   Drug crimes.

11     Q.   How much of your time would you say you

12   spent on drug crimes?

13     A.   A good portion of it.  I'd say probably 80

14   to 90 percent of it.

15     Q.   How long were you in the SIU?

16     A.   Ten years.

17     Q.   In those ten years how many drug crimes --

18   how many drug crime investigations do you think you

19   took part in?

20     A.   A couple hundred.

21     Q.   When you were conducting investigations,

22   did you ever have to speak with informants?

23     A.   Yes.

24     Q.   Did you sign up confidential informants to

 1    work with you?

 2        A.   Yes.

 3        Q.   And when I asked before about speaking with

 4    informants, other than the confidential informants

 5    that you signed up to work with you, did you speak

 6    with other people just in general about different

 7    investigations who were either witnesses or could

 8    provide some information about an investigation?

 9        A.   Yes.

10        Q.   When you worked with confidential

11    informants, how did you work with confidential

12    informants?

13        A.   I mean, can you be a little more specific

14    or --

15        Q.   Did you ever ask any confidential

16    informants to take any role in an investigation?

17        A.   Yes.

18        Q.   How did you -- how did confidential

19    informants take a role in investigation?

20        A.   It varied.  Sometimes they would just kind

21    of be our eyes and ears out on the street.  And

22    other times we would ask them to actually

23    participate in controlled purchases of drugs.

24        Q.   How many times do you think you had a

18

```
1    confidential informant participate in a controlled
2    purchase?
3         A.   Over a hundred.
4         Q.   And how many different confidential
5    informants do you think you used in controlled
6    purchases?
7         A.   Ten maybe.
8         Q.   The ten confidential informants that you
9    used for controlled purchases, what was the process
10   to have them become confidential informants?
11        A.   We would do a thorough background check on
12   them, run a criminal history on them.  They'd be
13   interviewed by myself and the sergeant in charge of
14   the unit.
15        Q.   Was it always Sergeant Gray for the ten
16   years that you were there?
17        A.   No.  It was Sergeant Cherubino took over
18   for the -- Sergeant Gray.
19        Q.   Do you recall when Sergeant Cherubino took
20   over for Sergeant Gray, then Sergeant Gray?
21        A.   I don't recall what year it was, no.
22        Q.   Before you got to the point where you were
23   running background checks and you were doing
24   interviews, did you approach the individual who
```

1    became a confidential informant, or did they

2    approach you to become a confidential informant?

3         A.   It worked both ways.

4         Q.   And the ten people that became confidential

5    -- about ten people that became confidential

6    informants for you, would you say it worked more one

7    way or the other?

8         A.   I probably recruited more informants than

9    approached me and wanted to be an informant.

10        Q.   How do you go about recruiting informants?

11        A.   It varied.  I mean, probably the most

12   common means that we used was we would have somebody

13   with a potential drug charge hanging over their

14   head, and we would offer them the opportunity to we

15   call it work off their case and become an informant

16   and in lieu of being charged with a crime or in

17   exchange for a lesser charge, things like that.

18        Q.   Did recruiting a confidential informant

19   require to get that person to trust you?

20        A.   Yes.

21        Q.   When you were investigating drug crimes

22   other than the confidential informants, did you have

23   a need to speak with drug users throughout the City

24   to investigate drug crimes?

20

```
 1      A.   Yes.
 2      Q.   And what percentage of your cases do you
 3 think you had to speak with drug users as part of
 4 the investigation?
 5      A.   I don't know if I could put a percentage
 6 number on it.  But, I mean, a lot of time was spent
 7 talking with users.
 8      Q.   Were there some people who were more
 9 willing to speak with you than other people?
10      A.   Yes.
11      Q.   And how did you get those people to be more
12 willing to speak with you?
13      A.   We just had to reassure them that, you
14 know, we were going to protect them, nothing would
15 happen to them, we would do whatever we could to
16 help them.  The main thing with the informants was
17 they were afraid they were going to get hurt or, you
18 know, their names were going to appear in a report.
19           And we just had to constantly reassure them
20 that, you know, their name would never appear
21 anywhere and, you know, they would never get hurt.
22 We would never put them in a position to be hurt.
23 We would do everything in our power to ensure their
24 safety.
```

1     Q.    So it sounds like you spent a lot of time

2  convincing the drug users that you spoke with to

3  trust you?

4     A.    Yes.

5     Q.    Have you -- other than drug and vice

6  crimes, have you investigated any other crimes as a

7  detective?

8     A.    No.

9     Q.    In vice investigations were they run the

10  same way as drug investigations, or were they

11  different?

12     A.    They vary differently a little bit, yeah.

13     Q.    Okay.  Is it fair to say that when you're

14  investigating drug crimes, you're mostly trying to

15  prevent future drug crimes rather than investigating

16  a past event?

17     A.    Yeah.  I'd say that's a fair statement.

18     Q.    And with vice crimes was it the same, or

19  were you more investigating past events like you

20  would if you were investigating a B&E or a robbery

21  of some sort?

22     A.    Vice was kind of -- kind of both I would

23  say.

24     Q.    Did you need informants like you did with

1    drug crimes to investigate vice crimes?

2        A.   No.

3        Q.   When you were investigating vice crimes,

4    did you have the same need to speak with or

5    interview drug users like you did with drug crimes?

6        A.   No.

7        Q.   You had said earlier that when you joined

8    SIU you had gotten quite a bit of training.  Did

9    that include how to write search warrants?

10       A.   Yes.

11       Q.   How to execute search warrants?

12       A.   Yes.

13       Q.   Did it include how to handle informants?

14       A.   Yes.

15       Q.   What about handling evidence?

16       A.   Yes.

17       Q.   Any other topics that we haven't discussed

18   already that you can think of that you got training

19   on while you were in the SIU?

20       A.   No.  I think that pretty much covered

21   everything.

22       Q.   You said that you were in the SIU for about

23   ten years.

24       A.   Hmm-hmm.

23

1       Q.   Why did you leave the SIU?

2       A.   I wasn't -- it wasn't my choice to leave.

3   I was told I was no longer in the drug unit.

4       Q.   Was that the same time that the Cambridge

5   Police disbanded SIU?

6       A.   It lived on for a short period of time

7   after I left.  But eventually, it was completely

8   disbanded.

9       Q.   Okay.  Do you know why you were reassigned

10  from the SIU?  Were you told why you were reassigned

11  from the SIU?

12      A.   I was told the unit was going in a

13  different direction.

14      Q.   Do you recall what year that was?

15      A.   2020.

16      Q.   Do you know how long the SIU existed for

17  after you left?

18      A.   I can't say for certain.  It was -- it was

19  months.  But I can't put a -- I'm not sure exactly

20  when the final detective was finally moved out of

21  there.

22      Q.   Were other detectives reassigned at the

23  same time you were?

24      A.   Yes.

24

1       Q.   Do you know how many of them were

2    reassigned at the same time you were?

3       A.   Two.

4       Q.   Do you remember who they were?

5       A.   Detective Christopher Borum, B-O-R-U-M, and

6    Detective Sergeant Louis Cherubino.

7       Q.   And is Detective Sergeant Cherubino's last

8    name C-H-E-R-U-B-I-N-O?

9       A.   Yes.

10      Q.   Did anyone take over for Detective Sergeant

11   Cherubino when he was reassigned?

12      A.   I think Lieutenant Gray kind of took over

13   the -- what remained of the unit.

14      Q.   And he had been in charge of the unit

15   before Sergeant Cherubino?

16      A.   Yes.

17      Q.   When you, Detective Borum and Sergeant

18   Cherubino got reassigned, do you remember how many

19   detectives were remaining in SIU?

20      A.   Five maybe.

21      Q.   And do you recall whether those five

22   remaining detectives got reassigned at the same

23   time, or did they get reassigned at different times?

24      A.   I think they were different times.

```
1       Q.   But the last detective got reassigned just
2   you think a few months after you got reassigned?
3       A.   I think it was -- yeah.  I can't put an
4   exact number on it, but I know it was at least a few
5   months.
6       Q.   Where did -- what was your assignment after
7   -- in 2020 after you left SIU?
8       A.   I went back to uniformed patrol.
9       Q.   Did you have enough seniority to be able to
10  bid on the sector you wanted?
11      A.   Yes.
12      Q.   And which sector did you bid on?
13      A.   Sector three I believe is where I went.
14      Q.   And what does sector three encompass, what
15  geographic area?
16      A.   We call it the coast.  It's basically from
17  Mass. Ave. from Harvard Square down to the river,
18  everything in that area.
19      Q.   And I meant to ask before.  Do you also bid
20  on which shift you work, or is it just sectors?
21      A.   Both.
22      Q.   Okay.  And taking your first ten years, did
23  you work any particular shift more than others?
24      A.   My first ten years I was strictly on the
```

26

1    alternating shifts.  I mean, I worked overnights and

2    early nights.

3        Q.   And how does the alternating shift work?

4        A.   Your first shift you go in, you work

5    eleven p.m. to seven a.m.  Then you're off for the

6    next eight hours.  Then you go back in three p.m. to

7    eleven p.m.  You get the break in the middle.  And

8    you do that again, eleven to seven, three to eleven,

9    and then you're off for two days.

10       Q.   And in 2020 when you went back to patrol,

11   what shift did you work?

12       A.   Days.

13       Q.   And how long did you work in sector three

14   on days?

15       A.   It was about a year or so probably.

16       Q.   And do you recall what changed after that

17   year, whether it was the shift or the sector?

18       A.   I went to night patrol.

19       Q.   In the same sector?

20       A.   Night patrol?  Sorry.  Did it again.  Night

21   patrol I worked a car that handled everything on

22   this side of Harvard Square.  So I basically covered

23   sectors one, two and three.

24       Q.   Were you assigned to a car with another

1   officer, or were you in an R car?

2       A.   I was by myself.  It was called an alpha

3   car which just covered the whole lower half of the

4   City.

5       Q.   Can you explain what an alpha car is.

6       A.   It's just a one officer car.  And you're

7   basically on just regular patrol.  And you're

8   essentially a -- it's the supplement to the other

9   units that are out there.  We don't really get

10  dispatched to many calls unless other units are tied

11  up.  We pretty much have free roam of the whole end

12  of the City to do what we want to do.

13      Q.   Is there an alpha car on every shift?

14      A.   No.

15      Q.   Is it any particular shifts, or is it

16  assigned specially?

17      A.   It's specifically for the -- it's called

18  the fourth platoon which is the night patrol unit

19  that works four p.m. to midnight.

20      Q.   And are most other patrol cars have one

21  officer or two officers assigned?

22      A.   It's kind of split up.  We have both two

23  officer cars and single officer cars.

24      Q.   Are all single officer cars R cars?

28

 1      A.   Yes.

 2      Q.   Other than the alpha?

 3      A.   Yes.

 4      Q.   And does R car stand for the report car?

 5      A.   Yes.

 6      Q.   And does that officer -- is that officer

 7 generally responsible for writing a report if they

 8 get dispatched to an incident?

 9      A.   Yes.

10      Q.   How long did you work the night shift?

11      A.   Probably about a year as well.  It was

12 until the end of August of 2022.

13      Q.   Since you left SIU in 2020, have you worked

14 details or overtime?

15      A.   Mainly overtime, but sprinkle in a few

16 details here and there.

17      Q.   And why mainly overtime?

18      A.   My overtime rate is higher than the detail

19 rate, so I get paid more.  Plus, I just prefer to

20 work a patrol shift rather than stand in the middle

21 of the street flapping my arms on a detail.

22      Q.   How often -- on average, how often a week

23 did you work an overtime shift?

24      A.   It kind of varied.  I mean, some weeks I

 1    would do five and some weeks maybe none or one.

 2         Q.   And on the weeks you did five, were those

 3    weeks that you weren't working otherwise, or did you

 4    work them in addition to your regular scheduled

 5    shifts?

 6         A.   Both.  If there was a vacation week or a

 7    week that I was off, I would work.  But there were

 8    many times that I would work doubles.

 9         Q.   And with Cambridge Police how does someone

10    get an overtime shift?

11         A.   It's based on the availability of the shift

12    and, you know, if we're short staffed.  And then it

13    goes -- there's a whole process between, you know,

14    which groups are working, which groups are off.  And

15    then we have a list.  And it goes alphabetically

16    through that list of where you are in each

17    particular group.  So --

18         Q.   So it's not by seniority?

19         A.   No.

20         Q.   When you were working overtime did you work

21    in any particular sector or on any particular shift

22    for overtime shifts?

23         A.   It was mainly the day shift I would do

24    overtime because my shift was four to 12.  So I

 1    would say most of my overtime was on the day shift

 2    before coming in to work my night shift.  You know,

 3    if it was a day off or something like that, I could

 4    work.  I'd basically work any time I could get it.

 5        Q.   In any particular sector that you did

 6    overtime shifts?

 7        A.   I would just take whatever was available.

 8        Q.   And did you stay assigned to sector three

 9    from when you left SIU in 2020 until you were

10    promoted in either August or September of 2022?

11        A.   When I was on days for that I think it was

12    like about a year or so, I was primarily sector

13    three.  And then when I went to nights, I went to

14    the alpha car which is --

15        Q.   Oh, right.  I apologize.  You did say that.

16             When did you get promoted to sergeant?

17        A.   August 2022.

18        Q.   And in August of 2022 what shift did you

19    work once you got promoted?

20        A.   Once I got promoted I went to the

21    alternating shift.

22        Q.   Did the sectors work the same for sergeants

23    as they did for patrol officers?

24        A.   No.

1      Q.   How does it work for sergeants?

2      A.   There are regularly four -- well, there are

3   four sergeant spots on -- in patrol.  They're not

4   always filled.  But some -- some of the sergeant

5   sectors encompass multiple patrol sectors.  So there

6   might -- so car 17 is one of the sergeants down this

7   end of the City.  And sectors one and two might call

8   under car 17.

9           It also depends how many sergeants are

10  working.  If there are two sergeants working, one

11  has the entire east end of the City.  One has the

12  entire north end of the City.  If there are four

13  sergeants working, it kind of gets split up a little

14  bit smaller.

15     Q.   So your particular assignment could change

16  from shift to shift?

17     A.   Yes.

18     Q.   Since you've become a sergeant, have you

19  worked in any particular area of the City, or does

20  it really just depend on shift by shift?

21     A.   It's kind of shift by shift.

22     Q.   Okay.  Have you continued to work overtime

23  since you've become a sergeant?

24     A.   Yes.

32

1    Q.   And how often on average would you say you

2  work overtime?

3    A.   I try to get in two or three overtime

4  shifts a week.

5    Q.   As a sergeant can you work overtime shifts

6  only as a sergeant, or can you take patrol officer

7  shifts?

8    A.   You can take patrol officer shifts.

9    Q.   And when you work overtime since you've

10  become a sergeant, what kind of overtime have you

11  been working?

12    A.   A lot of it's been on the day shift.  And

13  it's kind of been throughout the City.

14    Q.   And has it been as a patrol officer more

15  often or as a sergeant more often?

16    A.   It's more often as a patrol shift.

17    Q.   I want to talk to you about Facebook.  Do

18  you know what Facebook is?

19    A.   It's a social media platform I believe is

20  the term they use for it.

21    Q.   And do you have a Facebook profile?

22    A.   I do.

23    Q.   How long have you had your Facebook

24  profile?

1      A.   Boy.  I'd say over 15 years.

2      Q.   And what are your privacy settings on

3   Facebook?

4      A.   I try to do my best to keep them as private

5   as I can.  I don't know all the little tweaks and

6   things you can do to it to keep it as -- but I try

7   to keep everything as private as I can.

8      Q.   Have you always tried to keep everything as

9   private as you can, or has that changed?

10      A.   I think I've always tried to keep it that

11   way.

12      Q.   Do you know how many friends you have on

13   Facebook?

14      A.   It's somewhere over 600.

15      Q.   And you were asked in discovery to provide

16   a list of your friends?

17      A.   Yes.

18      Q.   I'm going to show you --

19          MS. KLEIMOLA:  If I could have this marked

20   as Exhibit 1.

21          (List of Facebook Friends marked as Exhibit

22          No. 1.)

23      Q.   You can take the one that was just marked.

24   This has the Bates numbers 12, 13, 14, 15, 16, 17

34

```
1    and 18 from your discovery response.
2         A.   Hmm-hmm.
3         Q.   Is this a list of your Facebook friends?
4         A.   Yes.
5         Q.   Are these all of your Facebook friends?
6         A.   Yes.
7         Q.   And you said you have over 600 Facebook
8    friends?
9         A.   Yes.
10        Q.   There are only 535 friends who are listed
11   here.  Do you know why there are some that are
12   missing?
13        A.   I do not.
14        Q.   You were also asked if you had deleted any
15   friends since your post on February 25th of 2021.
16        A.   Yes.
17        Q.   And you answered that you did not remember
18   deleting any friends; is that correct?
19        A.   Yes.
20        Q.   Is it that you don't remember whether or
21   not you deleted friends, or if you did delete
22   friends and you don't remember who they are?
23        A.   I don't know whether or not I deleted any.
24        Q.   Okay.  Do you recall being interviewed by
```

1    Professional Standards Unit April 1st of 2021?

2         A.   Yes.

3         Q.   And were you interviewed in regard to your

4    Facebook post from February 25th of 2021?

5         A.   Yes.

6         Q.   Were you asked in that interview how many

7    friends you had?

8         A.   I don't recall.

9         Q.   I'm going to show you --

10             MS. KLEIMOLA:  First of all, I'll have this

11   marked, the final PSU report from that

12   investigation.

13             (Final PSU Report marked as Exhibit No. 2.)

14        Q.   And if I could ask you to turn to page --

15   at the top it's page 6 of 11.  If you look at the

16   Bates stamps at the bottom of the page, it's six.

17             (Witness complies.)

18        A.   Yeah.

19        Q.   And if you see the paragraph -- it's the

20   third full paragraph down -- it starts with "He

21   estimated he has approximately 674 friends on

22   Facebook."

23        A.   Yes.

24        Q.   Do you recall being asked about that?

1        A.    I do not.

2        Q.    Okay.  Do you recall telling PSU that you

3   had approximately 674 friends?

4        A.    No.

5        Q.    Do you know why there's a disparity between

6   you said today that you had over 600 friends and the

7   friends that were listed in Exhibit 1?

8        A.    Well, there's a -- about a two-year

9   difference.  So I -- I mean, other people could have

10  deleted me as a friend.  When I compiled this list

11  on my Facebook home page, it lists friends.  And it

12  says "Friends" - I think 663 is the number?

13       Q.    74.  674.

14       A.    On this one.

15             (Indicates.)

16       Q.    535.

17       A.    Right.  But the one that I said was over

18  600.  So that's the number that shows.  It says

19  "Friends."  And in parentheses it says whatever the

20  number is, 600 and whatever friends.

21             So that's why I estimated 600 as the

22  number.  And this is -- I went through everybody on

23  the list, and this is what it came up with.  I don't

24  know where the discrepancies are.  I don't know how

1   Facebook calculates the numbers.

2       Q.   How did you generate Exhibit 1?

3       A.   I clicked on my friends list, and I

4   scrolled through everybody and wrote -- typed out

5   everybody's name.

6       Q.   So you didn't download anything.  You typed

7   out --

8       A.   I typed this out myself.

9       Q.   Okay.  Could you have missed some friends

10  when you were typing everything out?

11      A.   I don't think I would have missed that

12  many, no.  I don't -- I don't want to speculate, so

13  I won't say what I think.  Maybe -- I mean, some --

14  there are some people that have inactive pages.  I

15  don't know if those register as friends in the line

16  where it says how many friends you have.

17          And then they don't show in the full list.

18  I don't know if maybe that could be it.  But when I

19  click on my friends, these are all the names that

20  came up that I typed up.

21      Q.   Did you leave anyone off deliberately?

22      A.   No.

23      Q.   Do you identify yourself as a Cambridge

24  police officer anywhere on your Facebook profile?

```
 1        A.   No.

 2        Q.   How many of your friends are from the

 3   Cambridge Police Department?

 4        A.   I honestly can't put a number on it.  But I

 5   do have a lot of friends from the department.

 6        Q.   How many of your friends know that you're a

 7   Cambridge police officer?

 8        A.   I would say a very good portion of them.

 9        Q.   Do you accept friend requests from people

10   you don't know personally?

11        A.   No.

12        Q.   Could you mark -- and I can give you my

13   pen, it's in black -- on Exhibit 1 how many of those

14   friends listed are with the Cambridge Police

15   Department.

16        A.   Just on the page 1 or through the whole

17   thing?

18        Q.   Through the whole thing.

19             MS. KLEIMOLA:  And I can scan copies and

20   get you a copy.

21             MR. WEBER:  Do you not know who's in the

22   Cambridge Police Department?

23             MS. KLEIMOLA:  Well, not everyone uses

24   their real name as their profile name of Facebook.
```

```
 1       A.   Do you want active officers or just retired

 2  officers, too, or --

 3       Q.   Everyone, retired or active.

 4       A.   Okay.

 5            (Witness complies.)

 6            (Pause.)

 7       Q.   So you just marked everyone who is either a

 8  retired or active Cambridge police officer with a

 9  check mark next to their name; is that correct?

10       A.   Yes.

11       Q.   And if you could also mark with an X beside

12  anyone's name who does not know or may not know that

13  you're a Cambridge police officer.

14            (Witness complies.)

15            (Pause.)

16            Thank you.  Now that you've gone through

17  that list a couple of times, can you confirm that

18  you know everyone that you're Facebook friends with

19  in real life or personally?

20       A.   No.  Some of them I don't know in real

21  life.  Well -- yeah.  Some of them I don't know

22  personally in real life.

23       Q.   How many would you say that is?

24       A.   Just a handful.  Most of them are
```

1    musicians.

2        Q.   Okay.  So you know who they are, but you

3    have not met them in real life?

4        A.   A couple of them I've met.  Some of them I

5    haven't.

6        Q.   Okay.  And do you know Ken Reeves, the

7    former mayor?

8        A.   Not personally.  I know who he is.

9        Q.   You know who he is?

10       A.   Yes.

11       Q.   Are you Facebook friends with him?

12       A.   No.

13       Q.   Is it fair to say that you have either

14   lived in or worked in Cambridge for most, if not

15   your entire, adult life?

16       A.   Yes.

17       Q.   Turning to February 25th of 2021, the day

18   you posted about George Floyd on Facebook, do you

19   remember that day?

20       A.   Yes.

21       Q.   Do you remember what you did that day?

22       A.   Yes.

23       Q.   Can you tell us what you did that day.

24       A.   Got up that morning.  I specifically --

 1    don't remember specifically like the first few

 2    things of the day.  But I know I went in, was on my

 3    phone, read something on Facebook, made a post about

 4    it.  And then a short time later we took my children

 5    to the Aquarium.

 6         Q.   Both children?

 7         A.   My wife and I took my our children to the

 8    Aquarium.

 9         Q.   It was both children?

10         A.   Yes.

11         Q.   And so were you working that day?

12         A.   I was not officially on duty in uniform.  I

13    was on a training day.

14         Q.   And did you do -- was the training

15    somewhere in person?  Did you have to go to the

16    training?  Was it something online?  How did that

17    training work?

18         A.   No.  This was -- when COVID started, we

19    started doing our trainings online.  So the

20    department would give us a couple of days off in

21    order to do our trainings.  My trainings were done

22    ahead of time, which we were allowed to do.

23              And so by February 25th, my trainings had

24    already been done.  So I was -- I had already

42

1    completed my obligations of training, so I was --

2        Q.   So they weren't live.  They were something

3    you could do ahead of time?

4        A.   Right.  They were online.

5        Q.   But on the 25th you were still paid as an

6    employee.  It's wasn't a day off or paid time off?

7        A.   Correct.

8        Q.   Okay.  Were you at home when you were on

9    Facebook?

10       A.   Yes.

11       Q.   Was it -- did you have a department-issued

12   phone at that point in time?

13       A.   No.

14       Q.   Was it on your personal phone?

15       A.   Yes.

16       Q.   And looking at Exhibit 2 that's still right

17   in front of you, on the first page there's an

18   embedded image.  Is that an accurate screen shot of

19   what you posted on Facebook that morning?

20       A.   Yes.

21       Q.   When did you delete the post?

22       A.   It was a couple hours later.

23       Q.   Were you at the Aquarium at that point, or

24   were you still home?

43

1        A.   I don't think I was home.  I think we were

2    either at the Aquarium or en route to the Aquarium.

3        Q.   Do you remember how you got to the

4    Aquarium?

5        A.   I drove.

6        Q.   And you personally drove?  Your wife didn't

7    drive and you were in the passenger seat?

8        A.   No.  I drove.

9        Q.   Okay.  And did you park at the Aquarium, or

10   did you park somewhere else and take public

11   transportation in?

12       A.   We parked at a garage close to the

13   Aquarium.

14       Q.   Do you remember what time you went to the

15   Aquarium?

16       A.   Not exactly.  It was late morning I think.

17   Right around eleven maybe.

18       Q.   Do you recall how long you spent there?

19       A.   I do not, no.

20       Q.   How old were your children at the time?

21       A.   My daughter was seven months old and my son

22   was five.

23       Q.   He was five at the time, or is he five now?

24       A.   He's seven now.

1    Q.   Okay.

2    A.   He was five.

3    Q.   Okay.  Did you have to have a stroller?

4    A.   For my daughter I believe we did.

5    Q.   Was it school vacation week?

6    A.   I'm not positive.

7    Q.   Was it crowded?

8    A.   I do seem to remember it being very crowded

9 with kids all over the place.  So it may very well

10 have been school vacation week.

11   Q.   Do you recall whether it was a weekday or a

12 weekend?

13   A.   I don't recall what day of the week it was.

14   Q.   Okay.  And you think you deleted the post

15 either while you were driving to the Aquarium or

16 while you were at the Aquarium?

17   A.   It wouldn't have been while I was driving.

18 It would have been after we parked walking to the

19 Aquarium or shortly after getting there.

20   Q.   When you were in the Aquarium?

21   A.   Yes.

22   Q.   Okay.  Why did you delete the post?

23   A.   It just didn't generate much conversation

24 at the time.  And I just deleted it.

1      Q.   When you say "it didn't generate much

2  conversation at the time," what -- what would

3  generate -- what would you consider to be a lot of

4  conversation?

5      A.   People commenting on it.

6      Q.   And you think it was just a couple hours

7  after you had posted it that you took it down?

8      A.   Yes.

9      Q.   If you look back at Exhibit 2 that's in

10  front of you, that screen shot that's embedded on

11  page 1, do you see that that screen shot was taken

12  52 minutes after you made the post?

13      A.   Yes.

14      Q.   And do you see that there are two comments

15  that were made within those 52 minutes?

16      A.   Yes.

17      Q.   Do you know how many comments there were

18  when you deleted it?

19      A.   I do not.

20      Q.   Did you read these at least two comments

21  that were made within those 52 minutes?

22      A.   I'm sure that I did.  I don't recall what

23  they were, but I'm sure that I did.

24      Q.   Do you remember who posted them?

1      A.   No.

2      Q.   Do you remember generally what they were

3 about, if not the exact wording of the post -- of

4 the comments?

5      A.   No.  I do not.

6      Q.   Have you deleted other posts within a few

7 hours of putting them up?

8      A.   Yes.

9      Q.   And why do you delete posts a few hours

10 after putting them up?

11     A.   Same reason.  Either they don't generate

12 much conversation, or they're no longer relevant.

13     Q.   And the posts that you don't delete because

14 they do generate a lot of conversation, how many

15 comments do you get in the first couple of hours of

16 those posts?

17     A.   I can't put a specific number on it.  But,

18 I mean, enough that I would probably engage myself

19 in the conversation and, you know, have back and

20 forth talk with somebody.

21     Q.   Did you reply to any of the comments on

22 this post --

23     A.   No.

24     Q.   -- the February 25th post?

```
1        A.    No.

2        Q.    And this post, the February 25th post, the

3   only reason you deleted that was because it didn't

4   generate a lot of conversation?

5        A.    Yes.

6        Q.    I'm going to show you another Facebook

7   post.

8             MS. KLEIMOLA:  If I could mark this as I

9   think Exhibit 3.

10            (Facebook Post marked as Exhibit No. 3.)

11       Q.    If you can take a look at Exhibit 3.  Have

12  you seen this before?

13       A.    Yes.

14       Q.    And were you asked about this post during

15  your April 1st, 2021, PSU interview?

16       A.    I think I was.

17       Q.    Can you tell me where -- when you posted

18  this?

19       A.    I don't recall.

20       Q.    Can you tell me what it's about?

21       A.    It's a music video.

22       Q.    And what is "I think the Facebook police

23  nabbed me, dot, dot, dot, again" referring to?

24       A.    Usually when Facebook -- when comments are
```

1    posted on Facebook that are -- excuse me -- that

2    Facebook deems offensive or inappropriate or vulgar,

3    things like that, I think Facebook takes it upon

4    themselves to delete the post itself.

5         Q.   Were you referring to your February 25th,

6    2021, post with this second post in Exhibit 3?

7         A.   I think I was, yes.

8         Q.   Okay.  And but your February 25th post had

9    not been taken down by Facebook, correct?

10        A.   Correct.  I took it down myself.

11        Q.   So what did you mean by this second post?

12        A.   I think I was just joking, being sarcastic.

13        Q.   Did you post this before or after you were

14   placed on administrative leave?

15        A.   I don't recall.

16        Q.   When you were talking about the Facebook

17   police, were you referring to the Cambridge Police

18   Department?

19        A.   No.

20        Q.   And do you recall being asked about this

21   post in that April 1st, 2021, interview?

22        A.   I believe I was, yes.

23        Q.   Okay.  In your discovery responses that you

24   provided you were asked who at the City of Cambridge

1    you believed had violated your rights.  And you

2    named former City Manager Louis DePasquale; is that

3    correct?

4         A.   I believe so, yes.

5         Q.   Can you tell me why you believe that former

6    manager Louis DePasquale violated any of your

7    rights?

8              MR. WEBER:  Objection to the form.

9         A.   Can you repeat the question.

10        Q.   Can you tell me how you believe former City

11   Manager Louis DePasquale violated any of your

12   rights?

13             MR. WEBER:  Repeat the same objection.

14        A.   I felt that the punishment that I received,

15   both the administrative leave as well as the

16   subsequent suspension for my Facebook post, was

17   infringing upon my First Amendment rights.

18             And Mr. DePasquale was the City Manager at

19   the time.  He was the appointing authority of the

20   City.  And therefore, I felt he had a hand in

21   handing down my discipline.

22        Q.   Do you know whether your union grieved your

23   four-day suspension?

24        A.   Yes.

50

1      Q.   And did they?

2      A.   Yes.

3      Q.   Do you know -- has that process been

4   completed, or is it still pending?

5      A.   I believe it's still pending.

6      Q.   Do you know where it is in the process?

7      A.   I don't.  I know I had a hearing here.  But

8   I haven't heard anything, no, since.

9      Q.   Do you recall when that hearing was?

10      A.   It was several months ago.

11      Q.   And there's been no decision from anyone

12   yet?

13      A.   Not that I've been made aware of.

14      Q.   Okay.  Just give me one moment.

15           (Pause.)

16           In your discovery responses you also

17   provided a number of screen shots of text messages.

18   And I'm going to give you --

19           MS. KLEIMOLA:  First, I'll have marked the

20   entire bundle as Exhibit 4.

21           (Screen Shots of Text Messages marked as

22           Exhibit No. 4.)

23      Q.   And if you can take a look at Exhibit 4,

24   can you tell me in referring to the Bates numbers at

1    the bottom of the page -- so it starts with 19.

2        A.   Yes.

3        Q.   Can you tell me if pages 19, 20 and 21 if

4    those texts are with the same person or whether they

5    are with different people?

6        A.   Like the first three pages?

7        Q.   Yes.

8        A.   Those are -- I know for certain that one

9    and two are different people.  I'm not sure about

10   two and three.

11       Q.   Okay.  Can you tell us who on page -- the

12   second page, so Bates number 20 at the bottom, who

13   that was with?

14       A.   The -- which part?  The whole --

15       Q.   Oh.  So I was assuming that the entire page

16   was a conversation with the same person.  Are there

17   separate conversations on this page?

18       A.   I would say -- well, the -- there was at

19   least two separate ones.  I'm not sure if -- the

20   bottom three from "You have your beautiful family"

21   down to "Remember who matters," that's definitely

22   from the same person.  I'm not sure if that "back

23   from Florida" part is part of the bottom three or

24   not.

52

1       Q.   Okay.  So why don't we take the first one

2  first, the "Hey brother."

3       A.   Yes.

4       Q.   Who is that from?

5       A.   I'm not sure.

6       Q.   Do you know if you replied to it?

7       A.   I don't know.

8       Q.   Do you know who the "back from Florida"

9  text is from?

10       A.   I believe that was Officer Chris Borum.

11       Q.   Do you know if you replied to it?

12       A.   I don't know.

13       Q.   And the three at the bottom starting with

14  "You have your beautiful family," do you know who

15  those three text messages were from?

16       A.   Sergeant Halloran.

17       Q.   And do you know if you replied to those

18  text messages?

19       A.   I mean, I'm sure I replied to all of them.

20  I just don't know what my actual reply was.

21       Q.   Do you know if you replied to these text

22  messages on the same subject as in a reply to these

23  messages, or just you replied to the person?

24       A.   To the best of my recollection, my replies

53

1    were pretty much all along the same lines, like

2    thank you.  Basically, thank you.  I didn't really

3    get into much of a conversation with them.

4        Q.   Okay.  So turning to the next page that has

5    21 at the bottom, do you know are these text

6    messages from the same person, or are these from two

7    different people?

8        A.   I'm not sure.

9        Q.   Do you know who either one of these text

10   messages is from?

11       A.   I'm not sure.

12       Q.   Do you know if you replied to either one of

13   these text messages?

14       A.   Again, I'm sure that I probably did, just

15   not specifically what I said.

16       Q.   Turning to page 22 going on to 23, is this

17   chain of text messages on these two pages from the

18   same person, or are these from different people?

19       A.   It's the same person.

20       Q.   On both pages?

21       A.   Yes.

22       Q.   Do you know who they're from?

23       A.   Sergeant Matt Mahoney.

24       Q.   And did you reply to any of them?

54

1      A.   Again, I'm sure that I did.  But again,

2   basically along the same lines.  Thank you.

3      Q.   And going to page 24 at the bottom and then

4   onto page 25 where there's a line in the middle of

5   the page on page 25, so taking the text messages

6   that start on 24 and go to the line on 25, are those

7   from the same person or from different people?

8      A.   Different people.

9      Q.   And who is the first text message from on

10  page 24?

11     A.   Officer Dave Maldonado.

12     Q.   And the second text message on the same

13  page?

14     A.   I believe that was Detective Collazo.

15     Q.   And the bottom text message on the same

16  page?

17     A.   I don't know who that was from.

18     Q.   And going onto page 25, can you tell us who

19  the text messages above that line in the middle of

20  the page, who those text messages are from?

21     A.   I don't recall who those are from.

22     Q.   Are they from the same person or different

23  people?

24     A.   I think those are from the same person.

1      Q.   Okay.  And it looks like you replied to one

2   of those after "such bullshit," it looks like your

3   reply got cut off?

4      A.   Yeah.

5      Q.   Where there's that blue bubble?

6      A.   Yeah.

7      Q.   Can you tell us what your reply was?

8      A.   I don't recall.

9      Q.   And the bottom text message on that page

10  below the line, can you tell us who that is from?

11     A.   I cannot.

12     Q.   Are they from the same -- is that text

13  message from the same person that sent the text

14  messages on the next page, page 26?

15     A.   I don't believe so.

16     Q.   And the text messages on page 26, are those

17  three text messages from the same person or from

18  different people?

19     A.   I am not sure if they're from different

20  people or the same.

21     Q.   Do you know who any of the -- who sent any

22  of them?

23     A.   The one that starts with "Hey bud" was

24  retired Officer Jack Crowley.

56

1       Q.   C-R-O-W-L-E-Y?

2       A.   Yes.

3       Q.   So you believe that Officer Crowley sent

4  the first message.  Do you know whether he sent any

5  of the other two?  Either of the other two?

6       A.   I'm not sure.

7       Q.   Do you know who sent either of the other

8  two?

9       A.   No.

10       Q.   Do you know if you responded to any of the

11  text messages on page 26?

12       A.   I can't say for certain.  But again, if I

13  did, it was probably just a thank you, something

14  along those lines.

15       Q.   Turning to page 27 there are one -- five

16  text messages that you received and one text message

17  that you sent.  The top four text messages that you

18  received, do you know if the same person sent them

19  or if it was from different people?

20       A.   Different people.

21       Q.   And who sent the top text message?

22       A.   I believe that was Officer Darviris.

23       Q.   Can you spell that last name?

24       A.   Oh, boy.  D-A-R-V-I-R-I-S.

57

1     Q.   Did you reply to that text message?

2     A.   Again, I'm sure that I did.  Same lines.

3  Thank you.

4     Q.   The next three text messages, were those

5  sent from the same person or from different people?

6     A.   I'm not positive.  I think they were from

7  the same person.

8     Q.   Do you remember who that person is?

9     A.   No.

10     Q.   And there is one of your responses

11  included, "Angry but good."  Do you know if you

12  replied any other way other than that?

13     A.   Not that I recall.

14     Q.   And the text message that you received

15  that's listed after your reply, "Angry but good,"

16  "We're here for you classmate," do you remember if

17  that was from the same person who sent the other

18  three text messages on this page, or was it a

19  different person?

20     A.   I think it was the same.

21     Q.   On page 28 do you recall who sent you this

22  text message?

23     A.   I do not.

24     Q.   Do you know if you responded?

```
 1       A.   I'm not certain.
 2       Q.   On page -- pages 29 through 32, are all of
 3  these text messages to and from the same person or
 4  different people?
 5       A.   Sorry.   Twenty-nine through --
 6       Q.   Through the end, so through 32.
 7       A.   I believe those are all from the same
 8  person.
 9       Q.   And who was that?
10       A.   Officer Christopher Sullivan.
11       Q.   Was he the union vice president at the
12  time?
13       A.   Yes.
14       Q.   And were these sent to him in his role as
15  union vice president?
16       A.   Yes.
17       Q.   Thank you.   In discovery you provided some
18  medical records.   Are you ███████████████████████████
19  ████████████
20       A.   Yes.
21       Q.   And what's the name ████████████████████████?
22       A.   ███████████████  ████████████
23  ██████████████████████████.
24       Q.   How long have you ██████████████████████████
```



1   ████████████

2   A.   ████████████████████████

3   ██████████████████████████

4   █████████████████████

5   ████████████████████  █

6   ██████████████████████████

7   ████

8   █  ████  ███████████  ██████

9   ████████████

10  █  ███

11  █  █████████████

12  █  █████████████  ██

13  ████████████████

14  █  ███  ██████████████

15  ████████████████████████████

16  ███████████████████

17  █  █████████████

18  █  ████████████████████

19  ████████████

20  █  ██

21  Q.   Was it -- do you know if it was work

22  related?

23  A.   I can't say for certain.

24  Q.   ████████████████████████





1    Q.  ███████████████████████████████

2    █████████████████████████████

3    ██  ██████  ███████████████████████

4    █████████████████████████████████  ███

5    ██████████████████████████████████

6    █████████████████████████  ██████████████

7    █████████████████████████████████

8    ██  ████████

9    ██  █████████████

10    Q.  Do you recall sometime in July of 2022 when

11   you were working a patrol shift in Central Square

12   seeing Commissioner Elow while you were working?

13    A.  Yes.

14    Q.  Was that once that you saw her or more than

15   once?

16    A.  I'm sure I probably saw her on a couple of

17   occasions.

18    Q.  Do you recall having a conversation with

19   her?

20    A.  I do.

21    Q.  Was that once or more than once?

22    A.  I think it was just once in Central Square.

23    Q.  Do you recall the date?

24    A.  July -- I think it was the 12th.  I'm not

```
1    positive.

2         Q.   Do you recall what the conversation was?

3         A.   I do.

4         Q.   What was the conversation?

5         A.   She had approached me in the square.  At

6    that time there was a lot of recent violence in the

7    square.  I think there had been a couple of

8    stabbings and just an overall increase in crime in

9    the square.

10            She had walked over to me and kind of asked

11   me my opinion on what I thought about what was going

12   on and, you know, my thoughts on what I could do to

13   kind of help curtail the crime and the violence.

14   And I gave her some suggestions of what I would do

15   if, you know -- that was the general gist of the

16   conversation.

17        Q.   Was there any other topics other than

18   violence in Central Square and what you would do?

19        A.   Yes.  She told me that I was going to be

20   promoted.

21        Q.   Do you remember how she phrased it?

22        A.   She said, I just want you to know that I'm

23   going to promote you.

24        Q.   Do you remember what -- if that was in
```

63

```
1   response to anything or if she changed the topic
2   completely and said that?
3       A.   I think she just -- she just initiated that
4   conversation.
5       Q.   Did you respond at all?
6       A.   I did.
7       Q.   And what did you say?
8       A.   I asked her if it was going to be off of
9   the current list that we currently had or it was
10  going to be off -- it would have to be something in
11  the future.
12      Q.   And what -- did she answer that?
13      A.   She said it was going to be off the current
14  list.
15      Q.   So this was in July of 2022.  Do you know
16  -- do you remember when the list that was current
17  then expired?
18      A.   I believe it was August, the end of
19  August 2022.  So the following month.
20      Q.   Any other -- do you remember any other part
21  of that conversation about the promotion?
22      A.   She said something to the effect of, you
23  know, we just had to get through a few things with
24  POST.  And she made some reference like to old
```

64

1   school policing versus new school policing and

2   things like that.

3       Q.   When she referenced POST, do you know what

4   she was referring to?

5       A.   She just mentioned POST.  I didn't know if

6   she was talking about any specific investigations or

7   anything.  She just said POST.

8       Q.   And is POST the Peace Officer Standards and

9   Training Commission?

10      A.   Yes.

11      Q.   Did you have to be recertified by the POST

12  Commission in 2022?

13      A.   Yes.

14      Q.   Do you remember when that was?

15      A.   I don't.

16      Q.   And you said she also said something about

17  old school policing and new school policing.  Do you

18  remember any more of what she said about that?

19      A.   No.

20      Q.   Do you remember anything else that you

21  said?

22      A.   Specifically about the promotion or just in

23  general?

24      Q.   Or about the old school policing versus new

65

1    school or about the POST Commission?

2        A.   Not that I recall.

3        Q.   Did you have to interact with any members

4    of the public while the Commissioner was there?

5        A.   Yes.

6        Q.   Do you recall what that interaction was?

7        A.   I might a couple.  I think one person just

8    kind of walked by and just greeted me and said, Hey,

9    what's up, how's things, something like that, and

10   shook his hand or a fist bump or something.

11          And another individual always sitting there

12   I observed drinking from a bottle of alcohol.  So I

13   walked over to the person and said, Hey, knock it

14   off.  The Police Commissioner is over there.  You're

15   making me look bad.  Put it away and save it for

16   later, you know.

17          And he was -- I'm sorry, I'm sorry, kind of

18   waved to the Commissioner and put the booze away.

19   And I walked back over to the Commissioner.

20       Q.   Do you remember what time of day this was?

21       A.   It was early in the morning.  I would say

22   it was about eight-thirty, somewhere around there.

23       Q.   Do you remember anything else that you and

24   the Commissioner talked about during that

1   conversation?

2        A.   Basically, what I would do to -- she asked

3   me what I would do to combat like the drug problem

4   out there.  And I kind of got into details with her

5   about how I would go about doing it and gave her

6   different aspects of, you know, what could be done

7   to combat the drug problem out there.

8        Q.   And when you say "the drug problem out

9   there," where are you talking about, out there?

10       A.   I'm talking -- just Central Square.  I

11  mean, it's basically just an open drug market out

12  there.  I mean, it's just blatant drug use and drug

13  sales going on constantly out there.  And it's

14  really little to no enforcement.  So I gave her my

15  opinions on what I would do to clean it up.

16       Q.   And what opinions did you give her to clean

17  it up?

18       A.   Well, I believe I gave her two different

19  scenarios, one with the use of undercover officers

20  and one with the use of informants.

21       Q.   And can you go into any more detail about

22  what your suggestions were?

23       A.   Sure.  I told her that, you know, if we

24  took the one road with using undercover officers,

1   you know, we would have to get an undercover officer

2   from another agency, usually use the State Police or

3   another local department to go out there and I guess

4   infiltrate the goings on in the square and try to

5   befriend drug dealers and drug users and just become

6   -- blend in out there and try to make undercover

7   buys of drugs.

8          And I told her you could do it a couple

9   different ways.  You could, you know, do undercover

10  buys and you could just arrest the dealer on the

11  spot there.  Or, you know, the way we've done it in

12  the past is you could do a whole series of

13  undercover buys, do a whole long investigation,

14  secure warrants for individuals and go out one day

15  and just do like a warrant sweep and arrest all the

16  dealers on the warrants that we've obtained.  I told

17  her that would be one option.

18         Another option I gave her was the use of

19  informants to do controlled purchases and obtain

20  search warrants and execute those search warrants

21  and go about it that way.

22  Q.   Did you give any of other suggestions?

23  A.   I think those are the only two I gave her.

24  Q.   Any other parts of that conversation that

68

1    you remember?

2         A.   The Commissioner said that she was a little

3    leery about using the users, the drug users as

4    informants.  She didn't feel comfortable doing that.

5    And I told her -- I said, You don't necessarily have

6    to charge them.  Like, you know, they'd be working

7    for us, you know.

8              And you don't necessarily have to -- well,

9    not with regard to using them -- she didn't like

10   using them as informants.  But she was more

11   concerned about arresting the users, not -- not as

12   using them as informants.  But, you know, if you

13   observed a drug deal and you arrested the drug

14   dealer, she was concerned about what would happen

15   with the buyer, the drug user.

16             You know, she didn't -- was kind of

17   concerned about their being arrested.  And I told

18   her -- basically, I said, You don't have to arrest

19   them.  I mean, you can summons them into court, you

20   know, just set up a clerk's hearing.  You have a

21   little more leeway with that.  They also have drug

22   court which you could, you know, refer the person to

23   drug court.

24             You know, and at some point during that

69

1    part of the conversation, the Commissioner said

2    something along the lines of, Well, they're just

3    crack heads anyway.  And I kind of was taken aback

4    and looked at her because I currently had an open

5    investigation in Professional Standards where I was

6    alleged to have used the words -- the word crack

7    heads.

8         And I kind of just looked at her and said,

9    Really, Commissioner?  You just called them crack

10   heads.  And there's an open investigation.  And she

11   said -- she said, Well, you just can't call them

12   that to their face.  And I said, I didn't.  And she

13   said, Well, you just can't call them that to their

14   counsellors.  And I said, I didn't.

15        And I kind of just shrugged it off, and

16   that was kind of the end of it.  Then another

17   officer walked over and joined in our conversation.

18   And he referred to some of the people out in the

19   square as crack heads.  And I just threw my arms up

20   in the air.  And I just looked at the Commissioner

21   and I said, Are you kidding me?  You know, but that

22   was kind of the end of that.  So --

23        Q.   Do you remember who the other officer was?

24        A.   I think it was Officer Billy Simmons.

1      Q.   And before Officer Simmons walked up to

2  you, was there anyone else near you during the

3  conversation?

4      A.   There were a couple of officers present,

5  but they were probably -- I mean, when I was talking

6  to the Commissioner, it was just the Commissioner

7  and me.  We were separated by maybe ten feet from a

8  group of two or three other officers.

9      Q.   Do you remember being an affiant to a

10  search warrant of 39 Inman Street in May of 2015?

11      A.   Yes.

12      Q.   Do you recall responding to 39 Inman Street

13  to execute the search warrant?

14      A.   Yes.

15      Q.   At what point in the execution of the

16  search warrant did you arrive at 39 Inman Street?

17      A.   Entry had already been made.  The apartment

18  had already been secured.  And I believe initial

19  protective sweep had already been done.  I'm not

20  sure if the actual -- I don't think the actual

21  search had begun yet.

22      Q.   Do you recall what you did when you arrived

23  on the scene?

24      A.   Not much.  I mean, there were a number of

officers and detectives there.  There was Cambridge
Police, SIU.  It was DEA.  I'm not sure if Homeland
Security and another agency was there.  But there
were plainclothes officers everywhere.  So I kind of
just walked around and just observed most of what
was going on.

     Q.   Do you remember why you arrived after entry
had already been made?

     A.   The search warrant was not prepared ahead
of time.  It was kind of an ongoing -- ongoing
investigation.  And it involved the controlled
delivery of a package.  So once that took place, I
had to go to court to get the search warrant signed.
So in the time that it took me to get from court
back to the scene, they had already made entry.

     Q.   And court at that time was in Medford?

     A.   Yes.

     Q.   Did anyone drive with you back to the
scene?

     A.   I think I was with Detective Donofrio.

     Q.   Do you recall what you were driving, what
kind of car?

     A.   We had a -- at that time I think we had a
Toyota RAV4.

72

```
 1        Q.   Were you partners with Detective Donofrio
 2   at the time, or were you together just on this
 3   particular day?
 4        A.   I think at that time we were partners.
 5        Q.   And do you remember where in -- so first 39
 6   Inman, is that a single family or a multiple family
 7   home?
 8        A.   Multiple.
 9        Q.   Do you know how many units are in there?
10        A.   I don't.
11        Q.   Was it multi level?
12        A.   Yes.
13        Q.   Do you recall where you went?
14        A.   The unit where we executed the search
15   warrant was on the left as soon as you walked in the
16   front door.  So I would have been on the first level
17   on the left.  And I believe there was a basement as
18   well.
19        Q.   Did you go into the basement?
20        A.   I did.
21        Q.   Did you talk to anyone while you were in
22   39 Inman Street?
23        A.   I'm sure I talked to a number of
24   individuals.
```

73

1      Q.   Did you talk to any non-police officers
2  while you were inside 39 Inman Street?
3      A.   I'm sure that I did.
4      Q.   Do you remember who you spoke with?
5      A.   The topic of the search warrant, Mr.
6  Bohnenberg.  I don't recall anyone else.
7      Q.   Do you recall anyone else being inside
8  39 Inman Street?
9      A.   I think at some point another occupant of
10  that apartment came home.
11      Q.   Do you remember another occupant coming
12  home?
13      A.   Vaguely.  I seem to remember at some point
14  through the search warrant another resident of that
15  unit came home.
16      Q.   Do you remember if that other resident was
17  a male or a female?
18      A.   Male.
19      Q.   Do you remember if you spoke with that male
20  at all?
21      A.   I do not.
22      Q.   Do you remember that male's name?
23      A.   I do not.
24      Q.   Did you at any point have possession of any

 1    of the evidence that was seized from 39 Inman

 2    Street?

 3         A.   I'm sure that I did at some point, yes.

 4         Q.   Did you drive the evidence back to the

 5    station?

 6         A.   I don't recall that.  I'm not sure.

 7         Q.   Do you remember an Alexander Cornford?

 8         A.   I -- I know that eventually it was learned

 9    that he was the other occupant of the unit, yes.

10         Q.   The other male that had come home --

11         A.   Yes.

12         Q.   -- while you were executing the search

13    warrant?

14         A.   Yes.

15         Q.   And I'm sorry.  You said you do or do not

16    remember driving the evidence back to the station?

17         A.   I'm not positive if I did or if I did not.

18         Q.   Do you recall bagging the evidence and

19    getting it ready to submit into -- I'm sorry.  I

20    forget the name of the unit -- your evidence unit

21    after you got back to the station?

22         A.   I did not.

23         Q.   Are you saying that you remember you did

24    not bag and label the evidence when you got back to

1    the station or that you don't have a memory whether

2    you did or not?

3        A.   I did not bag the evidence.

4        Q.   Do you know why another officer said that

5    they helped you bag and label the evidence once you

6    got back to the station and that you had asked them

7    to help you?

8        A.   I think what that's referring to is

9    essentially can you do this for me so I don't have

10   to do it, not I'm going to do this, can you give me

11   a hand with doing it.

12       Q.   So you think you asked another officer to

13   bag and label the evidence?

14       A.   That's how we regularly did things in the

15   drug unit.  The arresting officer or the affiant

16   would sit at the desk and do the reports while other

17   detectives in the unit would handle all the

18   evidence.

19       Q.   Do you remember asking another officer to

20   bag and label this evidence on this particular case?

21       A.   I don't have a specific recollection of

22   that, no.

23       Q.   Okay.

24       A.   It was kind of just understood that that's

```
 1   how we did things.
 2        Q.   But you don't recall that specific
 3   question?
 4        A.   No.
 5        Q.   But you do have a specific memory that you
 6   weren't the one who bagged and labeled the evidence
 7   in this case?
 8        A.   Yes.
 9        Q.   Okay.  Are you aware that two years later
10   some evidence from that search warrant was found in
11   the SIU offices?
12        A.   Yes.
13        Q.   Do you know where that evidence was found?
14        A.   In a file cabinet.
15        Q.   And where was the file cabinet within the
16   office?
17        A.   It was in our -- we call it our evidence
18   staging area.  That's where all the evidence was,
19   you know, processed and bagged.
20        Q.   Do you know where that evidence -- how that
21   evidence came to be in that filing cabinet?
22        A.   I do not.
23        Q.   Was your call sign on the bag that
24   contained the evidence?
```

1        A.    I believe it was, yes.

2        Q.    Do you know how your call sign came to be

3   on the bag that had the evidence?

4        A.    I believe Detective Collazo wrote it on

5   there.

6        Q.    Do you know what the evidence was that was

7   found?

8        A.    It was cash.  And I think it was a bag of

9   drugs.  Ketamine, I think it was.

10       Q.    And was there a Pringles can with a false

11  bottom?

12       A.    Yes.

13       Q.    Do you know how -- do you know where that

14  Pringles can, the bag of drugs and the cash came

15  from?

16       A.    Eventually, I learned they came from the --

17  39 Inman Street.

18       Q.    Do you know where in 39 Inman Street it

19  came from?

20       A.    The basement.

21       Q.    Do you know whether it was found in a

22  particular room or whether it was found on a person?

23       A.    I think it was in a room.

24       Q.    Do you know which room?

78

1       A.   I don't recall.

2       Q.   Did you find this evidence in 39 Inman

3   Street?

4       A.   No.

5       Q.   And are you saying you don't whether you

6   did or that you have a specific memory that you were

7   not the one who found it?

8       A.   I did not find it.

9       Q.   Do you know who did find it?

10      A.   I do not.

11      Q.   And how do you know you didn't find it?

12      A.   Well, I just don't have a specific memory

13  of finding it.

14      Q.   Do you have a memory of having a

15  conversation with Alex Cornford?

16      A.   No.

17      Q.   And could you have had a conversation with

18  Alex Cornford?

19      A.   It's quite possible, yes.  I don't -- like

20  I said, there was a lot going on that day.  I don't

21  specifically remember.

22      Q.   The bag -- the brown paper bag that this

23  evidence was found inside of once it was at the

24  Cambridge police station, did you ask any other

1    officer at 39 Inman Street to give you a bag for

2    evidence?

3         A.   Not that I specifically recall, no.

4         Q.   Could you have?

5         A.   I could have, yes.

6         Q.   Okay.  And you could have been the one to

7    drive the evidence back to the station?

8         A.   Yes.

9         Q.   If you had gotten a bag for evidence from

10   another officer, what would you have done with any

11   evidence you put inside that bag?

12        A.   It would have been placed -- well, it would

13   have been placed with all the other evidence to be

14   transported.

15        Q.   And so is all of the evidence given to one

16   particular officer at the scene when you're

17   executing a search warrant?

18        A.   Yes.

19        Q.   Do you know who that officer was in this

20   case?

21        A.   I don't recall.

22        Q.   Does that same officer also drive the

23   evidence back to the station?

24        A.   It could vary.

80

Q.   Okay.  And did the execution of this search
warrant result in any criminal charges?

A.   Yes.

Q.   How many times have you been involved in an
execution of a search warrant that resulted in
criminal charges?

A.   I would say well over 50.

Q.   So you understand the importance of chain
of custody?

A.   Yes.

Q.   Can you describe for us what the steps you
and SIU would take to ensure chain of custody during
the execution of a search warrant.

A.   When something was found at the scene, it
would -- sometimes it would be photographed.  It
would be placed in an evidence bag, remain with the
evidence officer.  Then all the evidence would be
transported to the station, brought to our evidence
staging area where it would be bagged, processed,
tested if it needed to be tested.  And it would then
be submitted to the evidence and property unit.

MR. WEBER:  Before you ask your next
question, I'd like to take a short break.

MS. KLEIMOLA:  Of course.

1          MR. WEBER:  Working related.

2          MS. KLEIMOLA:  Oh, yeah.

3          MR. WEBER:  So could we just break for ten

4     minutes?

5          MS. KLEIMOLA:  Yeah.

6          (Off the record.)

7          (Recess begins at 11:49 a.m.)

8          (Recess ends at 12:11 p.m.)

9     BY MS. KLEIMOLA:

10     Q.  So I think my last question was can you

11     explain the steps you would take in the SIU to

12     secure a chain of custody after the execution of a

13     search warrant.

14     A.  Hmm-hmm.  The evidence found at the scene,

15     sometimes it would be photographed, sometimes not.

16     It would be given over to the scribe or the evidence

17     officer who would log it, would hold onto that.

18          And it would be conveyed to the police

19     station where it would be brought to our evidence

20     staging area, specifically in the SIU.  And it would

21     be processed there, packaged, labeled, tested and

22     then submitted to the department's evidence property

23     unit.

24     Q.  So when evidence is found at a location

1    during the execution of a search warrant, is it

2    always given to the evidence officer or the scribe

3    at that location, or is it given to one particular

4    person once you transport it back, like everyone

5    takes everything they found back to the station?

6        A.   It's usually all transported together.

7        Q.   Okay.  Is there always an evidence officer

8    or a scribe at every execution of a search warrant?

9        A.   Yes.

10       Q.   Do you remember who the evidence officer or

11   the scribe was during the execution of this

12   particular search warrant?

13       A.   No.

14       Q.   Is the evidence officer or the scribe ever

15   the same person as the affiant of the search

16   warrant?

17       A.   No.

18       Q.   And why not?

19       A.   We just kind of delegate different duties

20   to different people.  You want to stay focused on

21   what your task is.

22       Q.   Does the evidence officer or the scribe,

23   are they the ones who drive the evidence back to the

24   station?

83

1      A.   Not necessarily.

2      Q.   Okay.  And is the evidence officer or the

3  scribe the one who brings it back to that staging

4  area, packages it up and does anything that needs to

5  be done before it's given to the property and

6  evidence unit?

7      A.   Not necessarily.

8      Q.   Is the affiant ever the one who always

9  takes care of either one of those, either driving

10  the evidence or taking care of the packaging and

11  anything else that needs to be done before it's

12  given to the property and evidence unit?

13      A.   The affiant could drive the evidence back

14  to the station.  I would say it is extremely rare

15  for the affiant to -- to actually process the

16  evidence as well.  I'm sure it's happened, but it is

17  rare.

18      Q.   And is the evidence -- forgive me if I

19  already asked this.  Is it usually the evidence

20  officer or the scribe at -- who's designated the

21  evidence officer or the scribe at the execution of

22  the search warrant the one who packages and labels

23  it before -- when it's at the police station and

24  before it's given to the evidence and property unit?

84

1      A.   Not necessarily the same person.

2      Q.   Okay.  And you have a specific memory that

3  you were not the evidence officer on this search

4  warrant, or you don't recall?

5      A.   I was not.

6      Q.   And you have a specific memory that you

7  were not the one who took care of bagging it and

8  labeling it back at the station?

9      A.   Correct.

10      Q.   Okay.  And you don't ever recall having

11  that Pringles can and that bag of drugs and the

12  cash?

13      A.   That's correct.

14      Q.   Do you know who found those items at

15  39 Inman?

16      A.   I do not.

17      Q.   Do you know who placed them in the filing

18  cabinet at the Cambridge Police SIU office?

19      A.   I do not.

20      Q.   Do you know who found them at the Cambridge

21  Police SIU office?

22      A.   Detective Branley.

23      Q.   Do you know how he found them?

24      A.   I think he was looking for something else

85

1    and stumbled across it.

2        Q.   Were you there at the time?

3        A.   No.

4        Q.   Were you ever asked about that evidence

5    that Detective Branley found?

6        A.   Yes.

7        Q.   And who asked you about it?

8        A.   Initially, I think it was Detective Borum.

9        Q.   And do you remember what that conversation

10   was?

11       A.   I don't remember specifically.  I know he

12   asked me if I recognized the items or if I was

13   familiar with the name.

14       Q.   And what did he show you when you say "the

15   items"?

16       A.   I don't specifically remember exactly what

17   he showed me.  I believe there was a pill bottle

18   because I think I ran the name that was on the pill

19   bottle through our system and through CJIS to try to

20   determine who that person was.  I don't want to

21   assume that he showed me the money and the other

22   drugs, but I'm sure that he probably did.

23       Q.   And what about that brown paper bag?

24       A.   I don't recall the brown paper bag.

1      Q.   Did you ever see the brown paper bag?

2      A.   I don't recall.

3      Q.   Do you remember seeing your call sign on

4  the brown paper bag?

5      A.   No.  I don't recall.

6      Q.   Okay.  Were you disciplined as a result of

7  that incident and investigation?

8      A.   Yes.

9      Q.   When were you disciplined?

10     A.   I don't remember the exact time.  It was --

11  I don't remember the exact.

12     Q.   Do you remember the year?

13     A.   2019 I think it was.

14     Q.   Do you know when Detective Branley found

15  that evidence in the filing cabinet?

16     A.   I don't recall the exact date, no.

17     Q.   Do you remember the year?

18     A.   I think it was 2017 maybe.

19     Q.   And what was your discipline?

20     A.   I had to forfeit one day of benefitted

21  time.

22     Q.   And do you know what rule or regulation you

23  were found in violation of?

24     A.   Yes.  It was the kind of general rules and

```
 1   obligations of the department.  Specifically, I was
 2   told that I did not keep my supervisor updated as to
 3   the progress of a case -- of the case.
 4   Specifically, that there may have been an informant
 5   that could have been -- there could have been a
 6   potential informant from that case.  That was --
 7        Q.   And who was the potential informant in that
 8   case?
 9        A.   I don't know.  I'm assuming it was that --
10   was it Alexander?  Is that his name?  Cornford?  Is
11   that his name?  I can only assume that that's who it
12   was.
13        Q.   Okay.  Did you appeal that discipline?
14        A.   Yes.
15        Q.   Did you appeal it yourself through the
16   civil service or through your union?
17        A.   Through the union.
18        Q.   And what was the result of the appeal?
19        A.   I don't know.
20        Q.   Have you ever received word that it was
21   reduced or changed in any way?
22        A.   No.
23        Q.   Do you know if there's been a hearing?
24        A.   Not to my knowledge.
```

1      Q.   Okay.  Were you also disciplined in 2005 or

2  2006?

3      A.   I believe so, yes.

4      Q.   Do you recall if the discipline took place

5  in 2005 or 2006?

6      A.   I don't recall.

7      Q.   What were you disciplined for?

8      A.   I believe it was failure to obey a direct

9  order.  There were a couple of other charges that

10  were eventually dropped.  But the one that stuck was

11  failure to obey a direct order.

12      Q.   And what was your discipline in 2005 or

13  2006?

14      A.   It was ultimately a two-day suspension.

15      Q.   Did you serve more than three days of the

16  suspension?

17      A.   I did.

18      Q.   Was the three-day suspension a result of an

19  agreement between the City and the union?

20      A.   Yes.

21      Q.   What was the original discipline?

22      A.   Thirty days I think.

23      Q.   Could it have been 45 days?

24      A.   It could have been.  Actually, I think it

1    was 45, 30 to serve I think it -- is what -- if I
2    remember correctly.
3        Q.   Okay.  And I understand what the charges
4    were that you -- were the charges that you
5    ultimately served that three-day suspension for also
6    adjusted during that agreement with the union and
7    the City?
8        A.   I'm sorry.  Can you repeat that.
9        Q.   That was a terrible question.  In that
10   agreement where your suspension went from 45 days to
11   three days, did the charges also change as a result
12   of that agreement?
13       A.   Yes.
14       Q.   Okay.  So were there any additional charges
15   that you were -- that were sustained against you?
16       A.   Initially, yes.
17       Q.   What were those charges?
18       A.   One was a hostile work environment.  I
19   don't recall what the other one was.
20       Q.   And can you tell us what the basis of those
21   substantiated charges were?
22       A.   It was -- I had a relationship with another
23   officer in the department.  And she made some
24   accusations against me.  The department did an

90

1    investigation.  And those were their findings.

2        Q.   What was the race of the other officer

3    involved that you had the relationship with?

4        A.   White.

5        Q.   When the relationship started, was that

6    other officer an intern with the Cambridge Police?

7        A.   She was.

8        Q.   At any time were you told by a superior

9    officer not to contact the officer you were -- had

10   been in the relationship with?

11       A.   Yes.

12       Q.   Did you contact that officer anyway despite

13   your superior officers telling you not to?

14       A.   I don't recall.

15       Q.   Were you at some point told by a superior

16   officer not to go to the clerk's area or the front

17   desk area without permission of the shift commander?

18       A.   Yes.

19       Q.   And did you go to the front desk or the

20   clerk's area without permission of the shift

21   commander after you were told not to?

22       A.   I believe there was one occasion when I

23   did, yes.

24       Q.   And was this when the police headquarters

1    was in Central Square, not in its current building?

2        A.   Yes.

3        Q.   Did you learn that that officer -- female

4    officer you'd been in a relationship with had

5    started a new relationship with another officer?

6        A.   I did.

7        Q.   Did you drive by that other officer's house

8    to see whether she was there?

9        A.   I did.

10       Q.   Was that in the middle of the night?

11       A.   I don't recall the exact time.

12       Q.   Have you also received a number of awards

13   and commendations?

14       A.   Yes.

15       Q.   Let me see if I can find them.  Do you

16   recall in 2019 receiving the Employee Recognition

17   and awards -- I'm sorry -- the Herbert Halliday Life

18   Saving Ribbon?

19       A.   Yes.

20       Q.   Do you recall why you received that?

21       A.   I think that was for -- he was a shooting

22   victim.  He was shot.  And I applied a tourniquet to

23   that victim and rendered medical aid.

24       Q.   Do you remember when that was that you

1    rendered the aid?

2       A.   I don't.

3       Q.   Do you recall in 2017 receiving Detective

4    of the Year?

5       A.   Yes.

6       Q.   Do you know if that was for any one

7    particular case or investigation or if that was just

8    for cumulative work?

9       A.   Cumulative.

10      Q.   And were you still in the Special

11   Investigations Unit at the time?

12      A.   I was.

13      Q.   Do you recall participating at the Human

14   Services Council Regional Meeting in 2016, a class

15   on Opioid Addiction Fact and Fiction?  It was at the

16   Northborough senior center in Northborough,

17   Massachusetts, if that helps you remember.

18      A.   Yes.  I do remember that, yes.

19      Q.   Can you tell us what that training was

20   about?

21      A.   I honestly can't specifically say what it

22   was at this time.

23      Q.   Do you recall receiving the Albert G.

24   Eckardt, E-C-K-A-R-D-T, Medal of Commendation in

93

```
 1    2014?
 2        A.   Yes.
 3        Q.   Do you know if you received that for any
 4    one particular act or incident?
 5        A.   There was one particular act.
 6        Q.   Can you tell us what that was.
 7        A.   It was for my actions in the -- I believe
 8    that one was for my actions in the Watertown
 9    shootout in the Boston bombing, the marathon
10    bombing.
11        Q.   And do you know what particular -- what did
12    you do in the Watertown shootout?
13        A.   My -- Detective Donofrio and myself were
14    two of the first officers on scene in Watertown
15    during the shootout.  We assisted many other
16    agencies throughout the night with the follow-up
17    investigation.
18             And subsequently the following day when the
19    second terrorist was captured in the boat, I was on
20    scene there and assisted in evacuating houses on the
21    scene.
22        Q.   And when you responded to the Watertown
23    shootout, were you in Special Investigations Unit at
24    the time?
```

94

1     A.   Yes, I was.

2     Q.   So were you and Detective Donofrio in

3 plainclothes?

4     A.   Yes.

5     Q.   Do you also recall receiving the William J.

6 Carroll Letter of Commendation again in 2014?

7     A.   Not specifically, no.

8     Q.   Okay.

9     A.   I've received a number of Carroll

10 commendations.  And I can't say for certain which of

11 those, which acts.  They're usually all for one

12 specific act.

13     Q.   And so do you know if you received it in

14 2014 what it would be for?

15     A.   I don't recall what that one was for.

16     Q.   Do you recall receiving the William J.

17 Carroll Letter of Commendation in 2010?

18     A.   Again, I don't -- I know that I've received

19 many of them.  I don't recall the years that I

20 specifically got them.

21     Q.   If you did receive one in 2010, do you

22 remember what that would have been for?

23     A.   No.

24     Q.   Do you remember receiving the

1    Commissioner's Unit Award Ribbon One Star in 2013?

2        A.   Yes.

3        Q.   Do you recall what that was for?

4        A.   It was for work done in the SIU.  I don't

5    remember if it was for any specific act.  But I know

6    it was -- I'm pretty sure it was directly related to

7    my work in the unit.  With that award the entire

8    unit gets the award.

9        Q.   Does the name Operation Booting Heroin

10   sound familiar to you?

11       A.   Yes.

12       Q.   Was that something that you worked on in

13   SIU?

14       A.   Yes.  That was a -- it was an undercover

15   operation in the Central Square area focused on

16   targeting heroin dealers.

17       Q.   And do you remember receiving the Albert

18   Eckardt Commendation Medal in 2009?

19       A.   Yes.

20       Q.   Do you recall what that was for?

21       A.   If I remember correctly, that was -- there

22   was a shooting on I think Pine Street in Cambridge.

23   And I chased the shooter and took him into custody

24   and recovered a firearm.

96

1          MS. KLEIMOLA:  I do not have any more

2    questions.  Do you?

3          MR. WEBER:  I do not.

4          MS. KLEIMOLA:  Okay.  Well, thank you.

5          THE WITNESS:  Thank you.

6          THE COURT REPORTER:  Would you like a copy

7          of the transcript?

8          MR. WEBER:  Sure.

9          (Whereupon the deposition concluded at

10         12:29 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                   DEPONENT'S ERRATA SHEET

 2                 AND SIGNATURE INSTRUCTIONS

 3

 4          The original of the Errata Sheet has been

 5     delivered to BENJAMIN J. WEBER, ESQ.

 6          When the Errata Sheet has been completed by

 7     the deponent and signed, a copy thereof should be

 8     delivered to each party of record and the ORIGINAL

 9     delivered to KATE M. KLEIMOLA, ESQ., to whom the

10     original deposition transcript was delivered.

11

12                 INSTRUCTIONS TO DEPONENT

13

14     After reading this volume of your deposition,
       indicate any corrections or changes to your
       testimony and the reasons therefor on the Errata
15     Sheet supplied to you and sign it.  DO NOT make
       marks or notations on the transcript volume itself.
16
       REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
17     COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

18

19

20

21

22

23

24
```

```
 1   ATTACH TO THE DEPOSITION OF BRIAN HUSSEY
     CASE:  BRIAN HUSSEY -VS- CITY OF CAMBRIDGE and
 2   BRANVILLE BARD, in his capacity as Commissioner of
     the Cambridge Police Department
 3   APRIL 6, 2023

 4                        ERRATA SHEET

 5   INSTRUCTIONS:  After reading the transcript of your
     deposition, note any change or correction to your
 6   testimony and the reason therefor on this sheet.  DO
     NOT make any marks or notations on the transcript
 7   volume itself.  Sign and date this errata sheet
     (before a Notary Public, if required).  Refer to
 8   Page 97 of the transcript for errata sheet
     distribution instructions.

 9
     PAGE   LINE
10   _____  _____   CHANGE:  _____
                    REASON:  _____
11   _____  _____   CHANGE:  _____
                    REASON:  _____
12   _____  _____   CHANGE:  _____
                    REASON:  _____
13   _____  _____   CHANGE:  _____
                    REASON:  _____
14   _____  _____   CHANGE:  _____
                    REASON:  _____
15   _____  _____   CHANGE:  _____
                    REASON:  _____
16   _____  _____   CHANGE:  _____
                    REASON:  _____
17   _____  _____   CHANGE:  _____
                    REASON:  _____
18            I have read the foregoing transcript of my
     deposition and, except for any corrections or
19   changes noted above, I hereby subscribe to the
     transcript as an accurate record of the statements
20   made by me.
              Signed under the pains and penalties of
21   perjury this_____ day of_____, 2023.

22

     _____
23   BRIAN HUSSEY

24
```

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.


        I, Margaret G. Oliver, Notary Public in and
for the Commonwealth of Massachusetts, do hereby
certify that BRIAN HUSSEY, the witness whose
deposition is hereinbefore set forth, was duly sworn
by me and that such deposition is a true record of
the testimony given by the witness.
        I further certify that I am neither related to
or employed by any of the parties hereto or counsel
to this action, nor am I financially interested in
the outcome of this action.
        In witness whereof, I have hereunto set my
hand and seal this 9th day of May 2023.



        _____
        Margaret G. Oliver
        Notary Public
        My commission expires:  May 30, 2025


  THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
DIRECTION OF THE CERTIFYING REPORTER.

1

**'**

**'97** [1] - 9:10
**'98** [2] - 9:1, 9:10

**0**

**02109** [1] - 1:23
**02110** [1] - 2:4
**02139** [1] - 2:10

**1**

**1** [8] - 3:9, 33:20,
33:22, 36:7, 37:2,
38:13, 38:16, 45:11
**1-4** [1] - 1:2
**1-99** [1] - 1:1
**10:04** [1] - 1:21
**11** [1] - 35:15
**11:49** [1] - 81:7
**12** [5] - 5:18, 12:5,
29:24, 33:24
**12:11** [1] - 81:8
**12:29** [1] - 96:10
**12th** [1] - 61:24
**13** [1] - 33:24
**14** [1] - 33:24
**148** [1] - 59:15
**15** [3] - 6:19, 33:1,
33:24
**16** [1] - 33:24
**17** [3] - 31:6, 31:8,
33:24
**18** [1] - 34:1
**19** [2] - 51:1, 51:3
**1976** [1] - 5:4
**1993** [1] - 8:13
**1997** [1] - 8:14
**1998** [4] - 8:24, 9:15,
10:21, 12:2
**1:21-CV-11868-AK** [1]
- 1:4
**1st** [3] - 35:1, 47:15,
48:21

**2**

**2** [4] - 3:10, 35:13,
42:16, 45:9
**20** [2] - 51:3, 51:12
**2005** [3] - 88:1, 88:5,
88:12
**2006** [3] - 88:2, 88:5,
88:13
**2009** [3] - 10:18, 15:2,
95:18
**2010** [2] - 94:17, 94:21
**2013** [1] - 95:1
**2014** [3] - 93:1, 94:6,
94:14

**2015** [4] - 59:11,
59:15, 59:19, 70:10
**2016** [1] - 92:14
**2017** [2] - 86:18, 92:3
**2019** [2] - 86:13, 91:16
**2020** [5] - 23:15, 25:7,
26:10, 28:13, 30:9
**2021** [7] - 34:15, 35:1,
35:4, 40:17, 47:15,
48:6, 48:21
**2022** [9] - 28:12,
30:10, 30:17, 30:18,
60:15, 61:10, 63:15,
63:19, 64:12
**2023** [4] - 1:20, 98:3,
98:21, 99:10
**2025** [1] - 99:14
**208** [1] - 2:4
**21** [2] - 51:3, 53:5
**22** [1] - 53:16
**23** [1] - 53:16
**24** [3] - 54:3, 54:6,
54:10
**25** [4] - 54:4, 54:5,
54:6, 54:18
**25th** [9] - 34:15, 35:4,
40:17, 41:23, 42:5,
46:24, 47:2, 48:5,
48:8
**26** [3] - 55:14, 55:16,
56:11
**27** [1] - 56:15
**28** [1] - 57:21
**29** [1] - 58:2

**3**

**3** [5] - 3:11, 47:9,
47:10, 47:11, 48:6
**30** [4] - 60:20, 61:2,
89:1, 99:14
**32** [2] - 58:2, 58:6
**33** [1] - 3:9
**35** [1] - 3:10
**39** [13] - 70:10, 70:12,
70:16, 72:5, 72:22,
73:2, 73:8, 74:1,
77:17, 77:18, 78:2,
79:1, 84:15
**3rd** [1] - 5:4

**4**

**4** [5] - 3:4, 3:12, 50:20,
50:22, 50:23
**45** [3] - 88:23, 89:1,
89:10
**47** [1] - 3:11

**5**

**50** [3] - 2:3, 3:12, 80:7
**52** [3] - 45:12, 45:15,
45:21
**535** [2] - 34:10, 36:16

**6**

**6** [3] - 1:20, 35:15,
98:3
**600** [6] - 33:14, 34:7,
36:6, 36:18, 36:20,
36:21
**617.202.6270** [1] - 2:6
**617.349.4121** [1] -
2:11
**617.423.5841** [1] -
1:24
**663** [1] - 36:12
**674** [3] - 35:21, 36:3,
36:13

**7**

**700** [1] - 1:23
**71** [1] - 1:23
**74** [1] - 36:13
**795** [2] - 1:19, 2:9

**8**

**80** [1] - 16:13
**88** [1] - 59:15

**9**

**90** [1] - 16:14
**97** [1] - 98:8
**9th** [1] - 99:10

**A**

**a.m** [5] - 1:21, 11:22,
11:24, 26:5, 81:7
**aback** [1] - 69:3
**ability** [1] - 7:10
**able** [2] - 13:16, 25:9
**academy** [4] - 8:24,
9:12, 9:14
**accept** [1] - 38:9
**accurate** [3] - 42:18,
60:12, 98:19
**accurately** [1] - 7:11
**accusations** [1] -
89:24
**act** [4] - 93:4, 93:5,
94:12, 95:5
**action** [2] - 99:9, 99:9
**actions** [2] - 93:7,
93:8
**active** [3] - 39:1, 39:3,
39:8

**acts** [1] - 94:11
**actual** [3] - 52:20,
70:20
**added** [4] - 59:4, 59:5,
59:7, 60:5
**addiction** [2] - 10:9,
10:13
**Addiction** [1] - 92:15
**addition** [1] - 29:4
**additional** [1] - 89:14
**adjusted** [1] - 89:6
**administrative** [2] -
48:14, 49:15
**adult** [1] - 40:15
**affect** [1] - 7:10
**affiant** [6] - 70:9,
75:15, 82:15, 83:8,
83:13, 83:15
**afraid** [1] - 20:17
**agencies** [1] - 93:16
**agency** [2] - 67:2, 71:3
**ages** [1] - 5:15
**ago** [4] - 6:5, 6:6, 6:20,
50:10
**agreement** [4] - 88:19,
89:6, 89:10, 89:12
**ahead** [3] - 41:22,
42:3, 71:9
**aid** [3] - 9:23, 91:23,
92:1
**air** [1] - 69:20
**Albert** [2] - 92:23,
95:17
**alcohol** [1] - 65:12
**Alex** [2] - 78:15, 78:18
**Alexander** [2] - 74:7,
87:10
**alleged** [1] - 69:6
**allowed** [1] - 41:22
**alpha** [5] - 27:2, 27:5,
27:13, 28:2, 30:14
**alphabetically** [1] -
29:15
**alternating** [3] - 26:1,
26:3, 30:21
**Amendment** [1] -
49:17

**AND** [2] - 97:2, 97:17
**AND/OR** [1] - 99:17
**Angry** [2] - 57:11,
57:15
**answer** [1] - 63:12
**answered** [1] - 34:17
**ANY** [2] - 99:16, 99:17
**anyway** [3] - 61:7,
69:3, 90:12
**apartment** [2] - 70:17,

73:10
**apologize** [1] - 30:15
**appeal** [3] - 87:13,
87:15, 87:18
**appear** [2] - 20:18,
20:20
**APPEARANCES** [1] -
2:1
**applicable** [1] - 1:14
**application** [2] - 15:3,
15:6
**applied** [1] - 91:22
**APPLY** [1] - 99:16
**appointing** [1] - 49:19



**approach** [2] - 18:24,
19:2
**approached** [2] - 19:9,
62:5
**April** [4] - 1:20, 35:1,
47:15, 48:21
**APRIL** [1] - 98:3
**Aquarium** [13] - 41:5,
41:8, 42:23, 43:2,
43:4, 43:9, 43:13,
43:15, 44:15, 44:16,
44:19, 44:20
**area** [18] - 12:19,
13:21, 13:23, 14:1,
14:2, 14:4, 25:15,
25:18, 31:19, 59:15,
76:18, 80:19, 81:20,
83:4, 90:16, 90:17,
90:20, 95:15
**areas** [1] - 11:3
**arms** [2] - 28:21, 69:19
**arrest** [3] - 67:10,
67:15, 68:18
**arrested** [2] - 68:13,
68:17
**arresting** [2] - 68:11,
75:15
**arrive** [1] - 70:16
**arrived** [2] - 70:22,
71:7
**aspects** [1] - 66:6
**assigned** [10] - 11:8,
11:14, 11:15, 12:13,
12:19, 15:22, 26:24,
27:16, 27:21, 30:8
**assignment** [5] -
10:22, 14:21, 16:2,
25:6, 31:15
**assignments** [1] -
11:12
**assisted** [2] - 93:15,
93:20

**assume** [2] - 85:21, 87:11
**assuming** [3] - 4:8, 51:15, 87:9
**ATTACH** [1] - 98:1
**attorney** [2] - 2:6, 2:12
**Attorney** [1] - 3:13
**August** [7] - 28:12, 30:10, 30:17, 30:18, 60:15, 63:18, 63:19
**authority** [1] - 49:19
**availability** [1] - 29:11
**available** [1] - 30:7
**Ave** [1] - 25:17
**Avenue** [2] - 1:19, 2:9
**average** [2] - 28:22, 32:1
**Award** [1] - 95:1
**award** [2] - 95:7, 95:8
**awards** [2] - 91:12, 91:17
**aware** [2] - 50:13, 76:9

**B**

**B&E** [1] - 21:20
**bachelor** [2] - 8:14, 8:15
**background** [2] - 18:11, 18:23
**bad** [1] - 65:15
**bag** [20] - 74:24, 75:3, 75:5, 75:13, 75:20, 76:23, 77:3, 77:8, 77:14, 78:22, 79:1, 79:9, 79:11, 80:16, 84:11, 85:23, 85:24, 86:1, 86:4
**bagged** [3] - 76:6, 76:19, 80:19
**bagging** [2] - 74:18, 84:7
**BARD** [2] - 1:8, 98:2
**based** [2] - 11:10, 29:11
**basement** [3] - 72:17, 72:19, 77:20
**basis** [2] - 11:13, 89:20
**Bates** [4] - 33:24, 35:16, 50:24, 51:12
**beautiful** [2] - 51:20, 52:14
**became** [3] - 19:1, 19:4, 19:5
**become** [7] - 18:10, 19:2, 19:15, 31:18, 31:23, 32:10, 67:5
**befriend** [1] - 67:5
**beginning** [1] - 10:17

**begins** [1] - 81:7
**begun** [1] - 70:21
**behalf** [1] - 1:13
**below** [1] - 55:10
**benefitted** [1] - 86:20
**BENJAMIN** [2] - 2:3, 97:5
**Benjamin** [1] - 2:5
**beside** [1] - 39:11
**best** [2] - 33:4, 52:24
**between** [4] - 13:3, 29:13, 36:5, 88:19
**bid** [3] - 25:10, 25:12, 25:19
**Billy** [1] - 69:24
**birth** [1] - 5:3
**bit** [5] - 6:20, 10:24, 21:12, 22:8, 31:14
**black** [1] - 38:13
**blatant** [1] - 66:12
**blend** [1] - 67:6
**blood** [3] - 58:18, 59:14, 59:18
**blue** [1] - 55:5
**boat** [1] - 93:19
**Bobby** [1] - 15:11
**Bohnenberg** [1] - 73:6
**bombing** [2] - 93:9, 93:10
**Booting** [1] - 95:9
**booze** [1] - 65:18
**bordered** [3] - 14:7, 14:15, 14:16
**Borum** [4] - 24:5, 24:17, 52:10, 85:8
**BORUM** [1] - 24:5
**Boston** [3] - 1:23, 2:4, 93:9
**bother** [1] - 61:7
**bottle** [3] - 65:12, 85:17, 85:19
**bottom** [11] - 35:16, 51:1, 51:12, 51:20, 51:23, 52:13, 53:5, 54:3, 54:15, 55:9, 77:11
**bounced** [3] - 10:24, 13:3, 13:5
**boy** [2] - 33:1, 56:24
**Branley** [3] - 84:22, 85:5, 86:14
**BRANVILLE** [2] - 1:8, 98:2
**break** [3] - 26:7, 80:23, 81:3
**BRIAN** [5] - 1:5, 1:12, 3:3, 4:2, 98:1, 98:1, 98:23, 99:6
**Brian** [1] - 4:22
**briefly** [1] - 12:3

**brings** [1] - 83:3
**brother** [1] - 52:2
**brought** [2] - 80:18, 81:19
**brown** [5] - 78:22, 85:23, 85:24, 86:1, 86:4
**bubble** [1] - 55:5
**bud** [1] - 55:23
**building** [1] - 91:1
**Building** [1] - 1:22
**bullshit** [1] - 55:2
**bump** [1] - 65:10
**bundle** [1] - 50:20
**busy** [2] - 14:1
**buyer** [1] - 68:15
**buys** [3] - 67:7, 67:10, 67:13
**bweber@
benweberlaw.com** [1] - 2:5
**BY** [5] - 2:5, 2:10, 4:19, 81:9, 99:16

**C**

**C.A** [1] - 1:4
**cabinet** [5] - 76:14, 76:15, 76:21, 84:18, 86:15
**calculates** [1] - 37:1
**CAMBRIDGE** [3] - 1:8, 2:8, 98:1
**Cambridge** [37] - 1:10, 1:18, 1:19, 2:10, 6:16, 8:12, 8:19, 8:23, 9:2, 9:17, 9:20, 10:20, 11:3, 12:22, 13:10, 14:3, 16:1, 23:4, 29:9, 37:23, 38:3, 38:7, 38:14, 38:22, 39:8, 39:13, 40:14, 48:17, 48:24, 71:1, 78:24, 84:18, 84:20, 90:6, 95:22, 98:2
**cancelled** [1] - 60:18
**cannot** [1] - 55:11
**capacity** [3] - 1:9, 9:6, 98:2
**captured** [1] - 93:19
**car** [13] - 26:21, 26:24, 27:1, 27:3, 27:5, 27:6, 27:13, 28:4, 30:14, 31:6, 31:8, 71:22
**care** [3] - 83:9, 83:10, 84:7
**Carroll** [3] - 94:6, 94:9, 94:17

**cars** [5] - 27:20, 27:23, 27:24
**CASE** [1] - 98:1
**case** [10] - 6:9, 9:15, 75:20, 76:7, 79:20, 87:3, 87:6, 87:8, 92:7
**cases** [1] - 20:2
**cash** [3] - 77:8, 77:14, 84:12
**center** [1] - 92:16
**Central** [7] - 13:21, 61:11, 61:22, 62:18, 66:10, 91:1, 95:15
**certain** [7] - 23:18, 51:8, 56:12, 58:1, 59:23, 60:4, 94:10
**CERTIFICATION** [1] - 99:16
**certify** [2] - 99:6, 99:8
**CERTIFYING** [1] - 99:17
**chain** [4] - 53:17, 80:8, 80:12, 81:12
**CHANGE** [8] - 98:10, 98:11, 98:12, 98:13, 98:14, 98:15, 98:16, 98:17
**change** [3] - 31:15, 89:11, 98:5
**changed** [5] - 12:6, 26:16, 33:9, 63:1, 87:21
**changes** [2] - 97:14, 98:19
**charge** [5] - 18:13, 19:13, 19:17, 24:14, 68:6
**charged** [1] - 19:16
**charges** [9] - 80:2, 80:6, 88:9, 89:3, 89:4, 89:11, 89:14, 89:17, 89:21
**chased** [1] - 95:23
**check** [2] - 18:11, 39:9
**checks** [1] - 18:23
**CHERUBINO** [1] - 24:8
**Cherubino** [6] - 18:17, 18:19, 24:6, 24:11, 24:15, 24:18
**Cherubino's** [1] - 24:7
**children** [7] - 5:8, 5:13, 41:4, 41:6, 41:7, 41:9, 43:20
**choice** [3] - 11:11, 13:17, 23:2
**Chris** [1] - 52:10
**Christopher** [2] - 24:5, 58:10

**CITY** [3] - 1:8, 2:8, 98:1
**City** [23] - 1:18, 2:9, 6:3, 7:4, 11:4, 12:17, 12:20, 19:23, 27:4, 27:12, 31:7, 31:11, 31:12, 31:19, 32:13, 48:24, 49:2, 49:10, 49:18, 49:20, 88:19, 89:7
**civil** [1] - 87:16
**Civil** [1] - 1:15
**CJIS** [1] - 85:19
**class** [1] - 92:14
**classmate** [1] - 57:16
**clean** [2] - 66:15, 66:16
**clerk's** [3] - 68:20, 90:16, 90:20
**click** [1] - 37:19
**clicked** [1] - 37:3
**close** [3] - 14:3, 43:12, 61:7
**coast** [1] - 25:16
**Collazo** [2] - 54:14, 77:4
**combat** [2] - 66:3, 66:7
**comfortable** [1] - 68:4
**coming** [2] - 30:2, 73:11
**commander** [2] - 90:17, 90:21
**commencing** [1] - 1:21
**Commendation** [4] - 92:24, 94:6, 94:17, 95:18
**commendations** [2] - 91:13, 94:10
**commenting** [1] - 45:5
**comments** [7] - 45:14, 45:17, 45:20, 46:4, 46:15, 46:21, 47:24
**Commercial** [1] - 1:23
**Commission** [3] - 64:9, 64:12, 65:1
**commission** [1] - 99:14
**Commissioner** [14] - 1:9, 61:12, 65:4, 65:14, 65:18, 65:19, 65:24, 68:2, 69:1, 69:9, 69:20, 70:6, 98:2
**Commissioner's** [1] - 95:1
**common** [1] - 19:12
**COMMONWEALTH** [1] - 99:2

**Commonwealth** - 1:17, 99:5
**compiled** [1] - 36:10
**completed** [3] - 42:1, 50:4, 97:6
**COMPLETED** [1] - 97:17
**completely** [2] - 23:7, 63:2
**complies** [3] - 35:17, 39:5, 39:14
**concerned** [3] - 68:11, 68:14, 68:17
**concluded** [1] - 96:9
**conducting** [1] - 16:21
**confidential** [16] - 16:24, 17:4, 17:10, 17:11, 17:15, 17:18, 18:1, 18:4, 18:8, 18:10, 19:1, 19:2, 19:4, 19:5, 19:18, 19:22
**confirm** [1] - 39:17
**consider** [1] - 45:3
**consisted** [1] - 15:19
**constantly** [2] - 20:19, 66:13
**contact** [2] - 90:9, 90:12
**contained** [1] - 76:24
**context** [1] - 5:23
**continued** [1] - 31:22
**CONTROL** [1] - 99:17
**controlled** [6] - 17:23, 18:1, 18:5, 18:9, 67:19, 71:11
**conversation** [23] - 44:23, 45:2, 45:4, 46:12, 46:14, 46:19, 47:4, 51:16, 53:3, 61:18, 62:2, 62:4, 62:16, 63:4, 63:21, 66:1, 67:24, 69:1, 69:17, 70:3, 78:15, 78:17, 85:9
**conversations** [3] - 7:16, 8:8, 51:17
**conveyed** [1] - 81:18
**convincing** [1] - 21:2
**copies** [1] - 38:19
**COPLEY** [1] - 1:22
**copy** [3] - 38:20, 96:6, 97:7
**Cornford** [3] - 74:7, 78:15, 78:18
**cornford** [1] - 87:10
**correct** [9] - 16:3, 34:18, 39:9, 42:7, 48:9, 48:10, 49:3, 84:9, 84:13

**correction** [1] - 98:5
**corrections** [4] - 9:7, 9:9, 97:14, 98:18
**correctly** [4] - 15:9, 61:3, 89:2, 95:21
**Council** [1] - 92:14
**counsel** [2] - 4:3, 99:8
**Counsel** [2] - 7:17, 8:3
**counsellors** [1] - 69:14
**couple** [14] - 8:6, 16:20, 39:17, 40:4, 41:20, 42:22, 45:6, 46:15, 61:16, 62:7, 65:7, 67:8, 70:4, 88:9
**course** [1] - 80:24
**court** [6] - 68:19, 68:22, 68:23, 71:13, 71:14, 71:16
**COURT** [3] - 1:3, 1:22, 96:6
**Court** [3] - 13:22, 14:12, 14:18
**covered** [3] - 22:20, 26:22, 27:3
**COVID** [1] - 9:23
**CPR** [1] - 9:23
**crack** [4] - 69:3, 69:6, 69:9, 69:19
**crime** [4] - 16:18, 19:16, 62:8, 62:13
**crimes** [19] - 15:21, 16:4, 16:5, 16:8, 16:10, 16:12, 16:17, 19:21, 19:24, 21:6, 21:14, 21:15, 21:18, 22:1, 22:3, 22:5
**criminal** [3] - 18:12, 80:2, 80:6
**criminology** [1] - 8:16
**crowded** [2] - 44:7, 44:8
**Crowley** [2] - 55:24, 56:3
**CROWLEY** [1] - 56:1
**cumulative** [2] - 92:8, 92:9
**current** [4] - 63:9, 63:13, 63:16, 91:1
**curtail** [1] - 62:13
**custody** [4] - 80:9, 80:12, 81:12, 95:23
**cut** [1] - 55:3

**D**

**D-A-R-V-I-R-I-S** [1] - 56:24
**Darviris** [1] - 56:22

**date** [4] - 5:3, 61:23, 86:16, 98:7
**daughter** [2] - 43:21, 44:4
**Dave** [1] - 54:11
**days** [12] - 26:9, 26:12, 26:14, 30:11, 41:20, 60:20, 61:2, 88:15, 88:22, 88:23, 89:10, 89:11
**DEA** [2] - 10:4, 71:2
**deal** [1] - 68:13
**dealer** [2] - 67:10, 68:14
**dealers** [3] - 67:5, 67:16, 95:16
**decision** [1] - 50:11
**Declan** [1] - 71:2
**deems** [1] - 48:2
**Defendants** [4] - 1:10, 1:13, 2:12, 4:3
**definitely** [1] - 51:21
**degree** [1] - 8:14
**delegate** [1] - 82:19
**delete** [6] - 34:21, 42:21, 44:22, 46:9, 46:13, 48:4
**deleted** [5] - 34:14, 34:21, 34:23, 36:10, 44:14, 44:24, 45:18, 46:6, 47:3
**deleting** [1] - 34:18
**deliberately** [1] - 37:21
**delivered** [4] - 97:5, 97:8, 97:9, 97:10
**delivery** [1] - 71:12
**DeMarco** [1] - 15:11
**department** [8] - 8:21, 38:5, 41:20, 42:11, 67:3, 87:1, 89:23, 89:24
**Department** [12] - 1:10, 1:18, 8:19, 8:23, 9:2, 10:21, 12:23, 38:3, 38:15, 38:22, 48:18, 98:2
**DEPARTMENT** [1] - 2:8
**department's** [1] - 81:22
**department-issued** [1] - 42:11
**DePasquale** [4] - 49:2, 49:6, 49:11, 49:18
**deponent** [1] - 97:7
**DEPONENT** [1] - 97:12
**DEPONENT'S** [1] - 97:1

**deposed** [4] - 5:19, 5:23, 6:10, 7:6
**deposition** [8] - 7:13, 96:9, 97:10, 97:13, 98:5, 98:18, 99:6, 99:7
**DEPOSITION** [2] - 1:12, 98:1
**describe** [1] - 80:11
**Description** [1] - 3:8
**designated** [1] - 83:20
**desk** [3] - 75:16, 90:17, 90:19
**despite** [1] - 90:12
**detail** [3] - 28:18, 28:21, 66:21
**details** [3] - 28:14, 28:16, 66:4
**detective** [6] - 16:1, 21:7, 23:20, 24:5, 25:1, 84:22
**Detective** [14] - 24:6, 24:7, 24:10, 24:17, 54:14, 71:20, 72:1, 77:4, 85:5, 85:8, 86:14, 92:3, 93:13, 94:2
**detectives** [6] - 15:20, 23:22, 24:19, 24:22, 71:1, 75:17
**determine** [1] - 85:20
**development** [3] - 14:7, 14:9, 14:14
**Devin** [1] - 5:16
**difference** [1] - 36:9
**different** [28] - 11:2, 11:6, 12:3, 17:6, 18:4, 21:11, 23:13, 24:23, 24:24, 51:5, 51:9, 53:7, 53:18, 54:7, 54:8, 54:22, 55:18, 55:19, 56:19, 56:20, 57:5, 57:19, 58:4, 66:6, 66:18, 67:9, 82:19, 82:20
**differently** [1] - 21:12
**direct** [2] - 88:8, 88:11
**DIRECT** [2] - 4:18, 99:17
**DIRECTION** [1] - 99:17
**direction** [1] - 23:13
**directly** [1] - 95:6
**disbanded** [2] - 23:5, 23:8
**discipline** [6] - 49:21, 86:19, 87:13, 88:4, 88:12, 88:21
**disciplined** [4] - 86:6, 86:9, 88:1, 88:7

**discovery** [5] - 33:15, 34:1, 48:23, 50:16, 58:17
**discrepancies** [1] - 36:24
**discussed** [1] - 22:17
**disparity** [1] - 36:5
**dispatched** [2] - 27:10, 28:8
**distribution** [2] - 10:6, 98:8
**DISTRICT** [2] - 1:3, 1:3
**divides** [1] - 11:3
**DO** [2] - 97:15, 98:6

**DOES** [1] - 99:16
**dog** [1] - 5:8
**done** [9] - 41:21, 41:24, 66:6, 67:11, 70:19, 79:10, 83:5, 83:11, 95:4
**Donofrio** [4] - 71:20, 72:1, 93:13, 94:2
**door** [1] - 72:16
**dot** [3] - 47:23
**doubles** [1] - 29:8
**down** [8] - 25:17, 31:6, 35:20, 45:7, 48:9, 48:10, 49:21, 51:21
**download** [1] - 37:6
**drinking** [1] - 65:12
**drive** [8] - 43:7, 71:18, 74:4, 79:7, 79:22, 82:23, 83:13, 91:7
**driver's** [1] - 4:5
**driving** [5] - 44:15, 44:17, 71:21, 74:16, 83:9
**dropped** [1] - 88:10
**drove** [3] - 43:5, 43:6, 43:8
**drug** [45] - 9:24, 10:2, 10:3, 10:4, 10:5, 10:6, 10:18, 15:21, 16:4, 16:8, 16:10, 16:12, 16:17, 16:18, 19:13, 19:21, 19:23, 19:24, 20:3, 21:2, 21:5, 21:10, 21:14, 21:15, 22:1, 22:5, 23:3, 66:3, 66:7, 66:8, 66:11, 66:12, 67:5, 68:3, 68:13, 68:15, 68:21, 68:23, 75:15
**drugs** [9] - 7:9, 10:7, 10:14, 17:23, 67:7, 77:9, 77:14, 84:11,

85:22
**duly** [1] - 99:6
**during** [10] - 12:12,
47:14, 65:24, 68:24,
70:2, 80:12, 82:1,
82:11, 89:6, 93:15
**duties** [1] - 82:19
**duty** [1] - 41:12

## E

**early** [2] - 26:2, 65:21
**ears** [1] - 17:21
**East** [2] - 14:2, 14:3
**east** [1] - 31:11
**Eckardt** [2] - 92:24,
95:18
**ECKARDT** [1] - 92:24
**education** [2] - 8:11,
8:18
**effect** [1] - 63:22
**effects** [1] - 10:13
**eight** [4] - 12:5, 26:6,
65:22
**eight-thirty** [1] - 65:22
**either** [15] - 8:17,
15:12, 17:7, 30:10,
39:7, 40:13, 43:2,
44:15, 46:11, 53:9,
53:12, 56:5, 56:7,
83:9
**eleven** [7] - 11:23,
26:5, 26:7, 26:8,
43:17
**Elms** [5] - 13:22, 14:5,
14:6, 14:9, 14:15
**Elow** [1] - 61:12
**embedded** [2] - 42:18,
45:10
**employed** [1] - 99:8
**Employee** [1] - 91:16
**employee** [1] - 42:6
**en** [1] - 43:2
**encompass** [3] - 13:9,
25:14, 31:5
**end** [9] - 27:11, 28:12,
31:7, 31:11, 31:12,
58:6, 63:18, 69:16,
69:22
**ends** [1] - 81:8
**enforcement** [1] -
66:14
**engage** [1] - 46:18
**enjoyed** [1] - 14:1
**ensure** [2] - 20:23,
80:12
**entire** [6] - 31:11,
31:12, 40:15, 50:20,
51:15, 95:7
**entry** [3] - 70:17, 71:7,

71:15
**environment** [1] -
89:18
**equally** [1] - 16:9
**ERRATA** [3] - 97:1,
97:17, 98:4
**errata** [2] - 98:7, 98:8
**Errata** [3] - 97:4, 97:6,
97:14
**ESQ** [2] - 97:5, 97:9
**Esquire** [2] - 2:5, 2:10
**essentially** [2] - 27:8,
75:9
**estimated** [2] - 35:21,
36:21
**evacuating** [1] - 93:20
**event** [1] - 21:16
**events** [1] - 21:19
**eventually** [4] - 23:7,
74:8, 77:16, 88:10
**everywhere** [1] - 71:4
**evidence** [60] - 22:15,
74:1, 74:4, 74:16,
74:18, 74:20, 74:24,
75:3, 75:5, 75:13,
75:18, 75:20, 76:6,
76:10, 76:13, 76:17,
76:18, 76:20, 76:21,
76:24, 77:3, 77:6,
78:2, 78:23, 79:2,
79:7, 79:9, 79:11,
79:13, 79:15, 79:23,
80:16, 80:17, 80:18,
80:21, 81:14, 81:16,
81:19, 81:22, 81:24,
82:2, 82:7, 82:10,
82:14, 82:22, 82:23,
83:2, 83:6, 83:10,
83:12, 83:13, 83:16,
83:18, 83:19, 83:21,
83:24, 84:3, 85:4,
86:15
**exact** [7] - 25:4, 46:3,
59:12, 86:10, 86:11,
86:16, 91:11
**exactly** [5] - 23:19,
43:16, 60:4, 60:6,
85:16
**examination** [1] - 4:3
**EXAMINATION** [1] -
4:18
**examined** [1] - 4:6
**except** [3] - 4:9, 14:16,
98:18
**exchange** [1] - 19:17
**excuse** [1] - 48:1
**execute** [3] - 22:11,
67:20, 70:13
**executed** [1] - 72:14
**executing** [2] - 74:12,

79:17
**execution** [9] - 70:15,
80:1, 80:5, 80:13,
81:12, 82:1, 82:8,
82:11, 83:21
**Exhibit** [15] - 33:20,
33:21, 35:13, 36:7,
37:2, 38:13, 42:16,
45:9, 47:9, 47:10,
47:11, 48:6, 50:20,
50:22, 50:23
**EXHIBITS** [1] - 1:2
**Exhibits** [1] - 3:13
**exist** [2] - 14:10, 14:18
**existed** [2] - 12:1,
23:16
**expired** [1] - 63:17
**expires** [1] - 99:14
**explain** [3] - 11:2,
27:5, 81:11
**extensive** [3] - 8:20,
9:19, 9:24
**extremely** [1] - 83:14
**eyes** [1] - 17:21

## F

**face** [1] - 69:12
**Facebook** [34] - 3:9,
3:11, 32:17, 32:18,
32:21, 32:23, 33:3,
33:13, 33:21, 34:3,
34:5, 34:7, 35:4,
35:22, 36:11, 37:1,
37:24, 38:24, 39:18,
40:11, 40:18, 41:3,
42:9, 42:19, 47:6,
47:10, 47:22, 47:24,
48:1, 48:2, 48:3,
48:9, 48:16, 49:16
**Fact** [1] - 92:15
**failure** [2] - 88:8,
88:11
**fair** [4] - 21:13, 21:17,
40:13, 59:13
**false** [1] - 77:10
**familiar** [2] - 85:13,
95:10
**family** [4] - 51:20,
52:14, 72:6
**February** [9] - 5:4,
34:15, 35:4, 40:17,
41:23, 46:24, 47:2,
48:5, 48:8
**Federal** [1] - 2:3
**feet** [1] - 70:7
**felt** [2] - 49:14, 49:20
**female** [2] - 73:17,
91:3
**few** [11] - 6:5, 12:18,

25:2, 25:4, 28:15,
41:1, 46:6, 46:9,
59:2, 63:23
**Fiction** [1] - 92:15
**file** [2] - 76:14, 76:15
**filing** [2] - 76:21,
84:17, 86:15
**filled** [1] - 31:4
**Final** [2] - 3:10, 35:13
**final** [2] - 23:20, 35:11
**finally** [1] - 23:20
**financially** [1] - 99:9
**findings** [1] - 90:1
**firearm** [1] - 95:24
**first** [23] - 4:5, 8:22,
9:23, 10:17, 10:20,
10:23, 12:22, 25:22,
25:24, 26:4, 35:10,
41:1, 42:17, 46:15,
50:19, 51:6, 52:1,
52:2, 54:9, 56:4,
72:5, 72:16, 93:14
**First** [1] - 49:17
**fist** [1] - 65:10
**five** [13] - 6:6, 11:6,
11:7, 12:9, 24:20,
24:21, 29:1, 29:2,
43:22, 43:23, 44:2,
56:15
**flapping** [1] - 28:21
**Florida** [2] - 51:23,
52:8
**Floyd** [1] - 40:18
**focused** [2] - 82:20,
95:15
**follow** [1] - 93:16
**follow-up** [1] - 93:16
**following** [2] - 63:19,
93:18
**follows** [1] - 4:7
**foregoing** [1] - 98:18
**FOREGOING** [1] -
99:16
**forfeit** [1] - 86:20
**forget** [1] - 74:20
**forgive** [1] - 83:18
**form** [2] - 4:9, 49:8
**former** [4] - 40:7, 49:2,
49:5, 49:10
**forth** [2] - 46:20, 99:6
**four** [10] - 11:6, 12:5,
12:6, 27:19, 29:24,
31:2, 31:3, 31:12,
49:23, 56:17
**four-day** [1] - 49:23
**fourth** [1] - 27:18
**free** [1] - 27:11
**friend** [2] - 36:10, 38:9
**Friends** [4] - 3:9,
33:21, 36:12, 36:19

**friends** [29] - 8:6,
33:12, 33:16, 34:3,
34:5, 34:8, 34:10,
34:15, 34:18, 34:21,
34:22, 35:7, 35:21,
36:3, 36:6, 36:7,
36:11, 36:20, 37:3,
37:9, 37:15, 37:16,
37:19, 38:2, 38:5,
38:6, 38:14, 39:18,
40:11
**front** [5] - 42:17,
45:10, 72:16, 90:16,
90:19
**full** [3] - 9:3, 35:20,
37:17
**full-time** [1] - 9:3
**future** [2] - 21:15,
63:11

## G

**garage** [1] - 43:12
**general** [5] - 8:5, 17:6,
62:15, 64:23, 86:24
**generally** [2] - 28:7,
46:2
**generate** [7] - 37:2,
44:23, 45:1, 45:3,
46:11, 46:14, 47:4
**geographic** [2] - 11:3,
25:15
**George** [1] - 40:18
**gist** [1] - 62:15
**given** [8] - 79:15,
81:16, 82:2, 82:3,
83:5, 83:12, 83:24,
99:7
**goings** [1] - 67:4
**graduate** [1] - 9:14
**graduated** [2] - 8:12,
8:13
**graduation** [1] - 9:17
**Gray** [9] - 15:11,
15:14, 15:16, 18:15,
18:18, 18:20, 24:12
**greeted** [1] - 65:8
**grew** [1] - 14:2
**grieved** [1] - 49:22
**group** [2] - 29:17, 70:8
**groups** [1] - 29:14
**guess** [2] - 6:19, 67:3

## H

**H-U-S-S-E-Y** [1] - 4:22
**half** [3] - 12:17, 12:19,
27:3
**Hall** [1] - 1:19, 2:9
**Halliday** [1] - 91:17
**Halloran** [1] - 52:16

hand [4] - 49:20,
65:10, 75:11, 99:10
handful [1] - 39:24
handing [1] - 49:21
handle [2] - 22:13,
75:17
handled [1] - 26:21
handling [2] - 10:7,
22:15
hanging [1] - 19:13
happy [1] - 5:1
Harvard [7] - 12:18,
13:7, 13:8, 14:8,
14:16, 25:17, 26:22
head [3] - 6:12, 15:12,
19:14
headquarters [1] -
90:24
heads [4] - 69:3, 69:7,
69:10, 69:19
heard [1] - 50:8
hearing [4] - 50:7,
50:9, 68:20, 87:23
help [3] - 20:16, 62:13,
75:7
helped [1] - 75:5
helps [1] - 92:17
Herbert [1] - 91:17
hereby [2] - 98:19,
99:5
hereinbefore [1] -
99:6
hereto [1] - 99:8
hereunto [1] - 99:10
Heroin [1] - 95:9
heroin [1] - 95:16
high [2] - 13:23, 59:19
higher [1] - 28:18
history [1] - 18:12
hit [1] - 9:1
hmm [6] - 22:24, 34:2,
81:14
hmm-hmm [3] - 22:24,
34:2, 81:14
hold [2] - 9:3, 81:17
home [3] - 36:11,
42:8, 42:24, 43:1,
72:7, 73:10, 73:12,
73:15, 74:10
Homeland [1] - 71:2
honestly [2] - 38:4,
92:21
hostile [1] - 89:18
hour [3] - 12:5, 12:7
hours [7] - 12:4, 26:6,
42:22, 45:6, 46:7,
46:9, 46:15
house [1] - 91:7
houses [1] - 93:20
housing [3] - 14:7,

14:9, 14:14
Human [1] - 92:13
human [1] - 16:6
hundred [2] - 16:20,
18:3
hurt [3] - 20:17, 20:21,
20:22
HUSSEY [8] - 1:5,
1:12, 3:3, 4:2, 98:1,
98:1, 98:23, 99:6
Hussey [1] - 4:22



**I**

identification [1] -
10:6
identified [1] - 4:4
identify [1] - 37:23
image [1] - 42:18
immediately [1] - 9:16
importance [1] - 80:8
inactive [1] - 37:14
inappropriate [1] -
48:2
INC [1] - 1:22
incident [3] - 28:8,
86:7, 93:4
include [2] - 22:9,
22:13
included [1] - 57:11
increase [1] - 62:8
indicate [1] - 97:14
Indicates [1] - 36:15
individual [2] - 18:24,
65:11
individuals [2] -
67:14, 72:24
infiltrate [1] - 67:4
informant [9] - 18:1,
19:1, 19:2, 19:9,
19:15, 19:18, 87:4,
87:6, 87:7
informants [24] - 10:7,
16:22, 16:24, 17:4,
17:11, 17:12, 17:16,
17:19, 18:5, 18:8,
18:10, 19:6, 19:8,
19:10, 19:22, 20:16,
21:24, 22:13, 66:20,
67:19, 68:4, 68:10,
68:12
information [1] - 17:8
infringing [1] - 49:17
initial [2] - 7:23, 70:18
initiated [1] - 63:3
Inman [13] - 70:10,
70:12, 70:16, 72:6,

72:22, 73:2, 73:8,
74:1, 77:17, 77:18,
78:2, 79:1, 84:15
inside [4] - 73:2, 73:7,
78:23, 79:11
institutions [1] - 10:5
INSTRUCTIONS [3] -
97:2, 97:12, 98:5
instructions [1] - 98:8
interact [1] - 65:3
interaction [1] - 65:6
interested [1] - 99:9
intern [1] - 90:6
interrogatories [1] -
7:21
interview [6] - 15:7,
15:8, 22:5, 35:6,
47:15, 48:21
interviewed [3] -
18:13, 34:24, 35:3
interviews [1] - 18:24
introduce [1] - 4:20
investigate [2] -
19:24, 22:1
investigated [2] -
15:21, 21:6
investigating [6] -
19:21, 21:14, 21:15,
21:19, 21:20, 22:3
investigation [14] -
7:23, 17:8, 17:16,
17:19, 20:4, 35:12,
67:13, 69:5, 69:10,
71:11, 86:7, 90:1,
92:7, 93:17
investigations [7] -
10:5, 16:18, 16:21,
17:7, 21:9, 21:10,
64:6
Investigations [7] -
14:23, 15:1, 15:5,
15:17, 15:23, 92:11,
93:23
involved [3] - 71:11,
80:4, 90:3
issued [1] - 42:11
items [3] - 84:14,
85:12, 85:15
itself [3] - 48:4, 97:15,
98:7

**J**

Jack [1] - 55:24
job [1] - 8:17
jobs [1] - 9:3
join [4] - 8:22, 14:24,
15:4
joined [8] - 8:18, 9:11,
10:20, 12:2, 12:10,

12:22, 22:7, 69:17
joining [1] - 9:2
joking [1] - 48:12
July [4] - 60:19, 61:10,
61:24, 63:15
June [2] - 8:24, 15:2

**K**

KATE [1] - 97:9
Kate [1] - 2:10
keep [6] - 33:4, 33:6,
33:7, 33:8, 33:10,
87:2
keeping [1] - 14:1
Ken [1] - 40:6
Ketamine [1] - 77:9
kidding [1] - 69:21
kids [1] - 44:9
kind [34] - 10:2, 10:24,
13:3, 13:5, 13:21,
14:2, 14:3, 17:20,
21:22, 24:12, 27:22,
28:24, 31:13, 31:21,
32:10, 32:13, 62:10,
62:13, 65:8, 65:17,
66:4, 68:16, 69:3,
69:8, 69:15, 69:16,
69:22, 71:4, 71:10,
71:22, 75:24, 82:19,
86:24
kkleimola@
cambridgema.gov
[1] - 2:11
Kleimola [2] - 2:10,
3:13
KLEIMOLA [18] - 3:4,
4:8, 4:11, 4:14, 4:19,
33:19, 35:10, 38:19,
38:23, 47:8, 50:19,
80:24, 81:2, 81:5,
81:9, 96:1, 96:4,
97:9
knock [1] - 65:13
knowledge [1] - 87:24

**L**

label [4] - 74:24, 75:5,
75:13, 75:20
labeled [2] - 76:6,
81:21
labeling [1] - 84:8
labels [1] - 83:22
last [5] - 4:21, 24:7,
25:1, 56:23, 81:10
late [1] - 43:16
Latin [1] - 8:12
LAW [2] - 2:3, 2:8
Law [1] - 1:18
law [1] - 8:16

laws [1] - 9:23
lawsuit [2] - 6:3, 7:7
learn [1] - 91:3
learned [2] - 74:8,
77:16
least [3] - 25:4, 45:20,
51:19
leave [5] - 23:1, 23:2,
37:21, 48:14, 49:15
leery [1] - 68:3
leeway [1] - 68:21
left [7] - 23:7, 23:17,
25:7, 28:13, 30:9,
72:15, 72:17
legal [1] - 9:23
lesser [1] - 19:17
Letter [2] - 94:6, 94:17
level [2] - 72:11, 72:16
license [1] - 4:5
lieu [1] - 19:16
Lieutenant [1] - 24:12
life [5] - 39:19, 39:21,
39:22, 40:3, 40:15
Life [1] - 91:17
Lindsay [1] - 5:10
LINE [1] - 98:9
line [5] - 37:15, 54:4,
54:6, 54:19, 55:10
lines [5] - 53:1, 54:2,
56:14, 57:2, 69:2



list [12] - 29:15, 29:16,
33:16, 34:3, 36:10,
36:23, 37:3, 37:17,
39:17, 63:9, 63:14,
63:16
List [2] - 3:9, 33:21
listed [4] - 34:10, 36:7,
38:14, 57:15
lists [1] - 36:11
live [3] - 5:5, 5:7, 42:2
lived [3] - 5:17, 23:6,
40:14
local [1] - 67:3
location [2] - 81:24,
82:3
log [1] - 81:17
look [5] - 35:15, 45:9,
47:11, 50:23, 65:15
looked [3] - 69:4,
69:8, 69:20
looking [2] - 42:16,
84:24
looks [2] - 55:1, 55:2
Louis [4] - 24:6, 49:2,
49:6, 49:11
Lowell [1] - 9:13
lower [3] - 12:17,
13:10, 27:3

## M

**Mahoney** [1] - 53:23
**Main** [1] - 14:16
**main** [1] - 20:16
**majority** [1] - 13:6
**Maldonado** [1] - 54:11
**male** [4] - 73:17, 73:18, 73:19, 74:10
**male's** [1] - 73:22
**Manager** [3] - 49:2, 49:11, 49:18
**manager** [1] - 49:6
**marathon** [1] - 93:9
**Margaret** [3] - 1:15, 99:5, 99:13
**mark** [4] - 38:12, 39:9, 39:11, 47:8
**marked** [9] - 33:19, 33:21, 33:23, 35:11, 35:13, 39:7, 47:10, 50:19, 50:21
**market** [1] - 66:11
**marks** [2] - 97:15, 98:6
**Mass** [1] - 25:17
**MASSACHUSETTS** [2] - 1:3, 99:2
**Massachusetts** [11] - 1:14, 1:17, 1:19, 1:20, 1:23, 2:4, 2:9, 2:10, 5:6, 92:17, 99:5
**Matt** [1] - 53:23
**matters** [1] - 51:21
**Max** [1] - 7:2
**mayor** [1] - 40:7
**mean** [17] - 8:5, 16:5, 17:13, 19:11, 20:6, 26:1, 28:24, 36:9, 37:13, 46:18, 48:11, 52:19, 66:11, 66:12, 68:19, 70:5, 70:24
**meaning** [1] - 5:24
**MEANS** [1] - 99:17
**means** [1] - 19:12
**meant** [1] - 25:19
**Medal** [2] - 92:24, 95:18
**Medford** [1] - 71:16
**media** [1] - 32:19
**medical** [2] - 58:18, 91:23
▮▮▮▮▮▮▮▮
**medications** [3] - 7:9, 59:1, 59:24
**Meeting** [1] - 92:14
**members** [1] - 65:3
**memory** [7] - 75:1, 76:5, 78:6, 78:12,

78:14, 84:2, 84:6
**mentioned** [2] - 14:5, 64:5
**Mercantile** [1] - 1:22
**message** [11] - 54:9, 54:12, 54:15, 55:9, 55:13, 56:4, 56:16, 56:21, 57:1, 57:14, 57:22
**messages** [21] - 50:17, 52:15, 52:18, 52:22, 52:23, 53:6, 53:10, 53:13, 53:17, 54:5, 54:19, 54:20, 55:14, 55:16, 55:17, 56:11, 56:16, 56:17, 57:4, 57:18, 58:3
**Messages** [2] - 3:12, 50:21
**met** [2] - 40:3, 40:4
**middle** [4] - 26:7, 28:20, 54:4, 54:19, 91:10
**Middlesex** [2] - 9:4, 9:8
**MIDDLESEX** [1] - 99:3
**midnight** [1] - 27:19
**might** [3] - 31:6, 31:7, 65:7
**minutes** [4] - 45:12, 45:15, 45:21, 81:4
**miss** [3] - 60:14, 60:17, 60:18
**missed** [2] - 37:9, 37:11
**missing** [1] - 34:12
**moment** [1] - 50:14
**money** [1] - 85:21
**month** [2] - 11:13, 63:19
**months** [6] - 11:15, 23:19, 25:2, 25:5, 43:21, 50:10
**morning** [4] - 40:24, 42:19, 43:16, 65:21
**most** [6] - 19:11, 27:20, 30:1, 39:24, 40:14, 71:5
**mostly** [1] - 21:14
**moved** [3] - 12:4, 12:7, 23:20
**MR** [11] - 4:10, 4:13, 4:16, 38:21, 49:8, 49:13, 80:22, 81:1, 81:3, 96:3, 96:8
**MS** [17] - 3:4, 4:8, 4:11, 4:14, 4:19, 33:19, 35:10, 38:19, 38:23, 47:8, 50:19, 80:24, 81:2, 81:5,

81:9, 96:1, 96:4
**multi** [1] - 72:11
**multiple** [3] - 31:5, 72:6, 72:8
**music** [1] - 47:21
**musicians** [1] - 40:1

## N

**nabbed** [1] - 47:23
**name** [18] - 4:21, 5:9, 20:20, 24:8, 37:5, 38:24, 39:9, 39:12, 56:23, 58:21, 73:22, 74:20, 85:13, 85:18, 87:10, 87:11, 95:9
**named** [1] - 49:2
**names** [3] - 5:15, 20:18, 37:19
**nature** [2] - 10:1, 10:8
**near** [1] - 70:2
**necessarily** [5] - 68:5, 68:8, 83:1, 83:7, 84:1
**need** [3] - 19:23, 21:24, 22:4
**needed** [2] - 60:12, 80:20
**needs** [2] - 83:4, 83:11
**never** [3] - 20:20, 20:21, 20:22
**new** [4] - 64:1, 64:17, 64:24, 91:5
**Newtowne** [3] - 13:22, 14:12, 14:18
**next** [8] - 11:18, 14:14, 26:6, 39:9, 53:4, 55:14, 57:4, 80:22
**night** [10] - 11:1, 26:18, 26:20, 27:18, 28:10, 30:2, 91:10, 93:16
**nights** [2] - 26:2, 30:13
**nine** [2] - 5:12, 58:5
**NO** [1] - 1:4
**non** [1] - 73:1
**non-police** [1] - 73:1
**none** [1] - 29:1
**north** [1] - 31:12
**Northborough** [2] - 92:16
**NOT** [3] - 97:15, 98:6, 99:16
**Notary** [5] - 1:16, 4:6, 98:7, 99:5, 99:13
**notations** [2] - 97:15, 98:6
**note** [2] - 60:11, 98:5
**noted** [1] - 98:19

notes [2] - 7:18, 7:19
**nothing** [2] - 8:7, 20:14
**number** [14] - 20:6, 25:4, 36:12, 36:18, 36:20, 36:22, 38:4, 46:17, 50:17, 51:12, 70:24, 72:23, 91:12, 94:9
**numbers** [1] - 33:24, 37:1, 50:24
**nurse** [1] - 60:22

## O

**obey** [2] - 88:8, 88:11
**objection** [2] - 49:8, 49:13
**objections** [1] - 4:9
**obligations** [2] - 42:1, 87:1
**observed** [2] - 65:12, 68:13, 71:5
**obtain** [1] - 67:19
**obtained** [1] - 67:16
**occasion** [1] - 90:22
**occasions** [1] - 61:17
**occupant** [2] - 73:9, 73:11, 74:9
**October** [1] - 9:1
**OF** [12] - 1:3, 1:8, 1:12, 2:3, 2:8, 97:16, 98:1, 98:1, 99:2, 99:16, 99:16, 99:17
**offensive** [1] - 48:2
**offer** [1] - 19:14
**office** [3] - 76:16, 84:18, 84:21
**Office** [2] - 9:5, 9:9
**OFFICE** [1] - 2:3
**officer** [58] - 6:16, 9:7, 9:9, 9:17, 9:21, 11:8, 12:22, 15:24, 27:1, 27:6, 27:21, 27:23, 27:24, 28:6, 32:6, 32:8, 32:14, 37:24, 38:7, 39:8, 39:13, 54:11, 58:10, 67:1, 69:17, 69:23, 75:4, 75:12, 75:15, 75:19, 79:1, 79:10, 79:16, 79:19, 79:22, 80:17, 81:17, 82:2, 82:7, 82:10, 82:14, 82:22, 83:2, 83:20, 83:21, 84:3, 89:23, 90:2, 90:6, 90:9, 90:12, 90:16, 91:3, 91:4, 91:5
**Officer** [7] - 52:10,

55:24, 56:3, 56:22, 64:8, 69:24, 70:1
**officer's** [1] - 91:7
**officers** [16] - 12:13, 12:16, 12:19, 27:21, 30:23, 39:1, 39:2, 66:19, 66:24, 70:4, 70:8, 71:1, 71:4, 73:1, 90:13, 93:14
**offices** [2] - 1:18, 76:11
**officially** [1] - 41:12
**often** [8] - 11:12, 13:13, 28:22, 32:1, 32:15, 32:16
**old** [6] - 5:11, 43:20, 43:21, 63:24, 64:17, 64:24
**Oliver** [3] - 1:15, 99:5, 99:13
**on-the-job** [1] - 8:17
**once** [12] - 6:23, 30:19, 30:20, 61:14, 61:15, 61:21, 61:22, 71:12, 75:5, 78:23, 82:4
**One** [1] - 95:1
**one** [66] - 5:22, 6:11, 6:21, 6:22, 11:6, 11:14, 12:4, 12:7, 13:7, 13:9, 15:12, 15:20, 19:6, 26:23, 27:6, 27:20, 29:1, 31:6, 31:7, 31:10, 31:11, 33:23, 36:14, 36:17, 50:14, 51:8, 52:1, 53:9, 53:12, 55:1, 55:23, 56:15, 56:16, 57:10, 58:24, 60:8, 60:12, 65:7, 66:19, 66:20, 66:24, 67:14, 67:17, 76:6, 78:7, 79:6, 79:15, 82:3, 83:3, 83:8, 83:9, 83:22, 84:7, 86:20, 88:10, 89:18, 89:19, 90:22, 92:6, 93:4, 93:5, 93:8, 94:11, 94:15, 94:21
**ones** [2] - 51:19, 82:23
**ongoing** [2] - 71:10
**online** [3] - 41:16, 41:19, 42:4
**open** [3] - 66:11, 69:4, 69:10
**Operation** [1] - 95:9
**operation** [1] - 95:15
**opinion** [1] - 62:11
**opinions** [2] - 66:15, 66:16

**P**

**Opioid** [1] - 92:15
**opportunity** [1] - 19:14
**option** [2] - 67:17, 67:18
**order** [3] - 41:21, 88:9, 88:11
**ORIGINAL** [1] - 97:8
**original** [3] - 88:21, 97:4, 97:10
**otherwise** [1] - 29:3
**outcome** [1] - 99:9
**overall** [1] - 62:8
**overnights** [1] - 26:1
**overtime** [17] - 28:14, 28:15, 28:17, 28:18, 28:23, 29:10, 29:20, 29:22, 29:24, 30:1, 30:6, 31:22, 32:2, 32:3, 32:5, 32:9, 32:10

**P**

**p.m** [10] - 11:23, 26:5, 26:6, 26:7, 27:19, 81:8, 96:10
**P650** [1] - 8:1
**package** [1] - 71:12
**packaged** [1] - 81:21
**packages** [2] - 83:4, 83:22
**packaging** [2] - 10:6, 83:10
**PAGE** [2] - 97:16, 98:9
**page** [32] - 35:14, 35:15, 35:16, 36:11, 38:16, 42:17, 45:11, 51:1, 51:11, 51:12, 51:15, 51:17, 53:4, 53:16, 54:3, 54:4, 54:5, 54:10, 54:13, 54:16, 54:18, 54:20, 55:9, 55:14, 55:16, 56:11, 56:15, 57:18, 57:21, 58:2
**Page** [3] - 3:2, 3:8, 98:8
**pages** [6] - 37:14, 51:3, 51:6, 53:17, 53:20, 58:2
**PAGES** [1] - 1:1
**paid** [3] - 28:19, 42:5, 42:6
**pains** [1] - 98:20
**paper** [5] - 78:22, 85:23, 85:24, 86:1, 86:4
**paperwork** [2] - 7:18, 7:19

**paragraph** [2] - 35:19, 35:20
**parentheses** [1] - 36:19
**park** [2] - 43:9, 43:10
**parked** [2] - 43:12, 44:18
**part** [8] - 7:6, 16:19, 20:3, 51:14, 51:23, 63:20, 69:1
**participate** [2] - 17:23, 18:1
**participating** [1] - 92:13
**particular** [21] - 11:9, 13:12, 13:17, 25:23, 27:15, 29:17, 29:21, 30:5, 31:15, 31:19, 72:3, 75:20, 77:22, 79:16, 82:3, 82:12, 92:7, 93:4, 93:5, 93:11
**parties** [1] - 99:8
**partners** [2] - 72:1, 72:4
**parts** [1] - 67:24
**party** [2] - 6:7, 97:8
**passenger** [1] - 43:7
**past** [3] - 21:16, 21:19, 67:12
**patrol** [27] - 11:1, 11:5, 11:20, 11:21, 11:22, 12:13, 12:21, 14:20, 14:22, 15:24, 25:8, 26:10, 26:18, 26:20, 26:21, 27:7, 27:18, 27:20, 28:20, 30:23, 31:3, 31:5, 32:6, 32:8, 32:14, 32:16, 61:11
**Pause** [3] - 39:6, 39:15, 50:15
**Peabody** [2] - 5:6, 5:17
**Peace** [1] - 64:8
**pen** [1] - 38:13
**penalties** [1] - 98:20
**pending** [2] - 50:4, 50:5
**people** [26] - 10:14, 17:6, 19:4, 19:5, 20:8, 20:9, 20:11, 36:9, 37:14, 38:9, 45:5, 51:5, 51:9, 53:7, 53:18, 54:7, 54:8, 54:23, 55:18, 55:20, 56:19, 56:20, 57:5, 58:4, 69:18, 82:20
**percent** [1] - 16:14

**percentage** [2] - 20:2, 20:5
**period** [1] - 23:6
**perjury** [1] - 98:21
**permission** [2] - 90:17, 90:20
**person** [30] - 19:19, 41:15, 51:4, 51:16, 51:22, 52:23, 53:6, 53:18, 53:19, 54:7, 54:22, 54:24, 55:13, 55:17, 56:18, 57:5, 57:7, 57:8, 57:17, 57:19, 58:3, 58:8, 65:7, 65:13, 68:22, 77:22, 82:4, 82:15, 84:1, 85:20
**personal** [1] - 42:14
**personally** [5] - 38:10, 39:19, 39:22, 40:8, 43:6
**phone** [3] - 41:3, 42:12, 42:14
**photographed** [2] - 80:15, 81:15
**phrased** [1] - 62:21
**pick** [1] - 11:18
**pill** [2] - 85:17, 85:18
**Pine** [1] - 95:22
**place** [3] - 44:9, 71:12, 88:4
**placed** [5] - 48:14, 79:12, 79:13, 80:16, 84:17
**plainclothes** [3] - 15:19, 71:4, 94:3
**Plaintiff** [2] - 1:6, 2:6
**plaintiff** [1] - 7:1
**platform** [1] - 32:19
**platoon** [1] - 27:18
**plus** [1] - 28:19
**point** [11] - 18:22, 42:12, 42:23, 60:9, 68:24, 70:15, 73:9, 73:13, 73:24, 74:3, 90:15
**Police** [20] - 1:10, 8:19, 8:23, 9:2, 10:20, 11:3, 12:22, 23:5, 29:9, 38:3, 38:14, 38:22, 48:17, 65:14, 67:2, 71:2, 84:18, 84:21, 90:6, 98:2
**police** [15] - 6:16, 9:17, 9:20, 16:1, 17:24, 38:7, 39:8, 39:13, 47:22, 48:17, 73:1, 78:24, 81:18, 83:23, 90:24

**policing** [5] - 64:1, 64:17, 64:24
**portion** [2] - 16:13, 38:8
**Portland** [1] - 14:8
**position** [1] - 20:22
**positive** [4] - 44:6, 57:6, 62:1, 74:17
**possession** [1] - 73:24
**possible** [1] - 78:19
**possibly** [1] - 59:17
**post** [22] - 34:15, 35:4, 41:3, 42:21, 44:14, 44:22, 45:12, 46:3, 46:22, 46:24, 47:2, 47:7, 47:14, 48:4, 48:6, 48:8, 48:11, 48:13, 48:21, 49:16
**POST** [7] - 63:24, 64:3, 64:5, 64:7, 64:8, 64:11, 65:1
**Post** [3] - 3:11, 47:10
**posted** [6] - 40:18, 42:19, 45:7, 45:24, 47:17, 48:1
**posts** [4] - 46:6, 46:9, 46:13, 46:16
**potential** [3] - 19:13, 87:6, 87:7
**power** [1] - 20:23
**practitioner** [1] - 60:22
**prefer** [1] - 28:19
**preparation** [1] - 8:4
**prepare** [3] - 7:13, 7:17, 8:7
**prepared** [1] - 71:9
**prescribed** [1] - 60:8
**present** [1] - 70:4
**president** [2] - 58:11, 58:15
**pressure** [3] - 58:19, 59:15, 59:18
**pretty** [5] - 22:20, 27:11, 53:1, 60:16, 95:6
**prevent** [1] - 21:15
**primarily** [3] - 15:20, 16:4, 30:12
**Pringles** [3] - 77:10, 77:14, 84:11
**privacy** [1] - 33:2
**private** [3] - 33:4, 33:7, 33:9
**probation** [1] - 10:23
**problem** [3] - 66:3, 66:7, 66:8
**Procedure** [1] - 1:15
**process** [7] - 15:4,

15:6, 18:9, 29:13, 50:3, 50:6, 83:15
**processed** [2] - 76:19, 80:19, 81:21
**production** [1] - 4:4
**Professional** [4] - 1:16, 7:24, 35:1, 69:5
**profile** [4] - 32:21, 32:24, 37:24, 38:24
**progress** [1] - 87:3
**promote** [1] - 62:23
**promoted** [6] - 30:10, 30:16, 30:19, 30:20, 60:2, 62:20
**promotion** [2] - 63:21, 64:22
**pronounce** [2] - 59:9, 60:1
**proper** [1] - 10:7
**property** [5] - 80:21, 81:22, 83:5, 83:12, 83:24
**prostitution** [1] - 16:6
**protect** [1] - 20:14
**protective** [1] - 70:19
**provide** [2] - 17:8, 33:15
**provided** [3] - 48:24, 50:17, 58:17
**provisions** [1] - 1:14
**PSU** [5] - 3:10, 35:11, 35:13, 36:2, 47:15
**public** [2] - 43:10, 65:4
**Public** [5] - 1:16, 4:6, 98:7, 99:5, 99:13
**punishment** [1] - 49:14
**purchase** [1] - 18:2
**purchases** [4] - 17:23, 18:6, 18:9, 67:19
**purposes** [1] - 11:5
**pursuant** [1] - 1:13
**put** [10] - 20:5, 20:22, 23:19, 25:3, 38:4, 46:17, 60:7, 65:15, 65:18, 79:11
**putting** [2] - 46:7, 46:10

**Q**

**questions** [2] - 4:24, 96:2
**quite** [3] - 22:8, 59:17, 78:19

**R**

**race** [1] - 90:2

8

**ran** [1] - 85:18
**rank** [2] - 15:23, 16:2
**ranks** [1] - 15:10
**rare** [2] - 83:14, 83:17
**rate** [2] - 28:18, 28:19
**rather** [2] - 21:15, 28:20
**RAV4** [1] - 71:24
**read** [3] - 41:3, 45:20, 98:18
**reading** [2] - 97:13, 98:5
**ready** [1] - 74:19
**real** [5] - 38:24, 39:19, 39:20, 39:22, 40:3
**really** [4] - 27:9, 31:20, 53:2, 66:14
**Really** [1] - 69:9
**REASON** [8] - 98:10, 98:11, 98:12, 98:13, 98:14, 98:15, 98:16, 98:17
**reason** [4] - 46:11, 47:3, 59:16, 98:6
**reasons** [1] - 97:14
**reassigned** [10] - 23:9, 23:10, 23:22, 24:2, 24:11, 24:18, 24:22, 24:23, 25:1, 25:2
**reassure** [2] - 20:13, 20:19
**receive** [3] - 10:3, 10:9, 94:21
**RECEIVED** [1] - 97:17
**received** [11] - 49:14, 56:16, 56:18, 57:14, 87:20, 91:12, 91:20, 93:3, 94:9, 94:13, 94:18
**receiving** [7] - 91:16, 92:3, 92:23, 94:5, 94:16, 94:24, 95:17
**recent** [1] - 62:6
**recently** [3] - 59:5, 59:6, 60:5
**recertified** [1] - 64:11
**Recess** [2] - 81:7, 81:8
**Recognition** [1] - 91:16
**recognized** [1] - 85:12
**recollection** [2] - 52:24, 75:21
**record** [5] - 4:20, 81:6, 97:8, 98:19, 99:7
**records** [1] - 58:18
**recovered** [1] - 95:24
**recruited** [1] - 19:8
**recruiting** [2] - 19:10, 19:18
**reduced** [1] - 87:21

**Reeves** [1] - 40:6
**refer** [1] - 68:22
**Refer** [1] - 98:7
**reference** [1] - 63:24
**referenced** [1] - 64:3
**referred** [1] - 69:18
**referring** [6] - 47:23, 48:5, 48:17, 50:24, 64:4, 75:8
**regard** [2] - 35:3, 68:9
**Regional** [1] - 92:14
**register** [1] - 37:15
**regular** [2] - 27:7, 29:4
**regularly** [2] - 31:2, 75:14
**regulation** [1] - 86:22
**related** [4] - 59:22, 81:1, 95:6, 99:8
**relation** [1] - 6:15
**relationship** [6] - 89:22, 90:3, 90:5, 90:10, 91:4, 91:5
**relevant** [1] - 46:12
**remain** [1] - 80:16
**remained** [2] - 12:9, 24:13
**remaining** [2] - 24:19, 24:22
**Remember** [1] - 51:21
**remember** [65] - 6:4, 7:3, 24:4, 24:18, 34:17, 34:20, 34:22, 40:19, 40:21, 41:1, 43:3, 43:14, 44:8, 45:24, 46:2, 57:8, 57:16, 59:12, 60:6, 60:21, 60:24, 61:3, 62:21, 62:24, 63:16, 63:20, 64:14, 64:18, 64:20, 65:20, 65:23, 68:1, 69:23, 70:9, 71:7, 72:5, 73:4, 73:11, 73:13, 73:16, 73:19, 73:22, 74:7, 74:16, 74:23, 75:19, 78:21, 82:10, 85:9, 85:11, 85:16, 86:3, 86:10, 86:11, 86:12, 86:17, 89:2, 91:24, 92:17, 92:18, 94:22, 94:24, 95:5, 95:17, 95:21
**rendered** [2] - 91:23, 92:1
**repeat** [3] - 49:9, 49:13, 89:8
**rephrase** [1] - 5:1
**REPLACE** [1] - 97:16
**replied** [9] - 52:6, 52:11, 52:17, 52:19,

52:21, 52:23, 53:12, 55:1, 57:12
**replies** [1] - 52:24
**reply** [8] - 46:21, 52:20, 52:22, 53:24, 55:3, 55:7, 57:1, 57:15
**Report** [2] - 3:10, 35:13
**report** [4] - 20:18, 28:4, 28:7, 35:11
**REPORTER** [2] - 96:6, 99:17
**Reporter** [1] - 1:16
**REPORTING** [1] - 1:22
**reports** [1] - 75:16
**REPRODUCTION** [1] - 99:16
**requests** [1] - 38:9
**require** [1] - 19:19
**required** [1] - 98:7
**reschedule** [1] - 61:5
**reserved** [1] - 4:9
**resident** [2] - 73:14, 73:16
**resolved** [1] - 7:3
**respond** [1] - 63:5
**responded** [3] - 56:10, 57:24, 93:22
**responding** [1] - 70:12
**response** [4] - 7:22, 7:23, 34:1, 63:1
**responses** [3] - 48:23, 50:16, 57:10
**responsible** [1] - 28:7
**result** [5] - 80:2, 86:6, 87:18, 88:18, 89:11
**resulted** [1] - 80:5
**resume** [1] - 15:7
**retained** [1] - 3:13
**retired** [4] - 39:1, 39:3, 39:8, 55:24
**review** [1] - 4:11
**reviewed** [4] - 7:18, 7:20, 7:21, 7:22
**Ribbon** [2] - 91:18, 95:1
**rights** [4] - 49:1, 49:7, 49:12, 49:17
**Rindge** [1] - 8:12
**river** [1] - 25:17
**road** [1] - 66:24
**roam** [1] - 27:11
**robbery** [1] - 21:20
**role** [3] - 17:16, 17:19, 58:14
**room** [3] - 77:22, 77:23, 77:24
**route** [1] - 43:2

**rule** [1] - 86:22
**Rules** [1] - 1:14
**rules** [1] - 86:24
**run** [2] - 18:12, 21:9
**running** [1] - 18:23

**S**

**safety** [1] - 20:24
**sales** [1] - 66:13
**SAME** [1] - 99:16
**sarcastic** [1] - 48:12
**satisfactorily** [1] - 4:4
**save** [1] - 65:15
**Saving** [1] - 91:18
**saw** [2] - 61:14, 61:16
**scan** [1] - 38:19
**scenarios** [1] - 66:19
**scene** [9] - 70:23, 71:15, 71:19, 79:16, 80:14, 81:14, 93:14, 93:20, 93:21
**scheduled** [2] - 29:4, 61:6
**school** [9] - 13:23, 44:5, 44:10, 64:1, 64:17, 64:24, 65:1
**science** [2] - 8:14, 8:15
**screen** [4] - 42:18, 45:10, 45:11, 50:17
**Screen** [2] - 3:12, 50:21
**scribe** [9] - 81:16, 82:2, 82:8, 82:11, 82:14, 82:22, 83:3, 83:20, 83:21
**scrolled** [1] - 37:4
**seal** [1] - 99:10
**search** [26] - 22:9, 22:11, 67:20, 70:10, 70:13, 70:16, 70:21, 71:9, 71:13, 72:14, 73:5, 73:14, 74:12, 76:10, 79:17, 80:1, 80:5, 80:13, 81:13, 82:1, 82:8, 82:12, 82:15, 83:22, 84:3
**seat** [1] - 43:7
**second** [6] - 48:6, 48:11, 51:12, 54:12, 59:24, 93:19
**sector** [23] - 11:9, 11:14, 11:15, 11:18, 12:14, 12:15, 13:12, 13:16, 13:17, 13:19, 13:20, 13:24, 25:10, 25:12, 25:13, 25:14, 26:13, 26:17, 26:19, 29:21, 30:5, 30:8,

30:12
**sectors** [12] - 11:6, 12:9, 12:15, 13:1, 13:7, 13:9, 25:20, 26:23, 30:22, 31:5, 31:7
**secure** [2] - 67:14, 81:12
**secured** [1] - 70:18
**Security** [1] - 71:3
**see** [7] - 35:19, 45:11, 45:14, 60:20, 86:1, 91:8, 91:15
**seeing** [2] - 61:12, 86:3
**seem** [2] - 44:8, 73:13
**seized** [1] - 74:1
**senior** [1] - 92:16
**seniority** [6] - 11:10, 11:17, 13:4, 13:15, 25:9, 29:18
**sent** [12] - 55:13, 55:21, 56:3, 56:4, 56:7, 56:17, 56:18, 56:21, 57:5, 57:17, 57:21, 58:14
**separate** [2] - 51:17, 51:19
**separated** [2] - 11:5, 70:7
**September** [1] - 30:10
**sergeant** [15] - 15:15, 15:20, 18:13, 30:16, 31:3, 31:4, 31:18, 31:23, 32:5, 32:6, 32:10, 32:15, 52:16, 53:23, 60:2
**Sergeant** [12] - 15:15, 18:15, 18:17, 18:18, 18:19, 18:20, 24:6, 24:7, 24:10, 24:15, 24:17
**sergeants** [6] - 30:22, 31:1, 31:6, 31:9, 31:10, 31:13
**series** [1] - 67:12
**serve** [2] - 88:15, 89:1
**served** [1] - 89:5
**service** [1] - 87:16
**Services** [1] - 92:14
**set** [3] - 68:20, 99:6, 99:10
**settings** [1] - 33:2
**settled** [1] - 7:4
**seven** [7] - 5:16, 11:22, 11:24, 26:5, 26:8, 43:21, 43:24
**several** [1] - 50:10
**sheet** [3] - 98:6, 98:7, 98:8

**SHEET** [3] - 97:1, 97:17, 98:4
**Sheet** [3] - 97:4, 97:6, 97:15
**Sheriff's** [2] - 9:4, 9:9
**shift** [31] - 12:12, 25:20, 25:23, 26:3, 26:4, 26:11, 26:17, 27:13, 28:10, 28:20, 28:23, 29:10, 29:11, 29:21, 29:23, 29:24, 30:1, 30:2, 30:18, 30:21, 31:16, 31:20, 31:21, 32:12, 32:16, 61:11, 90:17, 90:20
**shifts** [13] - 11:20, 11:21, 12:1, 12:8, 26:1, 27:15, 29:5, 29:22, 30:6, 32:4, 32:5, 32:7, 32:8
**shook** [1] - 65:10
**shooter** [1] - 95:23
**shooting** [2] - 91:21, 95:22
**shootout** [4] - 93:9, 93:12, 93:15, 93:23
**short** [4] - 23:6, 29:12, 41:4, 80:23
**Shorthand** [1] - 1:16
**shortly** [2] - 12:6, 44:19
**shot** [4] - 42:18, 45:10, 45:11, 91:22
**Shots** [2] - 3:12, 50:21
**shots** [1] - 50:17
**show** [5] - 33:18, 35:9, 37:17, 47:6, 85:14
**showed** [2] - 85:17, 85:21
**shows** [1] - 36:18
**shrugged** [1] - 69:15
**side** [5] - 12:18, 13:6, 13:8, 14:17, 26:22
**sign** [6] - 4:12, 16:24, 76:23, 77:2, 86:3, 97:15
**Sign** [1] - 98:7
**SIGNATURE** [1] - 97:2
**signed** [3] - 17:5, 71:13, 97:7
**SIGNED** [1] - 97:17
**Signed** [1] - 98:20
**Simmons** [2] - 69:24, 70:1
**single** [3] - 27:23, 27:24, 72:6
**sit** [1] - 75:16
**sitting** [1] - 65:11
**SIU** [23] - 15:12, 16:15, 22:8, 22:19, 22:22,

23:1, 23:5, 23:10, 23:11, 23:16, 24:19, 25:7, 28:13, 30:9, 71:2, 76:11, 80:12, 81:11, 81:20, 84:18, 84:21, 95:4, 95:13
**six** [3] - 11:13, 11:15, 35:16
**six-month** [1] - 11:13
**smaller** [1] - 31:14
**social** [1] - 32:19
**someone** [1] - 29:9
**sometime** [1] - 61:10
**sometimes** [4] - 17:20, 80:15, 81:15
**somewhere** [4] - 33:14, 41:15, 43:10, 65:22
**son** [1] - 43:21
**soon** [1] - 72:15
**sorry** [8] - 26:20, 58:5, 65:17, 74:15, 74:19, 89:8, 91:17
**sort** [1] - 21:21
**sound** [1] - 95:10
**sounds** [1] - 21:1
**speaking** [2] - 8:5, 17:3
**Special** [7] - 14:23, 14:24, 15:5, 15:17, 15:22, 92:10, 93:23
**specially** [1] - 27:16
**specific** [12] - 17:13, 46:17, 64:6, 75:21, 76:2, 76:5, 78:6, 78:12, 84:2, 84:6, 94:12, 95:5
**specifically** [16] - 10:13, 27:17, 40:24, 41:1, 53:15, 64:22, 78:21, 79:3, 81:20, 85:11, 85:16, 87:1, 87:4, 92:21, 94:7, 94:20
**speculate** [1] - 37:12
**spell** [2] - 4:21, 56:23
**spent** [6] - 13:6, 16:8, 16:12, 20:6, 21:1, 43:18
**split** [3] - 16:9, 27:22, 31:13
**spot** [1] - 67:11
**spots** [1] - 31:3
**sprinkle** [1] - 28:15
**Square** [12] - 12:18, 13:7, 13:8, 13:22, 25:17, 26:22, 61:11, 61:22, 62:18, 66:10, 91:1, 95:15
**square** [5] - 62:5,

62:7, 62:9, 67:4, 69:19
**SS** [1] - 99:3
**St** [1] - 1:23
**stabbings** [1] - 62:8
**staffed** [1] - 29:12
**staging** [4] - 76:18, 80:19, 81:20, 83:3
**stamps** [1] - 35:16
**stand** [2] - 28:4, 28:20
**Standards** [4] - 7:24, 35:1, 64:8, 69:5
**Star** [1] - 95:1
**start** [3] - 9:16, 13:16, 54:6
**started** [7] - 4:15, 8:24, 12:4, 41:18, 41:19, 90:5, 91:5
**starting** [1] - 52:13
**starts** [3] - 35:20, 51:1, 55:23
**State** [1] - 67:2
**statement** [1] - 21:17
**statements** [1] - 98:19
**STATES** [1] - 1:3
**station** [15] - 74:5, 74:16, 74:21, 75:1, 75:6, 78:24, 79:7, 79:23, 80:18, 81:19, 82:5, 82:24, 83:14, 83:23, 84:8
**stay** [2] - 30:8, 82:20
**steps** [2] - 80:11, 81:11
**Steve** [1] - 15:10
**still** [8] - 14:10, 14:18, 42:5, 42:16, 42:24, 50:4, 50:5, 92:10
**stipulate** [1] - 4:8
**Strahan** [1] - 7:2
**street** [2] - 17:21, 28:21
**Street** [15] - 2:3, 14:16, 70:10, 70:12, 70:16, 72:22, 73:2, 73:8, 74:2, 77:17, 77:18, 78:3, 79:1, 95:22
**streets** [2] - 9:1, 14:15
**Streets** [1] - 14:8
**strictly** [1] - 25:24
**stroller** [1] - 44:3
**stuck** [1] - 88:10
**stumbled** [1] - 85:1
**subject** [1] - 52:22
**submit** [2] - 15:7, 74:19
**submitted** [3] - 7:22, 80:21, 81:22
**subscribe** [1] - 98:19

**subsequent** [1] - 49:16
**subsequently** [1] - 93:18
**substantiated** [1] - 89:21
**sued** [4] - 5:24, 6:13, 6:18, 6:24
**Suffolk** [1] - 8:13
**suggestions** [3] - 62:14, 66:22, 67:22
**suing** [1] - 5:24
**suit** [1] - 6:7
**Suite** [2] - 1:23, 2:4
**Sullivan** [1] - 58:10
**summons** [1] - 68:19
**superior** [3] - 90:8, 90:13, 90:15
**supervisor** [1] - 87:2
**supplement** [1] - 27:8
**supplied** [1] - 97:15
**suspension** [7] - 49:16, 49:23, 88:14, 88:16, 88:18, 89:5, 89:10
**sustained** [1] - 89:15
**sweep** [2] - 67:15, 70:19
**sworn** [2] - 4:5, 99:6
**system** [1] - 85:19

## T

**targeting** [1] - 95:16
**task** [1] - 82:21
**Tel** [1] - 1:24
**ten** [18] - 12:24, 13:2, 13:13, 14:21, 15:20, 16:16, 16:17, 18:7, 18:8, 18:15, 19:4, 19:5, 22:23, 25:22, 25:24, 70:7, 81:3
**tend** [1] - 12:18
**term** [1] - 32:20
**terrible** [1] - 89:9
**terrorist** [1] - 93:19
**tested** [3] - 80:20, 81:21
**testified** [1] - 4:6
**testify** [1] - 7:10
**Testimony** [1] - 3:2
**testimony** [4] - 8:9, 97:14, 98:6, 99:7
**text** [31] - 50:17, 52:9, 52:15, 52:18, 52:21, 53:5, 53:9, 53:13, 53:17, 54:5, 54:9, 54:12, 54:15, 54:19, 54:20, 55:9, 55:12, 55:13, 55:16, 55:17,

56:11, 56:16, 56:17, 56:21, 57:1, 57:4, 57:14, 57:18, 57:22, 58:3
**Text** [2] - 3:12, 50:21
**texts** [1] - 51:4
**THE** [10] - 4:17, 96:5, 96:6, 97:16, 98:1, 99:16, 99:16, 99:17, 99:17
**themselves** [1] - 48:4
**therefor** [2] - 97:14, 98:6
**therefore** [1] - 49:20
**thereof** [1] - 97:7
**third** [1] - 35:20
**thirty** [3] - 5:12, 65:22, 88:22
**thirty-nine** [1] - 5:12
**THIS** [2] - 97:16, 99:16
**thorough** [1] - 18:11
**thoughts** [1] - 62:12
**three** [29] - 11:6, 11:22, 11:23, 13:7, 13:9, 25:13, 25:14, 26:6, 26:8, 26:13, 26:23, 30:8, 30:13, 32:3, 51:6, 51:10, 51:20, 51:23, 52:13, 52:15, 55:17, 57:4, 57:18, 58:22, 70:8, 88:15, 88:18, 89:5, 89:11
**three-day** [2] - 88:18, 89:5
**threw** [1] - 69:19
**throughout** [3] - 19:23, 32:13, 93:16
**Thursday** [1] - 1:20
**tied** [1] - 27:10
**TO** [3] - 97:12, 98:1, 99:16
**today** [4] - 7:9, 8:4, 8:6, 36:6
**today's** [1] - 7:13
**together** [2] - 72:2, 82:6
**took** [14] - 16:19, 18:17, 18:19, 24:12, 41:4, 41:7, 45:7, 48:10, 66:24, 71:12, 71:14, 84:7, 88:4, 95:23
**top** [4] - 6:11, 35:15, 56:17, 56:21
**topic** [2] - 63:1, 73:5
**topics** [2] - 22:17, 62:17
**tourniquet** [1] - 91:22
**Toyota** [1] - 71:24

traffic [1] - 11:1
trafficking [1] - 16:6
trained [1] - 10:4
Training [1] - 64:9
training [18] - 8:18,
8:20, 9:20, 9:21,
9:23, 10:1, 10:3,
10:9, 10:11, 10:16,
22:8, 22:18, 41:13,
41:14, 41:16, 41:17,
42:1, 92:19
trainings [4] - 41:19,
41:21, 41:23
TRANSCRIPT [2] -
97:16, 99:16
transcript [8] - 96:7,
97:10, 97:15, 98:5,
98:6, 98:8, 98:18,
98:19
transport [1] - 82:4
transportation [1] -
43:11
transported [3] -
79:14, 80:18, 82:6
tried [3] - 13:18, 33:8,
33:10
true [1] - 99:7
trust [2] - 19:19, 21:3
truthfully [1] - 7:10
try [7] - 32:3, 33:4,
33:6, 60:1, 67:4,
67:6, 85:19
trying [2] - 6:19, 21:14
turn [1] - 35:14
turning [4] - 40:17,
53:4, 53:16, 56:15
tweaks [1] - 33:5
twenty [1] - 58:5
twenty-nine [1] - 58:5
two [38] - 5:8, 5:13,
5:16, 5:22, 11:6,
13:7, 13:9, 13:19,
13:20, 13:24, 15:11,
24:3, 26:9, 26:23,
27:21, 27:22, 31:7,
31:10, 32:3, 36:8,
45:14, 45:20, 51:9,
51:10, 51:19, 53:6,
53:17, 56:5, 56:8,
59:24, 60:12, 66:18,
67:23, 70:8, 76:9,
88:14, 93:14
two-day [1] - 88:14
two-year [1] - 36:8
typed [4] - 37:4, 37:6,
37:8, 37:20
typical [1] - 12:12
typing [1] - 37:10

U

ultimately [2] - 88:14,
89:5
UNDER [1] - 99:17
under [2] - 31:8, 98:20
undercover [7] -
66:19, 66:24, 67:1,
67:6, 67:9, 67:13,
95:14
understood [1] -
75:24
uniform [1] - 41:12
uniformed [1] - 25:8
union [7] - 49:22,
58:11, 58:15, 87:16,
87:17, 88:19, 89:6
Unit [9] - 14:23, 15:1,
15:5, 15:18, 15:23,
35:1, 92:11, 93:23,
95:1
unit [24] - 9:24, 10:2,
10:18, 15:19, 18:14,
23:3, 23:12, 24:13,
24:14, 27:18, 72:14,
73:15, 74:9, 74:20,
75:15, 75:17, 80:21,
81:23, 83:6, 83:12,
83:24, 95:7, 95:8
UNITED [1] - 1:3
units [3] - 27:9, 27:10,
72:9
University [1] - 8:13
unless [2] - 27:10,
60:17
UNLESS [1] - 99:17
up [23] - 13:22, 14:2,
15:12, 16:24, 17:5,
27:11, 27:22, 31:13,
36:23, 37:20, 40:24,
46:7, 46:10, 61:5,
65:9, 66:15, 66:17,
68:20, 69:19, 70:1,
83:4, 93:16
updated [1] - 87:2
user [1] - 68:15
users [9] - 19:23,
20:3, 20:7, 21:2,
22:5, 67:5, 68:3,
68:11
uses [1] - 38:23

V

vacation [3] - 29:6,
44:5, 44:10
vaguely [1] - 73:13
varied [3] - 17:20,
19:11, 28:24
varies [1] - 12:16
vary [3] - 12:15, 21:12,
79:24
versus [2] - 64:1,
64:24
██ ██ ██
vice [12] - 15:21, 16:4,
16:5, 16:8, 21:5,
21:9, 21:18, 21:22,
22:1, 22:3, 58:11,
58:15
victim [2] - 91:22,
91:23
video [1] - 47:24
violated [3] - 49:1,
49:6, 49:11
violation [1] - 86:23
violence [3] - 62:6,
62:13, 62:18
VOLUME [1] - 1:1
volume [3] - 97:13,
97:15, 98:7
VS [1] - 98:1
vulgar [1] - 48:2

W

walked [8] - 62:10,
65:8, 65:13, 65:19,
69:17, 70:1, 71:5,
72:15
walking [1] - 44:18
warrant [22] - 67:15,
70:10, 70:13, 70:16,
71:9, 71:13, 72:15,
73:5, 73:14, 74:13,
76:10, 79:17, 80:2,
80:5, 80:13, 81:13,
82:1, 82:8, 82:12,
82:16, 83:22, 84:4
warrants [6] - 22:9,
22:11, 67:14, 67:16,
67:20
Washington [6] -
13:22, 14:5, 14:6,
14:8, 14:9, 14:15
Watertown [4] - 93:8,
93:12, 93:14, 93:22
waved [1] - 65:18
ways [2] - 19:3, 67:9
WEBER [13] - 2:3,
4:10, 4:13, 4:16,
38:21, 49:8, 49:13,
80:22, 81:1, 81:3,
96:3, 96:8, 97:5
Weber [1] - 2:5
week [8] - 12:13,
28:22, 29:6, 29:7,
32:4, 44:5, 44:10,
44:13
weekday [1] - 44:11
weekend [1] - 44:12

weeks [4] - 28:24,
29:1, 29:2, 29:3
WHEN [1] - 97:17
whereof [1] - 99:10
white [1] - 90:4
whole [8] - 27:3,
27:11, 29:13, 38:16,
38:18, 51:14, 67:12,
67:13
wife [4] - 5:8, 8:6,
41:7, 43:6
wife's [1] - 5:9
William [2] - 94:5,
94:16
willing [2] - 20:9,
20:12
Windsor [1] - 14:8
WITH [1] - 97:16
WITNESS [2] - 4:17,
96:5
witness [7] - 1:12, 4:2,
6:2, 6:8, 99:6, 99:7,
99:10
Witness [3] - 35:17,
39:5, 39:14
witnesses [1] - 17:7
word [2] - 69:6, 87:20
wording [1] - 46:3
words [1] - 69:6
works [2] - 11:4, 27:19
write [1] - 22:9
writing [1] - 28:7
wrote [3] - 7:24, 37:4,
77:4

Y

Year [1] - 92:4
year [10] - 10:23,
18:21, 23:14, 26:15,
26:17, 28:11, 30:12,
36:8, 86:12, 86:17
yearly [1] - 61:6
years [19] - 5:18, 6:5,
6:6, 6:20, 12:24,
13:2, 13:13, 14:21,
16:16, 16:17, 18:16,
22:23, 25:22, 25:24,
33:1, 59:2, 76:9,
94:19
yourself [3] - 4:20,
37:23, 87:15

# EXHIBIT 2



*City of Cambridge*
*Police Department*

**EXHIBIT**
Hussey
2
4-6-23

TELEPHONE
(617) 349-3300

FAX
(617) 349-3320

WEB
www.cambridgepolice.org

**Dr. Branville G. Bard, Jr.**
*Police Commissioner*

**Louis A. DePasquale**
*City Manager*

**TO:**      Director James Mulcahy

**FROM:**    Lieutenant Philip McDavitt

**SUBJECT:**   Final Report of Investigation

**DATE:** April 14, 2021

**REF:** SI-2021-003

**Subject:**

The Professional Standards Unit (PSU) received information regarding a social media post made by Officer Brian Hussey on Facebook on February 25, 2021 at 8:08AM. On that date, at that time, Officer Hussey was on a Training Day for Virtual In-Service, making him on duty when he made the Facebook post.

**Background:**

On Wednesday, March 3, 2021, representatives from the National Association for the Advancement of Colored People (NAACP) made the Cambridge Police Department (CPD) aware of a Facebook post allegedly made by Officer Hussey. The NAACP provided a screenshot of the Facebook post in question.



*SI-2021-003*
*Page 2 of 11*

Upon reviewing the Facebook post, PSU determined Officer Hussey made it on February 25, 2021 at approximately 8:08AM. A check of the officer's OnDuty showed at that date and time Officer Hussey was on his fourth scheduled shift; however, on February 25th, he was not assigned to a route, instead he was on "Training: Regular Hours," to complete Virtual In-Service Training. Pursuant to this staff investigation, PSU obtained a P650 Report and conducted an interview with Officer Hussey.

**Violations Under Investigation:**

1. Cambridge Police Department Rules and Regulations
   Chapter 2, Section III, Paragraph B

   *The following acts by a member of the Force are prohibited: Discourtesy, rudeness, or insolence to any member of the public.*

2. Cambridge Police Department Policies & Procedures
   No. 212 Internet, E-mail, & Computer Usage
   Section V, Paragraph D

   *Recognizing that personnel do have electronic devices, namely personal mobile phones which have a variety of capabilities, there may be certain applications they may use as long as it is used in the furtherance of official duties, or as allowed by this and other policies.*

3. Cambridge Police Department Policies & Procedures
   No. 230 Addressing Bias-based Policing
   Section V, Paragraphs A, Part 1

   *As a means of offsetting and preventing inappropriate perceptions of biased law enforcement, each officer is expected to adhere to following protocols whenever engaging the general public: Be courteous and act professionally at all times.*

**Persons Interviewed:**
Officer Brian Hussey
125 Sixth Street
Cambridge, MA 02142
617-349-3300
*April 1, 2021*

*SI-2021-003*
*Page 3 of 11*

<u>Summary</u>:

<u>Officer Brian Hussey Facebook Post</u>:
Officer Hussey posted the following to his Facebook page on February 25, 2021 at approximately

8:08AM (Exhibit 4):

 **Brian Hussey**
52m · 👥

This is what it's come to..."honoring" a career
criminal, a thief and druggie...the future of this
country is bleak at best



WHDH.COM
**House Democrats reintroduce police reform bill
named in honor of George Floyd**

2 Comments

This is a screenshot the NAACP provided to the Department on March 3, 2021, which initiated this investigation. Officer Hussey reposted a WHDH news article regarding a proposed bill, entitled "H.R. 7120 - George Floyd Justice in Policing Act of 2020," under consideration by the United States Congress. According to Congress.gov, this legislation "addresses a wide range of policies and issues regarding policing practices and law enforcement accountability. It includes measures to increase accountability for law enforcement misconduct, to enhance transparency and data collection, and to eliminate discriminatory policing practices."

<u>Officer Brian Hussey P650 Report</u>:
The officer grew up in the City of Cambridge and lived in the City for over thirty years. During that time, he attended Cambridge Public Schools and participated in numerous sports. Officer Hussey reported he was exposed to considerable diversity while living in Cambridge and is

respectful of individuals with multicultural backgrounds.  He has been a Cambridge Police Officer for approximately twenty-three years.

On Thursday, February 25, 2021, at approximately 8:00AM, the officer was off-duty at home when he reposted a WHDH news article to his personal, private Facebook account.  The news article was entitled, "House Democrats reintroduce police reform bill named in honor of George Floyd." In addition to reposting the WHDH news article, the officer wrote the following statement and attached it to this Facebook post, "This is what it's come to… 'honoring' a career criminal, a thief and druggie…the future of this country is bleak at best."  He deleted this post from his Facebook page a "short time later."

According to Officer Hussey, the majority of the content he posts to his Facebook account involves his family, his children, and his dog.  The officer occasionally posts newsworthy topics that are of interest to him and has friendly debates and constructive dialogue with his friends on Facebook. The officer explained it is not uncommon for him to delete content he posts on his Facebook account when his discussion with his friends is over.  Officer Hussey deleted the February 25th Facebook post referencing George Floyd because the post "did not generate much conversation at the time."

He explained he is supportive of police reform, believes what happened to George Floyd was unjust, and Mr. Floyd did not deserve to die.  Officer Derek Chauvin and the other police officers involved in the death of George Floyd are a "disgrace to the badge," he added.  The officer agrees police reform is necessary because there are some rogue and dishonest officers; however, he does not think it is appropriate to name the police reform bill after George Floyd.

He continued, "While George Floyd did not deserve to have his life taken away that day, he was still a violent career criminal.  I feel that attaching the name of a violent career criminal, in 'honor', to a reform bill aimed at the betterment of policing is a disservice to the spirit of the bill."  Officer Hussey asserts George Floyd's race played no role in his Facebook post and he would have felt the same way if a police reform bill was named after a "violent career criminal" of any race.  The officer adamantly refutes any suggestion he is racist or condones racism.  He believes there are

*SI-2021-003*
*Page 5 of 11*

individuals more honorable than George Floyd that the police reform bill could have been named after.

The officer reiterated his disapproval of the manner in which George Floyd was treated by the Minneapolis Police Department. He believed George Floyd deserved to be treated with respect and did not deserve to have his life taken away. Officer Hussey contended his Facebook post was being taken out of context and he was merely attempting to express his concern regarding the name of the police reform bill. Additionally, he rebukes any allegations that his Facebook post was racially insensitive. The officer feels he was within his rights to voice his opinion because his Facebook post did not reference the Cambridge Police Department.

**Officer Brian Hussey PSU Interview:**
Officer Hussey was interviewed by PSU investigators on April 1, 2021 at approximately 10:21AM in the 4th floor PSU conference room. He has been a Cambridge Police Officer for approximately twenty-three years. The officer is currently assigned to the Patrol Operations day shift; he was previously a member of the Special Investigations Unit (SIU) for ten years, where he primarily conducted drug investigations. Additionally, his SIU responsibilities included working closely with social workers to offer services to individuals suffering from substance use disorder.

PSU investigators began the interview by reviewing Officer Hussey's P650 report he submitted on March 7, 2021. The officer confirmed he only reposted the WHDH news article to Facebook on February 25, 2021 and no other social media sites. He believes he used his personal cell phone to repost this article on Facebook. Investigators then presented Officer Hussey with a screenshot of his OnDuty calendar for February 2021 (Exhibit 1). On February 25, 2021, the officer's OnDuty schedule read, "Work 0700-1500 TRAIN." On January 12, 2021, at 7:38AM, Lieutenant Daniel Reagan entered Officer Hussey into OnDuty as "Training: Regular Hours" for the officer's shift on February 25th.

Officer Hussey was asked to clarify the statement he made in his P650 report that he was off-duty when he made the Facebook post in question on February 25, 2021 at approximately 8:00AM. The officer explained he completed all his In-Service training prior to February 25th. According to Officer Hussey, "The way it was explained to me was, 'You're getting two days off to do your

*SI-2021-003*
*Page 6 of 11*

trainings.  Should you complete your trainings prior to…those days…you don't have to do your trainings on those days.'"

PSU investigators advised Officer Hussey he was considered on duty between 7:00AM and 3:00PM on February 25th because he was being compensated by the City of Cambridge for working his regularly scheduled shift that day.  Investigators also informed the officer he was ineligible to work a detail or overtime between the hours of 7:00AM and 3:00PM on February 25th. Additionally, the officer was subject to "call-back" and could be ordered to respond to the City in the event of a public safety emergency during those hours.

Investigators next asked Officer Hussey several questions regarding his Facebook account and its privacy settings.  The officer explained access to his account is restricted, meaning the general public cannot view his Facebook page.  In order for someone to be able to view what Officer Hussey posts on Facebook, the officer would first have to accept their "friend request" on the social media site, and he does not accept friend requests from individuals he does not know. Officer Hussey confirmed he is unable to prevent his Facebook friends from copying his Facebook posts and distributing them to individuals he is not Facebook friends with.

He estimated he has approximately 674 friends on Facebook.  Investigators inquired how many of his Facebook friends are members of the Cambridge Police Department.  He responded, "A big portion…a decent amount."  Officer Hussey noted he is also Facebook friends with members of other law enforcement agencies and believes the majority of his Facebook friends are aware he is a Cambridge Police Officer.

PSU investigators presented Officer Hussey with his Facebook post referencing George Floyd, which was posted on February 25, 2021 at approximately 8:08AM (Exhibit 4).  Officer Hussey reaffirmed the statements he provided in his P650 report.  Specifically, while George Floyd did not deserve to be treated so inhumanely by the Minneapolis Police Department, Officer Hussey believes it is inappropriate to name a police reform bill after George Floyd because he was a violent career criminal.

SI-2021-003
Page 7 of 11

Investigators explained how the officer's description of George Floyd as a "druggie" in his Facebook post is discourteous and insensitive to those suffering from substance use disorder. Officer Hussey acknowledged he is required to be courteous and act professionally at all times to avoid perceptions of bias.

At the end of the interview, the CPPOA Attorney asserted officers are considered to be off-duty if they are on a scheduled training shift and have completed the required training in advance.

**Conclusion**:

As part of this investigation, PSU reviewed the social media post in question (Exhibit 4), Officer Hussey's P650 Report, his OnDuty for February 2021 (Exhibit 1), and a transcript of his PSU interview.

One of the first issues to address is Officer Hussey's status of on duty opposed to off-duty on Thursday, February 25, 2021 at approximately 8:00AM. In his P650 Report, the officer stated he was at his residence off-duty. A review of Exhibit 1 shows on February 25th, he was not on a scheduled day off or on any of the benefitted time that falls under Article 20 of the CPPOA's contractual agreement with the City.

The definition of off-duty is given in the Department's Policies and Procedures. Specifically, policy No. 205 which addresses off-duty police powers and conduct. In Section III, Paragraph B, the definition of off-duty is given:

B.     **Off-Duty Status:** Refers to the status of a sworn member of this department when that individual is free from the performance of specified police duties (e.g., regularly scheduled shifts, overtime assignments, private paid details, or times when an officer may be called back into service). This normally covers those periods of time when an officer is not scheduled to work, also referred to as time off, annual leave, or other forms of leave.

As the OnDuty system shows, Officer Hussey was on "Training: Regular Hours," from 7:00AM to 3:00PM. This entitled him to receive his base pay from the City during these hours. This also prevented him from being eligible to work a detail or overtime assignment. Also, had there been a sudden need for additional officers in the City, Officer Hussey was not free from being called

SI-2021-003
Page 8 of 11

back into service.  If the officer was called in during the hours of his shift, it would be without the benefit of receiving Overtime until after 3:20PM that day.

During the officer's PSU interview, the CPPOA Attorney noted there are various instances when an officer completes her/his training prior to the scheduled finish time, they are allowed to leave the training and considered off-duty.  While the CPPOA Attorney did not give any specific examples, the most common instances of this would be during annual In-Service and Firearm Qualifications, referred to within the Department as the "Range."  There are various factors that could lead to personnel being dismissed prior to the scheduled finish time of each of the four days of In-Service or at the Range each year.  While officers may be dismissed prior to the scheduled finish time and allowed to return home, they are frequently reminded they are ineligible to take a detail or overtime assignment until after the scheduled end time of In-Service or the Range.  The reason for this is to prevent "double dipping," which is a violation of the Commonwealth's state ethics laws.

In short, by Officer Hussey not being on a scheduled day off or any paid benefitted time off, such as the days that fall under Article 20 of the agreement between the CPPOA and the City, from 7:00AM to 3:00PM on February 25, 2021, he was on duty at the time he posted Exhibit 4.

As such, the Department has policies and procedures in place concerning the use of personal electronics, specifically cell phones, while on duty.  Any use of personal computers, which cell phones fall under, must be in furtherance of the officer's official duties.  Under no circumstances was it any part of Officer Hussey's official duties and responsibilities to post commentary on a police reform bill on his personal Facebook account.

While that violation is specific to conduct while officially on duty, Cambridge Police Officers are subject to the rules, policies, and procedures of the Department even while off-duty and receiving no pay from the City.  The best example of this is even while on vacation and outside of the hours of the officer's scheduled shift, all officers are prohibited from participating in criminal activity.

As such, even if Officer Hussey believed he could post Exhibit 4 while off-duty and not be subject to the rules, policies, and procedures of the Department, he was misinformed.  By the officer's own admission, the majority of his approximately 674 Facebook friends are aware he is a

*SI-2021-003*
*Page 9 of 11*

Cambridge Police Officer.  Therefore, anything he posts has the potential to reflect the opinions and thoughts of police officers in Cambridge.  This is what occurred when an unknown member of the community alerted the NAACP to the Facebook post.

In Exhibit 4, Officer Hussey refers to George Floyd as, "a career criminal, a thief and a druggie," and noted, "the future of this country is bleak at best."  This was in reference to a police reform bill being named in honor of George Floyd.  There is no other context given in the Facebook post, and as a result, Officer Hussey's meaning behind the post is open to interpretation by everyone who reads it.  This is in addition to the reader's knowledge that the person who posted Exhibit 4 is a Cambridge Police Officer.

Objectively, the post is rude and discourteous to George Floyd, whose death was well covered in the media and brought a call for police reform nationally.  By Officer Hussey referring to him as a "career criminal, a thief and a druggie" it gives the appearance the officer does not believe in rehabilitation and uses a derogatory term for someone who struggles with substance use disorder.  To say the post can be interpreted as insensitive to the circumstances surrounding George Floyd's death would be an understatement, given the officer provides no further context in the post.

The officer acknowledged that once this is posted on his Facebook account, he does not have the ability to prevent his Facebook friends from sharing this post from his account with people he is not friends with on Facebook.  As this post clearly was disseminated outside of Officer Hussey's group of friends on Facebook, it now can be viewed by people who have never met or spoken with the officer, and the only thing they are told is a Cambridge Police Officer posted this online.  This can be very damaging to the Department, as it can appear that Officer Hussey's post represents the thoughts and beliefs of the majority of Cambridge Police Officers.

Officer Hussey worked in SIU and as part of his duties and responsibilities offered services to people who suffer from substance use disorder.  In his PSU interview, he acknowledged he never called any of these people suffering from substance use disorder a "druggie" to their face, as it would be unprofessional to do so.  In his P650 Report, Officer Hussey wrote that he is "100% in favor of police reform" and also noted in reference to George Floyd, "Regardless of his background, he deserved to be treated with respect and with no more force than was necessary to

gain compliance with lawful orders." Officer Hussey did not treat George Floyd with respect by calling him a "career criminal, a thief and a druggie."

It is unfortunate Officer Hussey did not mention his work providing services to individuals with substance use disorder, or his support of police reform in Exhibit 4 to provide additional context to his actions and beliefs. What was posted, while the officer was on duty, led a member of the community to interpret the post as being inappropriate and notified the NAACP of Cambridge. This Association also found it to be inappropriate for a police officer to post, and subsequently brought it to the attention of the Department.

**Findings:**

1. Cambridge Police Department Rules and Regulations
   Chapter 2, Section III, Paragraph B

   *The following acts by a member of the Force are prohibited: Discourtesy, rudeness, or insolence to any member of the public.*

   **SUBSTANTIATED**

   **Basis:** Officer Hussey's Facebook post on February 25, 2021, concerning George Floyd offended a member of the community who then showed the Facebook post to the NAACP of Cambridge. The NAACP of Cambridge also found the Facebook post offensive and brought it to the attention of the Department.

2. Cambridge Police Department Policies & Procedures
   No. 212 Internet, E-mail, & Computer Usage
   Section V, Paragraph D

   *Recognizing that personnel do have electronic devices, namely personal mobile phones which have a variety of capabilities, there may be certain applications they may use as long as it is used in the furtherance of official duties, or as allowed by this and other policies.*

   **SUBSTANTIATED**

   **Basis:** Officer Hussey was on duty on February 25th at approximately 8:00AM when he posted Exhibit 4 on Facebook. The post was made using the officer's personal electronic device, his cell phone. There is nothing in the officer's official duties which involve posting news articles about police reform and his thoughts about it.

*SI-2021-003*
*Page 11 of 11*

3. Cambridge Police Department Policies and Procedures
   Policy 230, Section V, Paragraphs A, Part 1
   Addressing Bias-based Policing

*As a means of offsetting and preventing inappropriate perceptions of biased law enforcement, each officer is expected to adhere to following protocols whenever engaging the general public: Be courteous and act professionally at all times.*

### SUBSTANTIATED

**Basis:** Officer Hussey's Facebook post in question is discourteous and unprofessional. The post gives the impression the officer does not believe in rehabilitation and is disrespectful of people suffering from substance use disorder. This post can be interpreted that the Cambridge Police have a bias against people who have committed felony crimes or have a substance use disorder.

Respectfully Submitted,

Philip McDavitt
Lieutenant of Police
Professional Standards Unit

# EXHIBIT 3

# In the Matter of:

*Brian Hussey vs*

*City of Cambridge, et al.*

---

*Branville Bard*

*February 07, 2023*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*



2

1                    A P P E A R A N C E S

2


3   ON BEHALF OF THE PLAINTIFF, BRIAN HUSSEY:

4        HAROLD LICHTEN
         LICHTEN & LISS-RIORDAN, P.C.
5        729 BOYLSTON STREET, SUITE 2000
         BOSTON, MASSACHUSETTS 02116
6        TELEPHONE NO. (617) 994-5800
         E-MAIL:  HLICHTEN@LLRLAW.COM

7

8        BENJAMIN J. WEBER
         LAW OFFICE OF BENJAMIN J. WEBER
9        P.O. BOX 960796
         BOSTON, MASSACHUSETTS 02196
10       TELEPHONE NO. (617) 202-6270
         E-MAIL:  BWEBER@BENWEBERLAW.COM

11

12

13  ON BEHALF OF THE DEFENDANTS, CITY OF CAMBRIDGE, ET AL.:

14       KATE KLEIMOLA
         CITY OF CAMBRIDGE LAW DEPARTMENT
15       CAMBRIDGE CITY HALL
         795 MASSACHUSETTS AVENUE
16       CAMBRIDGE, MASSACHUSETTS 02139
         E-MAIL:  KKLEIMOLA@CAMBRIDGEMA.GOV

17

18

19

20  ALSO PRESENT:

21       BRIAN HUSSEY, PLAINTIFF
         MCCRAE NISTAD, LICHTEN & LISS-RIORDAN, P.C.
22

23

24

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

3

1                    I N D E X

2                                          PAGE

3   DIRECT EXAMINATION BY MR. LICHTEN         6

4   CROSS-EXAMINATION BY MS. KLEIMOLA         43

5

6

7        _____

8

9                E X H I B I T S

10

11  NUMBER              DESCRIPTION           PAGE

12

13  EXHIBIT 1  ARTICLE, CAMBRIDGE DAY         19

14  EXHIBIT 2  FINAL REPORT OF INVESTIGATION  25

15  EXHIBIT 3  E-MAIL FROM MO BARBOSA RE: HUSSEY POST  27

16  EXHIBIT 4  FACEBOOK POST BY PAUL UPTON    32

17

18

19

20

21

22

23

24

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

4

1

2 _____

3

4            S T I P U L A T I O N S

5

6     The deposition of DR. BRANVILLE BARD was taken remotely via

7 Zoom from Baltimore, Maryland on Tuesday, the 7th day of

8 February, 2023 at 9:15 a.m., said deposition was taken pursuant

9 to Notice for use in accordance with Federal Rules of Civil

10 Procedure.

11

12

13     It is agreed that Kelley K. Bohan, being a Notary Public

14 and Court Reporter for the State of Massachusetts, may swear the

15 witness remotely and that the reading and signing of the

16 completed transcript by the witness is not waived.

17

18

19

20

21

22

23

24

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

5

1                    P R O C E E D I N G S

2            COURT REPORTER:  We are on the record.  This is Kelley

3    Bohan.  I am a court reporter, and I am a notary public in the

4    Commonwealth of Massachusetts.

5            This deposition is being taken remotely.  This witness

6    is appearing remotely from Baltimore, Maryland.

7            The attorneys participating in this proceeding

8    acknowledge their understanding that I am not physically present

9    in the proceeding room, nor am I physically present with the

10   witness and that I will be reporting this proceeding remotely.

11   They further acknowledge that, in lieu of an oath administered

12   in person, the witness will verbally declare his testimony in

13   this matter under the pains and penalties of perjury.  The

14   parties and their counsel consent to this arrangement and waive

15   any objections to this manner of proceeding.

16           Please indicate your agreement by stating your name

17   and your agreement on the record, after which I will swear in

18   the witness and we may begin.

19           MR. LICHTEN:  Harold Lichten, yes.

20           MS. KLEIMOLA:  Kate Kleimola, yes.

21

22

23

24

6

1                 _____

2                      DR. BRANVILLE BARD

3              having been duly sworn, was examined and

4              testifies as follows:

5

6                       DIRECT EXAMINATION

7    BY MR. LICHTEN:

8        Q.   Okay, Dr. Bard, my name is Harold Lichten.  I think

9    I've taken your deposition one time before.  I'm going to ask

10   you some, a couple of questions about Mr. Hussey's case.  I plan

11   to be done in a fairly short time.  If for any reason you don't

12   understand any of my questions, you don't have to answer them,

13   just tell me and I will repeat that --

14           MS. KLEIMOLA:  Attorney Lichten, just before you start

15   questioning, can I assume that all objections are reserved

16   except for as to form?

17           MR. LICHTEN:  Yes.  And does the witness want to read

18   and sign before a notary or we'll waive the notary, you know, is

19   there a reading and signing?

20           MS. KLEIMOLA:  Yes, I think that makes sense.

21           MR. LICHTEN:  Okay.

22   BY MR. LICHTEN:

23       Q.   Okay, can you state your full name for the record

24   please, sir?

7

1      A.   My name is Branville Bard, that's B-R-A-N-V-I-L-L-E

2   B-A-R-D.

3      Q.   Okay.  And your current title is what?

4      A.   I am vice president for public safety, Johns Hopkins

5   University of Medicine.

6      Q.   Okay.  And what are your duties in that regard?

7      A.   I'm responsible for ensuring the safety, for public

8   safety at all of Johns Hopkins' institutions, both university

9   and medicine, in the world with the exception of the applied

10  physics lab.

11     Q.   Okay.  Someday I'll ask you why it doesn't apply to

12  the physics lab but not today.

13          Prior to the current position that you hold, you were

14  with the City of Cambridge; is that correct?

15     A.   Yes.  Prior to accepting the position at Johns

16  Hopkins, I was the police commissioner for the City of

17  Cambridge, Massachusetts.

18     Q.   Okay.  And prior to that, you were at the Philadelphia

19  Housing Authority; is that right?

20     A.   Prior to becoming police commissioner for the City of

21  Cambridge, I was the chief of police and director of public of

22  safety for the Philadelphia Housing Authority Police Department.

23     Q.   Okay.  How long were you at the Philadelphia Housing

24  Authority, from what year to what year?

8

1       A.    From 2015 to -- from February of 2015 to August of

2   2017, so approximately two and a half years.

3       Q.    Okay.  So you went to Cambridge directly from

4   Philadelphia?

5       A.    Yes.

6       Q.    Okay.  And I want to ask you some questions about the

7   structure of the Cambridge Police Department.  I know you were

8   considered to be the police commissioner, is that the same or

9   different than the police chief title that I'm familiar with

10   across Massachusetts?

11      A.    It's different in construction, but it's the same for

12   structural purposes.

13      Q.    Okay.  For example, in the City of Cambridge, who was

14   the appointing authority considered to be for the Cambridge

15   police officers and employees?

16      A.    The city manager is the appointing authority in the

17   City of Cambridge.

18      Q.    Okay.  And with respect to discipline, did he have

19   final authority over discipline of any Cambridge police

20   officers?

21      A.    As the appointing authority, the city manager has

22   final authority of discipline over all city employees.

23      Q.    Okay.  Now, what about discipline of less than -- I'm

24   sorry -- suspensions of less than five days; at the time, did

9

 1   you have authority to suspend for less than five days under the

 2   civil service law?

 3       A.   It's my understanding that the city manager is the

 4   final authority.

 5       Q.   Okay.  And with respect to discipline, did you make

 6   recommendations to him or how did that work?

 7       A.   Yes, I made recommendations.

 8       Q.   Okay.  And were any of your recommendations regarding

 9   discipline, in the time you were there, that you made to the

10   city manager ever not followed by the city manager?

11       A.   Off the top of my head, I don't recall any not being.

12       Q.   And the city manager at the time was Louis DePasquale?

13       A.   Yes.

14       Q.   Was he the city manager the whole time that you were

15   there?

16       A.   Louis DePasquale was the city manager for my entire

17   tenure.

18       Q.   Okay.  Now, in your capacity as police commissioner,

19   did you have authority for placing individuals on administrative

20   leave when an issue of possible discipline came up?

21       A.   Yes.

22       Q.   Okay.  And were you able to do that on your own

23   authority, or did you have to seek approval to simply place

24   someone on administrative leave?

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

10

1       A.   I believe as the appointing authority, the city

2   manager retains all those rights.  And in some cases, he divests

3   that authority.  But I -- There were several instances where I

4   had to place an individual on administrative leave, and that was

5   in conjunction with the, whatever, the collective bargaining

6   agreement.

7       Q.   Okay.  Now, when a complaint was made against an

8   officer or a superior officer during the time that you were

9   commissioner, did you always place that person on administrative

10  leave just by reason of the complaint, or did you have the

11  discretion not to place the officer on administrative leave

12  while any matter was being invested?

13      A.   A complaint in and of itself did not trigger an

14  assignment to administrative leave.

15      Q.   Okay.  Then what would or would not trigger the

16  placement of administrative leave; and who would make that

17  recommendation or decision?

18      A.   It would depend on the nature and severity of the

19  alleged complaint, and I would initially make the recommendation

20  if it was a police department employee.

21      Q.   Okay.  I'd like to ask you just the names of some

22  people.  Can you tell me who James Mulcahy is, please?

23      A.   Can you repeat that?

24      Q.   Yes, sorry.  Can you tell me whom James Mulcahy is?

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

11

1      A.   Yes, James Mulcahy is -- well, he was the director of
2  the Professional Standards Unit.  He's an attorney who works for
3  the Cambridge Police Department, and I assigned him --
4      Q.   Okay.  So he --
5           Go ahead, sorry.
6      A.   And I assigned him as the head of Professional
7  Standards at some point during my tenure there.
8      Q.   Okay.  So he was a non-uniformed officer -- a
9  non-uniformed employee of the City of Cambridge Police
10 Department?
11     A.   He was a non-sworn employee who -- in that capacity,
12 he was not uniform, yes.
13     Q.   Okay.  And for some reason, the video, I can only see
14 half of your face, so I can't see you talk.  I can only see your
15 eyes.  If you could lower it?
16     A.   Sorry about that.
17     Q.   It's a little disconcerting.  That's much better,
18 right there.
19     A.   How about now?
20     Q.   That's good, perfect.
21          What about Lieutenant Philip McDavitt, who is he?
22     A.   Lieutenant --
23          And I'm leaning forward to hear you better.  For some
24 reason you're coming in real low.

12

1      Q.   All right, all right, I'm going to try to make myself
2  louder.
3      A.   Okay.  Philip McDavitt was a lieutenant.  At that
4  time, he was assigned to the Professional Standards Unit.
5      Q.   Okay.  And so what were his job duties and how was he
6  related to Mr. Mulcahy at that time?
7      A.   So he, Lieutenant McDavitt, was assigned to
8  Professional Standards.  He reported to the director, who was
9  Jim Mulcahy, and he was responsible for conducting
10  investigations in the Professional Standards Unit.
11      Q.   Okay.  And did Mr. McDavitt get a promotion or leave
12  that position at some point in time?
13      A.   I'm not certain.  I don't -- I don't recall him being
14  promoted out of that position.
15      Q.   Okay.  When you left, he was still there?
16      A.   That's my belief, yes.
17      Q.   Okay.  And what was the date you actually left the
18  Cambridge Police Department?
19      A.   The exact date, it was in August of 2021, but I'm not
20  sure of the exact day.
21      Q.   Okay.  Okay.  And there was a Deputy Superintendent
22  Albert, you knew him; is that correct?
23      A.   Deputy Superintendent Jack Albert became
24  Superintendent Jack Albert while I was there, yes.

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

13

1    Q.   Okay.  And then he retired at some point in time?

2    A.   Yes.

3    Q.   Okay.  Was that in 2021?

4    A.   I don't recall what year he retired.

5    Q.   Okay.  But he was a superintendent while you were

6  there?

7    A.   He was.

8    Q.   Okay.  Did he receive any discipline in his -- while

9  you were there?

10   A.   He did.

11   Q.   And what was the discipline he received?

12   A.   If I'm not mistaken, a five-day suspension.

13   Q.   And when was that?

14   A.   I don't recall.

15   Q.   Was that before or after the incident involving Brian

16  Hussey, if you know?

17   A.   I believe it happened before the Hussey incident.  I'm

18  nearly certain it did.

19   Q.   And did he end up, if you know, did he end up serving

20  any of those suspension days?

21   A.   I don't recall.  But he was suspended for five days.

22   Q.   Okay.  Well, normally if you're suspended for a

23  certain number of days, you can't work those days and you don't

24  get paid for them; is that correct?

Brian Hussey vs                                          Branville Bard
City of Cambridge, et al.                                February 07, 2023

14

1        A.   It depends on agency's rules and practices.

2        Q.   Okay.  Well, I'm just talking about Superintendent

3   Albert.  Now, is it true that Superintendent Albert did not lose

4   any pay, he simply forfeited some vacations days, if you know?

5        A.   I don't recall, but that's a possibility.

6        Q.   Okay.  Now, was Superintendent Albert ever placed on

7   administrative leave?

8        A.   I don't remember.

9        Q.   As you sit here today, you don't remember placing him

10  on administrative leave; is that correct?

11       A.   I don't remember placing him on administrative leave.

12  I'm not saying that I didn't, I'm telling you I don't remember.

13       Q.   Okay, fair enough.  Now, Superintendent Albert was

14  suspended because he posted something on the Cambridge Police

15  Department's official Twitter page; is that right?

16       A.   That's correct.

17       Q.   And it was a very derogatory statement about two

18  elected officials in Massachusetts; is that right?

19       A.   It was disparaging remarks about elected officials,

20  yes.

21       Q.   And there was a lot of media and public reaction to

22  that; is that correct?  It was in the newspapers and a lot of

23  stories about it; is that right?

24       A.   There was media attention.

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

15

1     Q.   Okay.  Now, when did you first hear anything about
2  Brian Hussey?
3     A.   You'll have to be more specific.
4     Q.   Yeah, sure, that was a bad question.  Let me go back
5  and ask you something else.  As I understand it, you yourself
6  have been on Twitter for a number of years; is that correct?
7     A.   I have a Twitter account.
8     Q.   Okay.  Well, I went -- I looked at your Twitter
9  account the other day, and it looks to me that you have Twitter
10 messages going back to 2016, 2017 at least; is that right?
11    A.   I have a Twitter account.
12    Q.   Okay.  Well, do you know how often you posted on the
13 Twitter account?
14    A.   I don't.
15    Q.   Okay.  And your Twitter account was not set on private
16 settings; is that right?
17    A.   As I sit here, I don't know what my Twitter account is
18 set on.
19    Q.   And on your Twitter account you posted a number of
20 things, sometimes about current events; is that right?
21    A.   I've posted on Twitter.
22    Q.   Okay.  Well, do you recall posting on Twitter about
23 defunding the police?
24    A.   I don't.

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

16

1      Q.   Being against it.  I don't mean for it, I mean being
2   against that.  Do you remember doing that?
3      A.   I don't.
4      Q.   Okay.  Do you remember posting about police
5   departments being under attack in the media?
6      A.   I don't.
7      Q.   Do you remember posting about the George Floyd
8   incident?
9      A.   Not specifically.
10      Q.   Okay.  Do you recall being interviewed by NBC, a local
11   NBC affiliate, talking about the fact that racism permeates all
12   aspects of our lives?
13      A.   Not specifically.
14      Q.   Okay.  But there was no rule in the Cambridge Police
15   Department that prohibited officers or employees in the City of
16   Cambridge from posting on social media; is that correct?
17      A.   Not a blanket prohibition against using social media,
18   no.  Prohibitions against using social media for
19   non-work-related purposes during work times, yes, but not a
20   blanket prohibition.
21      Q.   That is someone could maintain a social media
22   presence, either on Twitter or Facebook or Instagram or Truth
23   Social, and that was permissible in the Cambridge Police
24   Department; is that right?

17

1     A.   Your question is whether having a social media

2  account, it was permissible under Cambridge Police Department

3  rules?

4     Q.   Yes.

5     A.   And the answer is yes.

6     Q.   And did the police department do anything to monitor

7  the accounts of individuals?

8     A.   No, not that I'm aware of.

9     Q.   Okay.  You never authorized that; is that correct?

10    A.   The monitoring, the blanket monitoring of social media

11  accounts?

12    Q.   Yes.

13    A.   No.

14    Q.   Okay.  And I may butcher this name, but did you know a

15  Frank Greenidge?

16    A.   Who?

17        MR. LICHTEN:  Ben, did I butcher that name?

18        MR. WEBSTER:  No, I think you -- He said Frank

19  Greenidge.

20    Q.   Frank Greenidge.

21    A.   Yes.

22    Q.   Yes, you knew Frank Greenidge?

23    A.   I believe that individual, that's the same name as a

24  Cambridge police officer.

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

18

1      Q.   Okay.  It is.  And did you know that he maintained a

2   Facebook page?

3      A.   I did not.

4      Q.   Okay.  Do you know what being a "friend" on social

5   media is, is that correct, a Facebook friend?

6      A.   I know what being a Facebook friend means, yes.

7      Q.   Okay.  Were you a Facebook friend with any individuals

8   in the Cambridge Police Department?

9      A.   I believe I was a Facebook friend with any individual

10   who sent me a request from Cambridge Police Department.

11      Q.   Okay.  And does that include Mr. Greenidge?

12      A.   I think so, but I'm not a hundred percent sure.

13      Q.   Okay.  So your best recollection is that you were a

14   Facebook friend with Mr. Greenidge -- Officer Greenidge; is that

15   correct?

16      A.   I think so, but I'm not certain as I sit here.

17      Q.   Okay.  And did you ever look at any of his Facebook

18   posts?

19      A.   I'm not aware.

20      Q.   So as you sit here today, is your answer you don't

21   remember if you looked at any of his Facebook posts or you don't

22   know or what --

23      A.   I think my best answer would be I think I may -- I

24   think have looked, saw some of his posts.

Brian Hussey vs                                          Branville Bard
City of Cambridge, et al.                              February 07, 2023

19

1       Q.   Okay.  Now, do you remember that he was a pretty
2   prolific writer or messager on Facebook, that he would post a
3   lot of stuff?
4       A.   That is not my knowledge or understanding of his
5   Facebook activity.
6       Q.   Okay.  Did you know he posted about alleged
7   conspiracies and about President Trump being an idiot and unfit
8   for office and things like that, were you aware that he posted
9   that, those things, on his Facebook page?
10      A.   I did not.  I was not aware.
11           MR. LICHTEN:  Hold on, I'm just getting another
12  document.  [Pause.]  Okay, Ben, if you could put on the screen
13  Exhibit 4, and we'll mark this as Exhibit 1.
14           MR. WEBSTER:  Yes, just give me a second.  [Pause.]
15  Is this correct, Harold?
16           MR. LICHTEN:  Yes.
17           (EXHIBIT 1 MARKED FOR IDENTIFICATION)
18           MR. LICHTEN:  Just can you scroll down a little so we
19  can see the faces on there.
20           MS. KLEIMOLA:  Can you also e-mail that to me?
21           MR. LICHTEN:  Yes, absolutely.  McCrae, can you do
22  that?  Oh, I don't know if McCrae is there.
23  BY MR. LICHTEN:
24      Q.   Do you remember an article that had your very handsome

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

20

1  picture in it for the Cambridge Day, which I guess is a local
2  newspaper?
3     A.   I don't.
4     Q.   Okay.  Well, that is you in the photograph; is that
5  right?
6     A.   It is.
7     Q.   Okay.  And the person to your left is who?
8     A.   Superintendent Jack Albert.
9     Q.   And that's on his retirement?
10    A.   It is.
11    Q.   Okay.  And you provided him with an award of some
12  type?
13    A.   That's a clock that is customary to be given out to
14  retirees in the Cambridge Police Department.
15         MR. LICHTEN:  Okay.  Ben, can you scroll down, further
16  down the article?  Keep going.  Keep going.  Okay, stop there.
17  BY MR. LICHTEN:
18    Q.   According to this article, there was a tweet by the
19  Cambridge police union that caused some furor; do you recall
20  that tweet?
21    A.   I don't.
22    Q.   You don't recall it?
23    A.   I don't.
24    Q.   Okay.  So just to, according to this article, it says:

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

21

1 "The Cambridge Police Patrol Officers Association tweeted in

2 July about a reform bill" -- and this is a quote -- "If you

3 think seven civilians killed in seven days in Boston is bad,

4 just wait for the purge that will come," end quote, and that

5 they then deleted it.  Do you see that?  Do you see that quote?

6     A.   I do.

7     Q.   Is it your testimony here today that you don't recall

8 that at all, that incident at all?

9     A.   Reading that just jogged my memory of it now, yes.

10     Q.   Okay.  So you do recall it?

11     A.   I do.

12     Q.   Okay.  Did you take any action to suspend,

13 investigate, place on administrative leave, or otherwise

14 discipline anyone for that tweet?

15     A.   You mean did I take action against the union for

16 engaging in --

17     Q.   No, no, not against the union, against anyone involved

18 with the union who may have been responsible for posting that

19 tweet.

20     A.   I don't recall whether an investigation was opened up

21 into that.

22     Q.   Okay.  But didn't that concern you that it was

23 possible that a Cambridge police officer was talking about a

24 purge and deaths that would come if a bill didn't pass, that

22

1   didn't concern you?

2       A.   The tweet is concerning, but I don't recall whether I

3   opened up an investigation into the union activity.

4       Q.   Okay.  So as we sit here today, you're not aware of

5   whether an officer in the Cambridge Police Department wrote that

6   tweet or not and posted it; is that right?

7       A.   I don't recall whether I opened up an investigation

8   into it.

9       Q.   Okay, fair enough.  And then, according to this

10  article, there was another incident where a dispatcher in the

11  department allegedly said, quote, "We don't live in a Communist

12  country yet" in defending someone who -- a Cambridge Police

13  Department employee who wasn't wearing a mask during the

14  pandemic.  Do you remember that incident?

15      A.   I don't.

16      Q.   So as you sit here today, this is the first time

17  you've heard of that?

18      A.   Oh, I'm absolutely not saying that.  I'm saying you

19  asked me do I remember, and I'm telling you I don't.

20      Q.   Okay, let me just make sure I understand.  So your

21  testimony is you just don't remember that incident one way or

22  another; is that your testimony?

23      A.   That's my testimony.

24      Q.   Okay, fair enough.  And then it also says in here that

23

1    the Cambridge Police Department is investing a police lieutenant

2    that had, quote, "deeply disturbing" -- Let me just, I'll just

3    read the quote.

4              "And in September, department officials said they were

5    investigating social media posts by a Cambridge Police

6    Department lieutenant that were 'deeply disturbing' in their

7    praise of political violence?"

8              Do you see that?

9        A.   No.  Tell me where you're at?

10       Q.   Sure.

11             MR. LICHTEN:  Can you show with the cursor, Ben, where

12   it is?

13             MR. WEBSTER:  [Complies with request.]

14             THE WITNESS:  Okay, I see it.

15   BY MR. LICHTEN:

16       Q.   Do you recall this incident?

17       A.   I think I recall what it's referring to, yes.

18       Q.   Okay.  And what is it referring to?

19       A.   If I'm correct, a lieutenant who had been out on leave

20   for quite sometime, last name Lynch, made a concerning state--

21   post, made a concerning post.  And that was investigated by

22   Professional Standards.

23       Q.   Okay.  And was there a report issued on that?

24       A.   So I don't remember.  He was out on extended leave,

Brian Hussey vs                                              Branville Bard
City of Cambridge, et al.                                February 07, 2023

24

1  which made it difficult to conduct that investigation, and

2  that's all I remember about that.

3       Q.   Well, do you remember him being formally disciplined

4  in any way?

5       A.   Once again, I don't remember.  I don't recall because

6  he was out on extended leave, and I don't -- I don't remember

7  the disposition of that case.

8       Q.   Well, do you remember if there was an investigative

9  report written and what the findings of that report were?

10      A.   I don't remember the disposition of that case.

11      Q.   Okay.  And when you say the individual was out on

12  leave, was he out on a disability or work-related injury leave,

13  if you recall?

14      A.   If you're saying work-related injury, I don't believe

15  he was out on a work injury on duty or --

16      Q.   Do you think he was out on sick leave at the time?

17      A.   I think that might be more akin to why he was out, but

18  I honestly don't recall the exact reason for his extended leave.

19      Q.   But as you sit here today, you don't recall taking any

20  formal disciplinary action against him?

21      A.   I very well may have, but honestly I don't remember

22  the disposition of that.

23      Q.   Okay.

24           MR. LICHTEN:  Ben, can you go to Exhibit 1, which will

Brian Hussey vs                                         Branville Bard
City of Cambridge, et al.                         February 07, 2023

                                                              25
 1   be Exhibit 2 for purposes of this deposition.
 2             (EXHIBIT 2 MARKED FOR IDENTIFICATION)
 3   BY MR. LICHTEN:
 4       Q.   I'm just going to put a report up on the screen that I
 5   think you'll recognize.
 6             At some point in time, do you recall becoming aware
 7   that there was some issue with respect to Brian Hussey and a
 8   Facebook post that he made?
 9       A.   Yes.
10       Q.   Okay.  And how did you first become aware of it?
11       A.   So I was contacted by one of the officers of the NAACP
12   Cambridge, Richard Harding.  And I don't remember which office
13   he was holding, whether he was the president or vice president
14   or whatever.  But he said that he needed to talk to me and the
15   city manager, uh, urgent, and --
16       Q.   Okay.  And that was Mr. Barbosa?
17       A.   No, I believe it was Richard Harding who first
18   contacted me.
19       Q.   Richard Hardy?
20       A.   Harding, H-A-R-D-I-N-G.
21       Q.   Okay.  And you believe he held an office with the
22   NAACP?
23       A.   Yes.
24       Q.   Okay.  And that was a phone call?

26

1      A.   I hate to say that I could be conflating these things,

2 but I don't remember exactly how he reached out.

3      Q.   Okay.  That was the first you heard of anything; is

4 that correct?

5      A.   I believe it was, yes.

6      Q.   And that was in March?

7      A.   I believe so, early March, yes.

8      Q.   Okay.  So he said he wanted to talk to you and the

9 city manager, did that happen, did that discussion take place

10 either over the phone or by Zoom or in person?

11      A.   It did by Zoom.

12      Q.   Okay.  And do you know, did you take notes of that

13 meeting?

14      A.   I don't think I did.

15      Q.   Okay, but there was a meeting.  And who was at that

16 meeting?

17      A.   If my memory is correct, it was: myself; the city

18 manager, Louis DePasquale; it was Richard Harding from the

19 NAACP; it was former Mayor Ken Reeves, uh, former Cambridge

20 Mayor Ken Reeves, who was also an officer with the NAACP

21 Cambridge; and then, I believe, also Mo Barbosa.

22      Q.   And Mr. Barbosa is a community activist in Cambridge;

23 is that right?

24      A.   In the Cambridge-Boston region, yes.

27

1    Q.   Okay.  And what, if anything, did they tell you?

2    A.   They informed me of a post that referenced an article

3  about the police reform bill named in honor of George Floyd, and

4  that it was brought to their attention that one of my officers,

5  Officer Brian Hussey, made some disparaging comments both about

6  George Floyd as a person and about individuals who suffer from

7  substance use disorder.

8    Q.   Okay.  Was anyone else from the Cambridge Police

9  Department present?

10    A.   Not that I remember.

11    Q.   And how long did the meeting last?

12    A.   I'm not certain.

13    Q.   Okay.  Did you call Officer Hussey or the union in to

14  get his side of the story at the time?

15    A.   No, I wouldn't have done that.

16    Q.   Okay.  What did you do?

17    A.   I asked for them to make a copy of the article or the

18  post available to me, and then I forwarded it to Professional

19  Standards and asked them to open up an investigation.

20         MR. LICHTEN:  Okay.  So let me see if I can go to

21  Exhibit 5, which will be Exhibit 3.

22         (EXHIBIT 3 MARKED FOR IDENTIFICATION)

23  BY MR. LICHTEN:

24    Q.   So this appears to be an e-mail from Mr. Barbosa to

28

1   you and Mr. DePasquale and posing the post; is that right?

2       A.   Yes.

3       Q.   Okay.  He doesn't cc anyone else from the NAACP, but

4   you're saying those other two people were there; is that right?

5       A.   Yes, that's my belief.  And, like I said, I hope I'm

6   not conflating meetings, but I'm pretty certain that that's the

7   way that -- well, that's my best recollection.

8       Q.   Okay.  And then got that and gave that to the police

9   standards, you sent it to the police standards division; is that

10  right?

11      A.   Professional Standards Unit, yes.

12      Q.   Professional Standards, sorry.  And did you then place

13  Hussey on administrative leave?

14      A.   I'm not certain when he was placed on administrative

15  leave, even if he was placed on administrative leave.

16      Q.   So as you sit here today, you don't recall placing him

17  on administrative leave in early March?

18      A.   I don't recall.

19      Q.   Okay.  So I just want to be clear:  So as you sit here

20  today, your testimony is that you don't recall placing him on

21  administrative leave up through the time he received a

22  suspension eight weeks later?

23      A.   Yeah, I don't.

24      Q.   Okay.  [Pause.]  Sorry about that.

29

1          So then you asked Mr. McDavitt to do an investigation?

2     A.   Not directly.

3     Q.   What did you do?

4     A.   I instructed the Professional Standards Unit to

5   conduct an investigation --

6     Q.   Okay.

7     A.   -- not to any particular investigator.

8     Q.   Okay.  In this meeting, what did Mr. Barbosa,

9   Mr. Reeves, and the other individual there, what did they tell

10  you about the post?  What were they upset about?

11    A.   The fact that it was a Cambridge employee, a Cambridge

12  Police Department employee who made the post.  The former mayor

13  is very verbose, and I remember his language -- and I'm

14  paraphrasing --  but, you know, basically, he said that that

15  very post called into question our ability to serve in a

16  biased-free manner that we purport to embody, is like the

17  verbiage he used.

18    Q.   Okay.  And did you read the post?

19    A.   I did.

20    Q.   Okay.  Now, what did you understand the post, the

21  points that Brian Hussey was making in the post?

22    A.   Your question is what?

23    Q.   What did you understand the point was of Brian

24  Hussey's post or Facebook post, what was he trying to express;

30

1    what was your understanding?

2          A.   So it was, the article was about, I believe it was a

3    House bill about police reform in the name of George Floyd.  And

4    so his comments above the article were, you know, we're honoring

5    a career criminal, a thief, and a druggie and --

6          Q.   Okay.

7          A.   -- he believed the outlook for the country was bleak.

8          Q.   So you understood that his concern was the fact that a

9    bill, a police reform bill would have George Floyd's name on it,

10   not some police hero or something like that?  Did you understand

11   that he wasn't complaining about what happened?  He wasn't in

12   any way affirming what happened to George Floyd, that he was

13   just concerned with naming a bill after someone who had a

14   criminal record; did you understand that?

15         A.   I understood that the post caused many to call into

16   question the department's reputation.  I understood that the

17   post was disparaging against individuals, a specific individual,

18   George Floyd.  I understood that the post was insensitive to

19   individuals who've suffered from substance use issues.  Yeah, I

20   understood that the post was damaging to the reputation of the

21   Cambridge Police Department.

22         Q.   Okay.  Well, you said many were concerned.  The only

23   persons who spoke to you were three people from the NAACP; is

24   that correct?

31

1      A.   I believe that only two of them were from the NAACP.

2      Q.   Okay.  No one from the public, no one from the public

3  ever called to complain about this; is that correct?

4      A.   Oh, I'm not sure if anyone ever called to complain

5  about it.  I think --

6      Q.   Do you know how long the post was up for?

7      A.   I know that it was less than an hour old when someone

8  screenshot it and sent it to the NCAAP, who then brought it

9  directly to me, with the distinct, uh -- their whole purpose was

10 to shield the identity of whoever brought the post to their

11 attention.  And they asked that -- they made sure that they

12 wanted to protect the source of it.  But within 52 minutes or 57

13 minutes, I can't remember exactly, of Hussey posting that on

14 Facebook, it was screenshot and then disseminated elsewhere.  If

15 your question was how long was it up in total, I don't know.

16     Q.   Do you know what the Facebook settings were of the

17 post?

18     A.   Oh, I don't know.  But I think it's in the

19 investigation.  But as I sit here, I don't recall.

20     Q.   Okay.  Now, let me ask you this:  So would you agree

21 that one of the points Officer Hussey was making was that he

22 didn't think the bill, a police reform bill, should be named

23 after someone who had a criminal record; whether you agree with

24 that or not, did you understand that that was one of the points

32

1    he was making?

2        A.   Listen, I felt that the post ran a risk of doing

3    irreparable harm to the department's reputation.

4        Q.   Okay, but that wasn't my question.  My question was

5    did you understand that that was the point he was trying to

6    make, that you shouldn't name a police reform bill after someone

7    with a criminal record?

8        A.   I answered your question.

9        Q.   All right.  Do you know what George Floyd's criminal

10   record was?

11       A.   I don't.

12       Q.   Did you know whether he had a long criminal record?

13       A.   I personally haven't seen his record.  I've heard it,

14   his record, described.

15       Q.   Do you know who Paul Upton is?

16       A.   The name sounds familiar, but I don't recall who he

17   is.

18            MR. LICHTEN:  Okay.  Ben, can you put up Exhibit 2,

19   which will be Exhibit 4 for this deposition.

20            (EXHIBIT 4 MARKED FOR IDENTIFICATION)

21   BY MR. LICHTEN:

22       Q.   Let me ask you first:  Do you recognize Paul Upton as

23   being a Somerville police deputy superintendent?

24       A.   I don't.

33

1      Q.   Okay.  So as you sit here today, you don't know who

2  Paul Upton is?

3      A.   I just answered your question, I don't.

4      Q.   Okay, okay, fair enough.  And I'd like to ask you --

5  I'll represent to you that this was a post that happened around

6  the same time on Facebook on Paul Upton's Facebook.  He is a

7  Somerville deputy.  And I'd like you to read this post and then

8  I'm going to ask you a question about it.

9           MR. LICHTEN:  And you're going to have to scroll down

10  a little bit.

11      A.   [Pause.]  I'm finished reading.

12      Q.   Okay.  So in this post, Deputy Upton from Somerville

13  is saying that he doesn't think it's proper to honor someone who

14  has a criminal record by naming a federal police reform bill

15  after him.  Do you agree or disagree with what Deputy Upton is

16  saying?

17           MS. KLEIMOLA:  Objection, relevance.

18      Q.   You may answer.

19      A.   What did you say?

20      Q.   I said do you agree or disagree with the point that

21  Deputy Upton is making in his post?

22      A.   Deputy Upton, to my knowledge, was never a member of

23  the Cambridge Police Department, and I'm concerned with how

24  posts by members of the Cambridge Police Department impacted the

34

1  department's reputation and our ability to maintain trust and

2  legitimacy with the community.

3      Q.   Okay, well, that wasn't my question.  My question is

4  whether you agree or disagree with the point he's making in this

5  post.  I'm not asking you about the reputation of the Cam--

6      A.   I'll tell you this, if I was the chief of police or

7  police commissioner for the Somerville Police Department or

8  whatever department he represents, I would have a problem with

9  him making that post.

10          MR. LICHTEN:  Okay.  If we can go back to Exhibit 1?

11          MR. WEBSTER:  Are you talking about the report?

12          MR. LICHTEN:  Yes.

13  BY MR. LICHTEN:

14      Q.   Okay.  Now, did you read this report and take any

15  action on it?  I'm showing you the report to Mulcahy from

16  McDavitt, "Final Report of Investigation" dated April 14th,

17  2021.  Do you remember getting a copy of this report?

18      A.   Yes.

19      Q.   Okay.  And did you review the report?

20      A.   I would have, yes.

21      Q.   Okay.  And did you ever call Mr. Hussey in to get his

22  side of the story, ask him about it?

23      A.   Professional Standards would have done that.

24      Q.   Okay.  Did Professional Standards, to your knowledge,

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

35

1  call in any of the individuals that you met with, Mr. Barbosa or

2  any of those individuals, to interview them and get their side

3  of the story, if you know?

4      A.   I believe that they contacted those individuals, but

5  I'm not certain of who and when and how long.

6      Q.   Well, I didn't see anything in here about that.  It

7  says "persons interviewed" and it says "Brian Hussey," right?

8      A.   If that was the only person interviewed, then the

9  report --

10     Q.   Well, I don't want to put words in your mouth.

11         MR. LICHTEN:  Will you go to that, Ben.  It's "persons

12  interviewed."  There it is.

13     A.   I'll admit that the report is a more accurate

14  reflection of who was actually interviewed by Professional

15  Standards.

16     Q.   Okay.  So it says "Persons Interviewed: Brian Hussey,"

17  so that suggests that this entire investigation consisted of

18  just interviewing Brian Hussey; is that right?

19     A.   Yes.

20     Q.   So how would you know that there were people in the

21  community who were offended by this article or somehow the

22  reputation of the Cambridge Police Department had been impaired

23  if there were no interviews by Professional Standards of people

24  making that point?

36

1      A.   Are you serious?  I literally was given that report by

2  the NAACP.  I was given the Facebook post by the president and

3  vice president, or whatever office they held, of the NAACP for

4  Cambridge.  They brought it to me as being concerned.  They're

5  members of the community.  And they were -- they didn't happen

6  across that post, they were sent that post.  So --

7      Q.   Who sent that post?

8      A.   Excuse me --

9      Q.   You're making a point that there was concern in the

10  community, who sent that post to them?

11      A.   -- can I finish my answer?

12      Q.   Yes, go ahead.

13      A.   I'm distracted now, so we can move on.  I can't

14  remember what --

15      Q.   Okay.  Who sent the post to the person at the NAACP,

16  if you know?

17      A.   I already explained in a prior answer that I don't

18  know because they wanted to protect the interest of whoever, the

19  identity of who sent that post to them.

20      Q.   Did you think it would have been appropriate to

21  interview other people in connection with this so-called

22  investigation?

23      A.   The post speaks for itself.

24      Q.   Okay, well, it does.  Okay.  Now going back to this

37

1  article.

2      A.   We're going back to the --

3      Q.   To this report, excuse me, to this report.  Okay, so

4  in this report it says on the second or third page, it says

5  "Officer Brian Hussey P650 Report."

6          MR. LICHTEN:  Can you turn to that, Ben?

7          MR. WEBSTER:  I'm there.

8  BY MR. LICHTEN:

9      Q.   Now, did you read this, Dr. Bard?

10     A.   Did I read this report that's in front of me?  Yes.

11     Q.   Yes, yes.

12     A.   [Pause.]  I'm sorry, are you asking me to read it now,

13 or are you asking me --

14     Q.   No, no, have you read it?

15     A.   Yeah, I think I've answered yes, I have.

16     Q.   Okay.  Were you aware that Hussey grew up in

17 Cambridge, went to integrated schools, played sports, got along

18 well with the neighborhood; were you aware of that?

19     A.   I'm aware that I read it in the report, yes.

20     Q.   Okay.  And you were aware that on the day in question

21 at 8:08 a.m. he was at home; is that correct?

22     A.   I was made aware of that.

23     Q.   Okay.  And as I understand it, he had, because of the

24 pandemic, there were these things called "training days" for

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

38

1   which an officer did not have to show up for work but had to
2   complete certain training modules on a computer; is that right?
3       A.   Officers had to complete modules on a computer, yes.
4       Q.   Okay.  And were you aware that on this particular day,
5   Officer Hussey had completed his training modules because he did
6   them early?
7       A.   I certainly wasn't aware of that.  I became aware
8   during -- reading the report, yes.  But at that time --
9       Q.   Okay.  And you had no reason to question that, right?
10      A.   Had no reason to question what?
11      Q.   You had no reason to question that he had finished his
12  training modules by that time?
13      A.   No.
14           MR. LICHTEN:  Okay.  Now, if you could scroll down a
15  little further, Ben?
16           MR. WEBSTER:  [Complies with request.]
17  BY MR. LICHTEN:
18      Q.   Okay.  According to this report, Officer Hussey said
19  that he was supportive of police reform; were you aware that he
20  said that?
21      A.   I've read the report, and I'm aware that it's
22  contained in the -- in his memo.
23      Q.   And do you have any reason to believe that that's not
24  truthful on his part?

39

1      A.   No.

2      Q.   Okay.  It also says that Hussey believed that what

3   happened to George Floyd was unjust.  Mr. Floyd did not deserve

4   to die.  That Officer Derek Chauvin and the other police

5   officers involved are a disgrace to the badge.  Were you aware

6   that he said that during the investigation?

7      A.   I wish that was the content of his Facebook post

8   because then we wouldn't be sitting here today.

9      Q.   Because you think whether or not to take action

10  against someone depends upon on whether you agree with what they

11  put in their Facebook post; is that what you're saying?

12     A.   Of course not.  My sole concern was the damage that it

13  did and the potential for damage that it had to threaten the

14  trust that the City of Cambridge and citizens would have in

15  their Cambridge Police Department, not whether I agree with the

16  content of a post.  That content that you just pointed to would

17  have done nothing to erode the trust of the Cambridge Police

18  Department and the community at large.

19     Q.   Okay.  He goes on in his statement to say he did not

20  think it was appropriate to name a police officer reform bill

21  after George Floyd.  Do you see that?  Is that correct?

22     A.   I see the last line of the second, the paragraph--

23     Q.   Well, do you have any reason to believe that he did

24  not believe that?  That's what he believed, right, that it was

40

1  inappropriate to name that bill after George Floyd?

2      A.   I don't know what Hussey believes and what he doesn't

3  believe.  All I can tell you is the content of what he posted,

4  and what he posted was disparaging to George Floyd.  It was

5  disparaging to members of the -- anybody who has ever had

6  substance use issues.

7      Q.   What did he say about George Floyd that was

8  disparaging to people generally who have substance abuse issues?

9      A.   He called him a thief and a druggie.  The derogatory

10  term there being "druggie."  We work closely with people who

11  suffer from substance use disorder and substance use issues.

12  And it's --

13     Q.   Isn't a druggie someone who uses drugs regularly?

14     A.   It's a dehumanizing term.  And so, no, it's not

15  something -- it's not a terminology that we adopted.  It's a

16  derogatory term.

17     Q.   Did you think race played a role in Officer Hussey's

18  post?

19     A.   It did not appear to.

20     Q.   That is you didn't believe that race played a role in

21  its post?

22          MS. KLEIMOLA:  Objection, asked and answered.

23     Q.   Is that what you said?  I'm sorry, I just didn't hear

24  you.

41

1        A.   I said it didn't appear to.

2        Q.   Okay.  So is it the fact that he said the bill should

3    not be named after George Floyd or just use of the word

4    "druggie" that made you believe that he should be disciplined?

5    I guess what was it in the post specifically that made you think

6    he was deserving of discipline for his Facebook post?

7        A.   It was the fact that it had negative connotations and

8    it tore at the fabric or trust that we spent a long time

9    building in the community.  Folks viewed the Cambridge Police

10   Department as one who favors prevention, intervention, and

11   diversion over more serious or more punitive methods

12   traditionally associated with the criminal justice system.  You

13   know, we pride ourselves on the fact that we believe that

14   individuals are better served through a social justice approach

15   than through your traditional criminal justice approaches.  And

16   when you have that approach, that means that you're often

17   working hand in hand with individuals who have, you know, fallen

18   in life and are working towards better outcomes.  Some of those

19   individuals have substance use issues.

20       Q.   So that's what you got out of his post, that he was

21   taking a shot at all people with drug problems?

22       A.   I took from the post that it was disparaging, it was

23   dehumanizing, and that it, particularly in the context of the

24   national climate, tore at the fabric of the trust that we spent

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

42

1  a long time building.  You know, the old saying trust takes a

2  lifetime to build and just a moment to tear down.  Well, any

3  individual associated with the Cambridge Police Department could

4  in a moment tear down, you know, that trust we've spent a long

5  time building with community, and that post, you know, had the

6  potential to do that.

7          MR. LICHTEN:  All right.  Why don't we go off the

8  record for five minutes.  I'll see if I have anything more for

9  you.  So we'll take a five to ten-minute break, and then I

10  should be done pretty soon.  Thank you.

11  (Whereupon, a break was taken from 10:14 a.m. to 10:25 a.m.)

12  BY MR. LICHTEN:

13      Q.   I just have a couple more questions, Dr. Bard.  Were

14  you aware as to whether Brian Hussey's Facebook page had private

15  settings or was open to the public?

16      A.   I know that somebody screenshot it and sent it to the

17  NAACP.  I'm not aware of the settings, although I think it's

18  addressed in the report.

19      Q.   Okay.  So as you sit here today, do you know whether

20  he had private settings or public settings?

21      A.   I don't know.

22      Q.   Okay.  And as you sit here today, do you know who

23  screenshotted it?

24      A.   Oh, I don't -- I never knew.

43

1    Q.   Okay.  I take it then that no one who worked for the

2  Cambridge Police Department ever complained to you about

3  Hussey's Facebook posts that we're talking about today; is that

4  right?

5    A.   I don't recall whether anyone did.

6    Q.   Okay.  And if no one -- I take it that no one said

7  that they could not work with Hussey or that he had disrupted

8  the work situation at the department because of this post; is

9  that correct?

10    A.   I don't know that anyone didn't say that either.

11    Q.   But you don't know that they did; is that right?

12    A.   No, I don't know that they did.

13    Q.   Okay.  But no one complained to you from the entire

14  Cambridge Police Department, civilian or uniformed divisions, no

15  one complained to you about the Facebook post that Hussey did;

16  is that correct?

17    A.   No, not that I recall.

18        MR. LICHTEN:  Okay, that's all I have.  Thank you very

19  much, I appreciate it.

20        THE WITNESS:  Thank you.

21        MR. LICHTEN:  Kate, are you all set?

22        MS. KLEIMOLA:  No, I have some questions for Dr.

23  Bard.

24                        CROSS-EXAMINATION

44

BY MS. KLEIMOLA:

1  Q.   Okay.  Dr. Bard, you talked a little bit about your

3  career history.  Can you tell us when you first became a police

4  officer?

5  A.   I joined the Philadelphia Police Department on August

6  13th of 1993, and I was employed there for 21 and a half years.

7  Q.   And were you a patrol officer, were you a detective

8  part of your career; what were your assignments in the

9  Philadelphia Police Department?

10  A.   So I served as a police officer, as a sergeant, as a

11  lieutenant, as a captain, and as an inspector, which is a goofy

12  rank, but it's the military equivalent of lieutenant colonel.

13  Q.   And where did you go from the Philadelphia Police

14  Department?

15  A.   I left the Philadelphia Police Department after 21 and

16  a half years to serve as the chief of police and director of

17  public safety for the Philadelphia Housing Authority Police

18  Department.

19  Q.   And you stayed there until August of 2021 when you

20  came to the Cambridge Police Department?

21  A.   Yes.

22  Q.   Oh, I'm sorry, August of 2017?

23  A.   August of 2017, yes, I'm sorry.

24  Q.   Okay.  And you left the Cambridge Police Department in

45

1  August of 2021?

2       A.   Yes.

3       Q.   Did you go directly to Johns Hopkins from the

4  Cambridge Police Department?

5       A.   Directly, yes.  I think there was about a week's break

6  in service, but yes.

7       Q.   You were asked about a tweet by a dispatcher

8  referencing someone not wearing a mask and that we're not a

9  Communist country.  Can you tell us, are dispatchers employees

10 of the Cambridge Police Department in the City of Cambridge?

11      A.   They're not.

12      Q.   Which department are they employees of?

13      A.   Emergency Communications.

14      Q.   And as the commissioner of the police department, did

15 you have any authority over Emergency Communications?

16      A.   I did not.

17      Q.   Turning back to the post that has been at issue.  You

18 described that your concern was that it would tear at the trust

19 that the department had built up in the community, and you were

20 concerned that it disparaged and dehumanized substance abusers.

21 Can you talk about, first, what trust had been built up in the

22 community that you were referring to?

23      A.   Yeah, so the department, you know, made great painful

24 strides to build up trust with members of our community by

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

46

1  establishing programs that favored a social justice approach as
2  opposed to your traditional criminal justice approaches.  That
3  was evidenced by our safety net collaborative, which was a
4  program aimed to take young individuals who exhibited criminal
5  and/or concerning behavior and put them in contact with
6  wraparound services to help them and their family so that they
7  could have better life outcomes.  And, you know, so many other
8  programs.  But even Officer Hussey was a member of our Special
9  Investigations Unit which diverted and worked with individuals
10 who suffered from substance use issues.
11         So the department took great strides to be, uh, have a
12 lean towards social justice programs and outcomes as opposed to
13 the traditional, more punitive methods associated with the
14 criminal justice system.
15    Q.   And why is it important that the community has trust
16 in the Cambridge Police Department?
17    A.   Because that's the only way we can function properly
18 and do our job.  We have to be seen as trustworthy and
19 legitimate and bias-free.  And that post by Officer Hussey,
20 particularly in the context of a post-George Floyd America, it
21 ran a risk of doing irreparable harm to the department's
22 reputation.
23         MS. KLEIMOLA:  And I'm just going to pause for one
24 second to make sure Attorney Lichten is still here.  You just

47

1  went off camera, so.

2          MR. LICHTEN:  Yeah, I'm here.

3          MS. KLEIMOLA:  Okay.  Just making sure we hadn't lost

4  you in some weird Zoom --

5          MR. LICHTEN:  I'm here.

6  BY MS. KLEIMOLA:

7      Q.   You also talked about in particular the word

8  "druggie."  What does the word "druggie" mean in the police

9  community?

10     A.   So it's a derogatory term.  And for a police officer

11 to use it, you know, it dehumanizes, and it in some ways

12 demonizes.  It makes it easier to not to care about the outcomes

13 for an individual.  And historically when you dehumanize an

14 individual, then it's easier to perpetrate atrocities against

15 them.  So it's inappropriate for a police officer to be using

16 that term.

17     Q.   You also mentioned a few minutes ago that Officer

18 Hussey was a member of the SIU, can you tell us what the SIU is?

19     A.   So the Special Investigations Unit investigate

20 narcotics trafficking but also provide diversionary methods and

21 other outcomes for other individuals who suffer from substance

22 use issues.

23     Q.   Are officers or detectives who are assigned to SIU

24 visible in the public?

48

1      A.   Very much so.

2      Q.   Were they visible in the community of substance users

3   or substance abusers?

4      A.   Yes.

5      Q.   Was it important for, in particular members of the

6   SIU, to have the trust of that community?

7      A.   It certainly was, obviously.  And, you know,

8   individuals have to trust you if they're going to refer

9   individuals to you or if they are themselves are going to submit

10  to you.  And if individuals believe that you are biased against

11  them for any reason, then they're not going to willingly submit

12  to any type of collaborative effort with you.

13     Q.   And then just going back to your meeting that you had

14  with the former city manager and Mo Barbosa and the two members

15  of the NAACP, I believe you said that one of them was Ken

16  Reeves?

17     A.   Yes.

18     Q.   Can you spell his last name for us, if you know it?

19     A.   I think it's R-E-A-V-E-E-S -- I mean, excuse me, let

20  me say it again, R-E-A-V-E-S, Reaves.

21     Q.   And you recall when you were asked about some comments

22  that Mr. Reeves made during that meeting, do you recall any

23  other comments that were made by Mr. Reeves or by either

24  Mr. Harding or Mr. Barbosa during the meeting?

49

1    A.   Not specifically.  As I recall, former Mayor Reeves is
2  very verbose and the way he speaks is, um, is just somewhat
3  different.  So I remember it stuck with me that he said that it
4  flies -- it runs afoul, or something, of what we purport to
5  embody, is what stuck with me, the image that we purport to
6  embody, the biased-free image that we purport to embody.  His
7  post, meaning Officer Hussey's post ran afoul of that image.
8    Q.   And understanding that you don't recall specifics of
9  what Mr. Harding or what Mr. Barbosa said, do you recall whether
10  or not they expressed any concerns about the post?
11    A.   Oh, they -- just, you know, the mere fact they're
12  reaching out to me about needing to speak about an urgent
13  matter, and then having the meeting with me, they were very
14  alarmed and concerned about the post.
15    Q.   Was Officer Hussey well known in the Cambridge
16  community as a police officer?
17    A.   I lost part of your question.
18    Q.   Was Officer Hussey well known in the Cambridge
19  community as a police officer?
20    A.   He was.
21         MS. KLEIMOLA:  If I could just have one moment.
22         [Pause.]
23         Thank you, I don't have anything else.
24         MR. WEBSTER:  Just, could we go off the record, just

50

1   give us a minute.

2   (Whereupon, the record was paused from 10:37 a.m. to 10:38 a.m.)

3          MR. WEBSTER:  That's all for Plaintiff.  Thanks, Dr.

4   Bard.

5          THE WITNESS:  Thank you.

6          MS. KLEIMOLA:  Thank you.

7   (Whereupon, the deposition concluded at 10:38 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

51

1              ERRATA SHEET DISTRIBUTION INFORMATION

2           DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4              ERRATA SHEET DISTRIBUTION INFORMATION

5

6          The original of the Errata Sheet has been delivered to

7     Kate Kleimola, Esquire.

8              When the Errata Sheet has been completed by the

9     deponent and signed, a copy thereof should be delivered to each

10    party of record and the ORIGINAL forwarded to Harold Lichten,

11    Esquire, to whom the original deposition transcript was

12    delivered.

13                   INSTRUCTIONS TO DEPONENT

14

15         After reading this volume of your deposition, please

16    indicate any corrections or changes to your testimony and the

17    reasons therefor on the Errata Sheet supplied to you and sign

18    it.  DO NOT make marks or notations on the transcript volume

19    itself.  Add additional sheets if necessary.  Please refer to

20    the above instructions for Errata Sheet distribution

21    information.

22

23

24

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

52

1   PLEASE ATTACH TO THE DEPOSITION OF:  Dr. Branville Bard

2   CASE:  Brian Hussey v. City of Cambridge, et al.

3   DATE TAKEN:  February 7th, 2023

4                         ERRATA SHEET

5        Please refer to Page 51 for Errata Sheet instructions and

6   distribution instructions.

7   PAGE LINE              CHANGE              REASON

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16       I have read the foregoing transcript of my deposition, and

17  except for any corrections or changes noted above, I hereby

18  subscribe to the transcript as an accurate record of the

19  statements made by me.

20

21       Executed this _____ day of _____, 2023.

22

23                         _____

24                         Dr. Branville Bard

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

53

1  COMMONWEALTH OF MASSACHUSETTS                    HAMPSHIRE, ss.

2

3      I, KELLEY K. BOHAN, a Court Reporter and Notary Public duly
   commissioned and qualified in and for the Commonwealth of
4  Massachusetts, do hereby certify that there came before me on
   the 7th day of February, 2023, at 9:15 a.m., the person
5  hereinbefore named, identification as prescribed by Executive
   Order 455 (03-13) issued by the Governor of the Commonwealth of
6  Massachusetts, was by me duly sworn to testify to the truth and
   nothing but the truth of his knowledge concerning the matters in
7  controversy in this cause; that he was thereupon examined upon
   his oath, and his examination reduced to typewriting under my
8  direction; and that this is a true record of the testimony given
   by the witness to the best of my ability.
9      I further certify that I am neither attorney or counsel
   for, nor related to or employed by, any of the parties to the
10 action in which this deposition is taken, and further, that I am
   not a relative or employee of any attorney or counsel employed
11 by the parties hereto or financially interested in the action.

12

13

14      My Commission Expires:  December 25, 2026

15

16

17                     _Kelley K. Rh_

18      _____

19                     Kelley K. Bohan
                      Court Reporter/Notary Public

20

21

22

23

24

**Exhibits**

**Exhibit 1**
3:13 19:13,17 24:24
34:10
**Exhibit 2**
3:14 25:1,2 32:18
**Exhibit 3**
3:15 27:21,22
**Exhibit 4**
3:16 19:13 32:19,20

---

**1**

**1**
19:13,17 24:24
34:10
**10:14**
42:11
**10:25**
42:11
**10:37**
50:2
**10:38**
50:2,7
**13th**
44:6
**14th**
34:16
**1993**
44:6

---

**2**

**2**
25:1,2 32:18
**2015**
8:1
**2016**
15:10
**2017**
8:2 15:10 44:22,23
**2021**
12:19 13:3 34:17
44:19 45:1
**21**
44:6,15

---

**3**

**3**
27:21,22

---

**4**

**4**
19:13 32:19,20

---

**5**

**5**
27:21
**52**
31:12
**57**
31:12

---

**8**

**8:08**
37:21

---

**A**

**a.m.**
37:21 42:11 50:2,7
**ability**
29:15 34:1
**absolutely**
19:21 22:18
**abuse**
40:8
**abusers**
45:20 48:3
**accepting**
7:15
**account**
15:7,9,11,13,15,17,
19 17:2
**accounts**
17:7,11
**accurate**
35:13
**acknowledge**
5:8,11
**action**
21:12,15 24:20
34:15 39:9
**activist**
26:22
**activity**
19:5 22:3
**addressed**
42:18
**administered**
5:11

**administrative**
9:19,24 10:4,9,11,
14,16 14:7,10,11
21:13 28:13,14,15,
17,21
**admit**
35:13
**adopted**
40:15
**affiliate**
16:11
**affirming**
30:12
**afoul**
49:4,7
**agency's**
14:1
**agree**
31:20,23 33:15,20
34:4 39:10,15
**agreement**
5:16,17 10:6
**ahead**
11:5 36:12
**aimed**
46:4
**akin**
24:17
**alarmed**
49:14
**Albert**
12:22,23,24 14:3,6,
13 20:8
**alleged**
10:19 19:6
**allegedly**
22:11
**America**
46:20
**and/or**
46:5
**appearing**
5:6
**appears**
27:24
**applied**
7:9
**apply**
7:11
**appointing**
8:14,16,21 10:1

**approach**
41:14,16 46:1
**approaches**
41:15 46:2
**approval**
9:23
**approximately**
8:2
**April**
34:16
**arrangement**
5:14
**article**
19:24 20:16,18,24
22:10 27:2,17 30:2,4
35:21 37:1
**aspects**
16:12
**assigned**
11:3,6 12:4,7 47:23
**assignment**
10:14
**assignments**
44:8
**Association**
21:1
**assume**
6:15
**atrocities**
47:14
**attack**
16:5
**attention**
14:24 27:4 31:11
**attorney**
6:14 11:2 46:24
**attorneys**
5:7
**August**
8:1 12:19 44:5,19,
22,23 45:1
**authority**
7:19,22,24 8:14,16,
19,21,22 9:1,4,19,23
10:1,3 44:17 45:15
**authorized**
17:9
**award**
20:11
**aware**
17:8 18:19 19:8,10
22:4 25:6,10 37:16,

18,19,20,22 38:4,7,
19,21 39:5 42:14,17

**B**

**B-A-R-D**
7:2
**B-R-A-N-V-I-L-L-E**
7:1
**back**
15:4,10 34:10 36:24
37:2 45:17 48:13
**bad**
15:4 21:3
**badge**
39:5
**Baltimore**
5:6
**Barbosa**
25:16 26:21,22
27:24 29:8 35:1
48:14,24 49:9
**Bard**
6:2,8 7:1 37:9 42:13
43:23 44:2 50:4
**bargaining**
10:5
**basically**
29:14
**begin**
5:18
**behavior**
46:5
**belief**
12:16 28:5
**believed**
30:7 39:2,24
**believes**
40:2
**Ben**
17:17 19:12 20:15
23:11 24:24 32:18
35:11 37:6 38:15
**bias-free**
46:19
**biased**
48:10
**biased-free**
29:16 49:6
**bill**
21:2,24 27:3 30:3,9,
13 31:22 32:6 33:14
39:20 40:1 41:2

**bit**
33:10 44:2
**blanket**
16:17,20 17:10
**bleak**
30:7
**Bohan**
5:3
**Boston**
21:3
**Branville**
6:2 7:1
**break**
42:9,11 45:5
**Brian**
13:15 15:2 25:7 27:5
29:21,23 35:7,16,18
37:5 42:14
**brought**
27:4 31:8,10 36:4
**build**
42:2 45:24
**building**
41:9 42:1,5
**built**
45:19,21
**butcher**
17:14,17

**C**

**call**
25:24 27:13 30:15
34:21 35:1
**called**
29:15 31:3,4 37:24
40:9
**Cam--**
34:5
**Cambridge**
7:14,17,21 8:3,7,13,
14,17,19 11:3,9
12:18 14:14 16:14,
16,23 17:2,24 18:8,
10 20:1,14,19 21:1,
23 22:5,12 23:1,5
25:12 26:19,21,22
27:8 29:11 30:21
33:23,24 35:22 36:4
37:17 39:14,15,17
41:9 42:3 43:2,14
44:20,24 45:4,10
46:16 49:15,18

**Cambridge-boston**
26:24
**camera**
47:1
**capacity**
9:18 11:11
**captain**
44:11
**care**
47:12
**career**
30:5 44:3,8
**case**
6:10 24:7,10
**cases**
10:2
**caused**
20:19 30:15
**Chauvin**
39:4
**chief**
7:21 8:9 34:6 44:16
**citizens**
39:14
**city**
7:14,16,20 8:13,16,
17,21,22 9:3,10,12,
14,16 10:1 11:9
16:15 25:15 26:9,17
39:14 45:10 48:14
**civil**
9:2
**civilian**
43:14
**civilians**
21:3
**clear**
28:19
**climate**
41:24
**clock**
20:13
**closely**
40:10
**collaborative**
46:3 48:12
**collective**
10:5
**colonel**
44:12
**comments**
27:5 30:4 48:21,23

**commissioner**
7:16,20 8:8 9:18
10:9 34:7 45:14
**Commonwealth**
5:4
**Communications**
45:13,15
**Communist**
22:11 45:9
**community**
26:22 34:2 35:21
36:5,10 39:18 41:9
42:5 45:19,22,24
46:15 47:9 48:2,6
49:16,19
**complain**
31:3,4
**complained**
43:2,13,15
**complaining**
30:11
**complaint**
10:7,10,13,19
**complete**
38:2,3
**completed**
38:5
**Complies**
23:13 38:16
**computer**
38:2,3
**concern**
21:22 22:1 30:8 36:9
39:12 45:18
**concerned**
30:13,22 33:23 36:4
45:20 49:14
**concerns**
49:10
**concluded**
50:7
**conduct**
24:1 29:5
**conducting**
12:9
**conflating**
26:1 28:6
**conjunction**
10:5
**connection**
36:21

connotations
41:7
consent
5:14
considered
8:8,14
consisted
35:17
conspiracies
19:7
construction
8:11
contact
46:5
contacted
25:11,18 35:4
contained
38:22
content
39:7,16 40:3
context
41:23 46:20
copy
27:17 34:17
correct
7:14 12:22 13:24
14:10,16,22 15:6
16:16 17:9 18:5,15
19:15 23:19 26:4,17
30:24 31:3 37:21
39:21 43:9,16
counsel
5:14
country
22:12 30:7 45:9
couple
6:10 42:13
court
5:2,3
criminal
30:5,14 31:23 32:7,
9,12 33:14 41:12,15
46:2,4,14
CROSS-
EXAMINATION
43:24
current
7:3,13 15:20
cursor
23:11
customary
20:13

—————
D

damage
39:12,13
damaging
30:20
date
12:17,19
dated
34:16
day
12:20 15:9 20:1
37:20 38:4
days
8:24 9:1 13:20,21,23
14:4 21:3 37:24
deaths
21:24
decision
10:17
declare
5:12
deeply
23:2,6
defending
22:12
defunding
15:23
dehumanize
47:13
dehumanized
45:20
dehumanizes
47:11
dehumanizing
40:14 41:23
deleted
21:5
demonizes
47:12
department
7:22 8:7 10:20 11:3,
10 12:18 16:15,24
17:2,6 18:8,10 20:14
22:5,11,13 23:1,4,6
27:9 29:12 30:21
33:23,24 34:7,8
35:22 39:15,18
41:10 42:3 43:2,8,14
44:5,9,14,15,18,20,
24 45:4,10,12,14,19,
23 46:11,16

department's
14:15 30:16 32:3
34:1 46:21
departments
16:5
Depasquale
9:12,16 26:18 28:1
depend
10:18
depends
14:1 39:10
deposition
5:5 6:9 25:1 32:19
50:7
deputy
12:21,23 32:23 33:7,
12,15,21,22
Derek
39:4
derogatory
14:17 40:9,16 47:10
deserve
39:3
deserving
41:6
detective
44:7
detectives
47:23
die
39:4
difficult
24:1
DIRECT
6:6
directly
8:3 29:2 31:9 45:3,5
director
7:21 11:1 12:8 44:16
disability
24:12
disagree
33:15,20 34:4
disciplinary
24:20
discipline
8:18,19,22,23 9:5,9,
20 13:8,11 21:14
41:6
disciplined
24:3 41:4

disconcerting
11:17
discretion
10:11
discussion
26:9
disgrace
39:5
disorder
27:7 40:11
disparaged
45:20
disparaging
14:19 27:5 30:17
40:4,5,8 41:22
dispatcher
22:10 45:7
dispatchers
45:9
disposition
24:7,10,22
disrupted
43:7
disseminated
31:14
distinct
31:9
distracted
36:13
disturbing
23:2,6
diversion
41:11
diversionary
47:20
diverted
46:9
divests
10:2
division
28:9
divisions
43:14
document
19:12
drug
41:21
druggie
30:5 40:9,10,13 41:4
47:8
drugs
40:13

Brian Hussey vs
City of Cambridge, et al.

Branville Bard
February 07, 2023

**duly**
6:3
**duties**
7:6 12:5
**duty**
24:15

**E**

**e-mail**
19:20 27:24
**early**
26:7 28:17 38:6
**easier**
47:12,14
**effort**
48:12
**elected**
14:18,19
**embody**
29:16 49:5,6
**Emergency**
45:13,15
**employed**
44:6
**employee**
10:20 11:9,11 22:13
29:11,12
**employees**
8:15,22 16:15 45:9,
12
**end**
13:19 21:4
**engaging**
21:16
**ensuring**
7:7
**entire**
9:16 35:17 43:13
**equivalent**
44:12
**erode**
39:17
**establishing**
46:1
**events**
15:20
**evidenced**
46:3
**exact**
12:19,20 24:18
**EXAMINATION**

6:6
**examined**
6:3
**exception**
7:9
**excuse**
36:8 37:3 48:19
**exhibit**
19:13,17 24:24 25:1,
2 27:21,22 32:18,19,
20 34:10
**exhibited**
46:4
**explained**
36:17
**express**
29:24
**expressed**
49:10
**extended**
23:24 24:6,18
**eyes**
11:15

**F**

**fabric**
41:8,24
**face**
11:14
**Facebook**
16:22 18:2,5,6,7,9,
14,17,21 19:2,5,9
25:8 29:24 31:14,16
33:6 36:2 39:7,11
41:6 42:14 43:3,15
**faces**
19:19
**fact**
16:11 29:11 30:8
41:2,7,13 49:11
**fair**
14:13 22:9,24 33:4
**fairly**
6:11
**fallen**
41:17
**familiar**
8:9 32:16
**family**
46:6
**favored**
46:1

**favors**
41:10
**February**
8:1
**federal**
33:14
**felt**
32:2
**final**
8:19,22 9:4 34:16
**findings**
24:9
**finish**
36:11
**finished**
33:11 38:11
**five-day**
13:12
**flies**
49:4
**Floyd**
16:7 27:3,6 30:3,12,
18 39:3,21 40:1,4,7
41:3 46:20
**Floyd's**
30:9 32:9
**Folks**
41:9
**forfeited**
14:4
**form**
6:16
**formal**
24:20
**formally**
24:3
**forward**
11:23
**forwarded**
27:18
**Frank**
17:15,18,20,22
**friend**
18:4,5,6,7,9,14
**front**
37:10
**full**
6:23
**function**
46:17
**furor**
20:19

**G**

**gave**
28:8
**generally**
40:8
**George**
16:7 27:3,6 30:3,9,
12,18 32:9 39:3,21
40:1,4,7 41:3
**give**
19:14 50:1
**good**
11:20
**goofy**
44:11
**great**
45:23 46:11
**Greenidge**
17:15,19,20,22
18:11,14
**grew**
37:16
**guess**
20:1 41:5

**H**

**H-A-R-D-I-N-G**
25:20
**half**
8:2 11:14 44:6,16
**hand**
41:17
**handsome**
19:24
**happen**
26:9 36:5
**happened**
13:17 30:11,12 33:5
39:3
**Harding**
25:12,17,20 26:18
48:24 49:9
**Hardy**
25:19
**harm**
32:3 46:21
**Harold**
5:19 6:8 19:15
**hate**
26:1

**head**
9:11 11:6
**hear**
11:23 15:1 40:23
**heard**
22:17 26:3 32:13
**held**
25:21 36:3
**hero**
30:10
**historically**
47:13
**history**
44:3
**hold**
7:13 19:11
**holding**
25:13
**home**
37:21
**honestly**
24:18,21
**honor**
27:3 33:13
**honoring**
30:4
**hope**
28:5
**Hopkins**
7:4,16 45:3
**Hopkins'**
7:8
**hour**
31:7
**House**
30:3
**Housing**
7:19,22,23 44:17
**hundred**
18:12
**Hussey**
13:16,17 15:2 25:7
27:5,13 28:13 29:21
31:13,21 34:21 35:7,
16,18 37:5,16 38:5,
18 39:2 40:2 43:7,15
46:8,19 47:18 49:15,
18
**Hussey's**
6:10 29:24 40:17
42:14 43:3 49:7

**I**

**IDENTIFICATION**
19:17 25:2 27:22
32:20
**identity**
31:10 36:19
**idiot**
19:7
**image**
49:5,6,7
**impacted**
33:24
**impaired**
35:22
**important**
46:15 48:5
**inappropriate**
40:1 47:15
**incident**
13:15,17 16:8 21:8
22:10,14,21 23:16
**include**
18:11
**individual**
10:4 17:23 18:9
24:11 29:9 30:17
42:3 47:13,14
**individuals**
9:19 17:7 18:7 27:6
30:17,19 35:1,2,4
41:14,17,19 46:4,9
47:21 48:8,9,10
**informed**
27:2
**initially**
10:19
**injury**
24:12,14,15
**insensitive**
30:18
**inspector**
44:11
**Instagram**
16:22
**instances**
10:3
**institutions**
7:8
**instructed**
29:4

**integrated**
37:17
**interest**
36:18
**intervention**
41:10
**interview**
35:2 36:21
**interviewed**
16:10 35:7,8,12,14,
16
**interviewing**
35:18
**interviews**
35:23
**invested**
10:12
**investigate**
21:13 47:19
**investigated**
23:21
**investigating**
23:5
**investigation**
21:20 22:3,7 24:1
27:19 29:1,5 31:19
34:16 35:17 36:22
39:6
**investigations**
12:10 46:9 47:19
**investigative**
24:8
**investigator**
29:7
**investing**
23:1
**involved**
21:17 39:5
**involving**
13:15
**irreparable**
32:3 46:21
**issue**
9:20 25:7 45:17
**issued**
23:23
**issues**
30:19 40:6,8,11
41:19 46:10 47:22

**J**

**Jack**
12:23,24 20:8
**James**
10:22,24 11:1
**Jim**
12:9
**job**
12:5 46:18
**jogged**
21:9
**Johns**
7:4,8,15 45:3
**joined**
44:5
**July**
21:2
**justice**
41:12,14,15 46:1,2,
12,14

**K**

**Kate**
5:20 43:21
**Kelley**
5:2
**Ken**
26:19,20 48:15
**killed**
21:3
**Kleimola**
5:20 6:14,20 19:20
33:17 40:22 43:22
44:1 46:23 47:3,6
49:21 50:6
**knew**
12:22 17:22 42:24
**knowledge**
19:4 33:22 34:24

**L**

**lab**
7:10,12
**language**
29:13
**large**
39:18
**law**
9:2

**lean**
46:12
**leaning**
11:23
**leave**
9:20,24 10:4,10,11,
14,16 12:11 14:7,10,
11 21:13 23:19,24
24:6,12,16,18 28:13,
15,17,21
**left**
12:15,17 20:7 44:15,
24
**legitimacy**
34:2
**legitimate**
46:19
**Lichten**
5:19 6:7,8,14,17,21,
22 17:17 19:11,16,
18,21,23 20:15,17
23:11,15 24:24 25:3
27:20,23 32:18,21
33:9 34:10,12,13
35:11 37:6,8 38:14,
17 42:7,12 43:18,21
46:24 47:2,5
**lieu**
5:11
**lieutenant**
11:21,22 12:3,7
23:1,6,19 44:11,12
**life**
41:18 46:7
**lifetime**
42:2
**Listen**
32:2
**literally**
36:1
**live**
22:11
**lives**
16:12
**local**
16:10 20:1
**long**
7:23 27:11 31:6,15
32:12 35:5 41:8
42:1,4
**looked**
15:8 18:21,24

**lose**
14:3
**lost**
47:3 49:17
**lot**
14:21,22 19:3
**louder**
12:2
**Louis**
9:12,16 26:18
**low**
11:24
**lower**
11:15
**Lynch**
23:20

---
**M**
---

**made**
9:7,9 10:7 23:20,21
24:1 25:8 27:5 29:12
31:11 37:22 41:4,5
45:23 48:22,23
**maintain**
16:21 34:1
**maintained**
18:1
**make**
9:5 10:16,19 12:1
22:20 27:17 32:6
46:24
**makes**
6:20 47:12
**making**
29:21 31:21 32:1
33:21 34:4,9 35:24
36:9 47:3
**manager**
8:16,21 9:3,10,12,
14,16 10:2 25:15
26:9,18 48:14
**manner**
5:15 29:16
**March**
26:6,7 28:17
**mark**
19:13
**MARKED**
19:17 25:2 27:22
32:20
**Maryland**
5:6

**mask**
22:13 45:8
**Massachusetts**
5:4 7:17 8:10 14:18
**matter**
5:13 10:12 49:13
**mayor**
26:19,20 29:12 49:1
**Mccrae**
19:21,22
**Mcdavitt**
11:21 12:3,7,11 29:1
34:16
**meaning**
49:7
**means**
18:6 41:16
**media**
14:21,24 16:5,16,17,
18,21 17:1,10 18:5
23:5
**medicine**
7:5,9
**meeting**
26:13,15,16 27:11
29:8 48:13,22,24
49:13
**meetings**
28:6
**member**
33:22 46:8 47:18
**members**
33:24 36:5 40:5
45:24 48:5,14
**memo**
38:22
**memory**
21:9 26:17
**mentioned**
47:17
**mere**
49:11
**messager**
19:2
**messages**
15:10
**met**
35:1
**methods**
41:11 46:13 47:20
**military**
44:12

**minute**
50:1
**minutes**
31:12,13 42:8 47:17
**mistaken**
13:12
**Mo**
26:21 48:14
**modules**
38:2,3,5,12
**moment**
42:2,4 49:21
**monitor**
17:6
**monitoring**
17:10
**mouth**
35:10
**move**
36:13
**Mulcahy**
10:22,24 11:1 12:6,9
34:15

---
**N**
---

**NAACP**
25:11,22 26:19,20
28:3 30:23 31:1
36:2,3,15 42:17
48:15
**named**
27:3 31:22 41:3
**names**
10:21
**naming**
30:13 33:14
**narcotics**
47:20
**national**
41:24
**nature**
10:18
**NBC**
16:10,11
**NCAAP**
31:8
**needed**
25:14
**needing**
49:12
**negative**

41:7
**neighborhood**
37:18
**net**
46:3
**newspaper**
20:2
**newspapers**
14:22
**non-sworn**
11:11
**non-uniformed**
11:8,9
**non-work-related**
16:19
**notary**
5:3 6:18
**notes**
26:12
**number**
13:23 15:6,19

**O**

**oath**
5:11
**Objection**
33:17 40:22
**objections**
5:15 6:15
**offended**
35:21
**office**
19:8 25:12,21 36:3
**officer**
10:8,11 11:8 17:24
18:14 21:23 22:5
26:20 27:5,13 31:21
37:5 38:1,5,18 39:4,
20 40:17 44:4,7,10
46:8,19 47:10,15,17
49:7,15,16,18,19
**officers**
8:15,20 16:15 21:1
25:11 27:4 38:3 39:5
47:23
**official**
14:15
**officials**
14:18,19 23:4
**open**
27:19 42:15

**opened**
21:20 22:3,7
**opposed**
46:2,12
**outcomes**
41:18 46:7,12 47:12,
21
**outlook**
30:7

**P**

**P650**
37:5
**paid**
13:24
**painful**
45:23
**pains**
5:13
**pandemic**
22:14 37:24
**paragraph--**
39:22
**paraphrasing**
29:14
**part**
38:24 44:8 49:17
**participating**
5:7
**parties**
5:14
**pass**
21:24
**patrol**
21:1 44:7
**Paul**
32:15,22 33:2,6
**pause**
19:12,14 28:24
33:11 37:12 46:23
49:22
**paused**
50:2
**pay**
14:4
**penalties**
5:13
**people**
10:22 28:4 30:23
35:20,23 36:21 40:8,
10 41:21

**percent**
18:12
**perfect**
11:20
**perjury**
5:13
**permeates**
16:11
**permissible**
16:23 17:2
**perpetrate**
47:14
**person**
5:12 10:9 20:7 26:10
27:6 35:8 36:15
**personally**
32:13
**persons**
30:23 35:7,11,16
**Philadelphia**
7:18,22,23 8:4 44:5,
9,13,15,17
**Philip**
11:21 12:3
**phone**
25:24 26:10
**photograph**
20:4
**physically**
5:8,9
**physics**
7:10,12
**picture**
20:1
**place**
9:23 10:4,9,11 21:13
26:9 28:12
**placement**
10:16
**placing**
9:19 14:9,11 28:16,
20
**Plaintiff**
50:3
**plan**
6:10
**played**
37:17 40:17,20
**point**
11:7 12:12 13:1 25:6
29:23 32:5 33:20
34:4 35:24 36:9

**pointed**
39:16
**points**
29:21 31:21,24
**police**
7:16,20,21,22 8:7,8,
9,15,19 9:18 10:20
11:3,9 12:18 14:14
15:23 16:4,14,23
17:2,6,24 18:8,10
20:14,19 21:1,23
22:5,12 23:1,5 27:3,
8 28:8,9 29:12 30:3,
9,10,21 31:22 32:6,
23 33:14,23,24 34:6,
7 35:22 38:19 39:4,
15,17,20 41:9 42:3
43:2,14 44:3,5,9,10,
13,15,16,17,20,24
45:4,10,14 46:16
47:8,10,15 49:16,19
**political**
23:7
**posing**
28:1
**position**
7:13,15 12:12,14
**possibility**
14:5
**post**
19:2 23:21 25:8
27:2,18 28:1 29:10,
12,15,18,20,21,24
30:15,17,18,20 31:6,
10,17 32:2 33:5,7,
12,21 34:5,9 36:2,6,
7,10,15,19,23 39:7,
11,16 40:18,21 41:5,
6,20,22 42:5 43:8,15
45:17 46:19 49:7,10,
14
**post-george**
46:20
**posted**
14:14 15:12,19,21
19:6,8 22:6 40:3,4
**posting**
15:22 16:4,7,16
21:18 31:13
**posts**
18:18,21,24 23:5
33:24 43:3

potential
39:13 42:6
practices
14:1
praise
23:7
presence
16:22
present
5:8,9 27:9
president
7:4 19:7 25:13 36:2,
3
pretty
19:1 28:6 42:10
prevention
41:10
pride
41:13
prior
7:13,15,18,20 36:17
private
15:15 42:14,20
problem
34:8
problems
41:21
proceeding
5:7,9,10,15
Professional
11:2,6 12:4,8,10
23:22 27:18 28:11,
12 29:4 34:23,24
35:14,23
program
46:4
programs
46:1,8,12
prohibited
16:15
prohibition
16:17,20
Prohibitions
16:18
prolific
19:2
promoted
12:14
promotion
12:11
proper
33:13

properly
46:17
protect
31:12 36:18
provide
47:20
provided
20:11
public
5:3 7:4,7,21 14:21
31:2 42:15,20 44:17
47:24
punitive
41:11 46:13
purge
21:4,24
purport
29:16 49:4,5,6
purpose
31:9
purposes
8:12 16:19 25:1
put
19:12 25:4 32:18
35:10 39:11 46:5

──────────

**Q**

──────────

question
15:4 17:1 29:15,22
30:16 31:15 32:4,8
33:3,8 34:3 37:20
38:9,10,11 49:17
questioning
6:15
questions
6:10,12 8:6 42:13
43:22
quote
21:2,4,5 22:11 23:2,
3

──────────

**R**

──────────

R-E-A-V-E-E-S
48:19
R-E-A-V-E-S
48:20
race
40:17,20
racism
16:11

ran
32:2 46:21 49:7
rank
44:12
reached
26:2
reaching
49:12
reaction
14:21
read
6:17 23:3 29:18 33:7
34:14 37:9,10,12,14,
19 38:21
reading
6:19 21:9 33:11 38:8
real
11:24
reason
6:11 10:10 11:13,24
24:18 38:9,10,11,23
39:23 48:11
Reaves
48:20
recall
9:11 12:13 13:4,14,
21 14:5 15:22 16:10
20:19,22 21:7,10,20
22:2,7 23:16,17
24:5,13,18,19 25:6
28:16,18,20 31:19
32:16 43:5,17 48:21,
22 49:1,8,9
receive
13:8
received
13:11 28:21
recognize
25:5 32:22
recollection
18:13 28:7
recommendation
10:17,19
recommendations
9:6,7,8
record
5:2,17 6:23 30:14
31:23 32:7,10,12,13,
14 33:14 42:8 49:24
50:2
Reeves
26:19,20 29:9 48:16,

22,23 49:1
refer
48:8
referenced
27:2
referencing
45:8
referring
23:17,18 45:22
reflection
35:14
reform
21:2 27:3 30:3,9
31:22 32:6 33:14
38:19 39:20
regard
7:6
region
26:24
regularly
40:13
related
12:6
relevance
33:17
remarks
14:19
remember
14:8,9,11,12 16:2,4,
7 18:21 19:1,24
22:14,19,21 23:24
24:2,3,5,6,8,10,21
25:12 26:2 27:10
29:13 31:13 34:17
36:14 49:3
remotely
5:5,6,10
repeat
6:13 10:23
report
23:23 24:9 25:4
34:11,14,15,16,17,
19 35:9,13 36:1
37:3,4,5,10,19 38:8,
18,21 42:18
reported
12:8
reporter
5:2,3
reporting
5:10

**represent**
33:5
**represents**
34:8
**reputation**
30:16,20 32:3 34:1,5
35:22 46:22
**request**
18:10 23:13 38:16
**reserved**
6:15
**respect**
8:18 9:5 25:7
**responsible**
7:7 12:9 21:18
**retains**
10:2
**retired**
13:1,4
**retirees**
20:14
**retirement**
20:9
**review**
34:19
**Richard**
25:12,17,19 26:18
**rights**
10:2
**risk**
32:2 46:21
**role**
40:17,20
**room**
5:9
**rule**
16:14
**rules**
14:1 17:3
**runs**
49:4

_____ S _____

**safety**
7:4,7,8,22 44:17
46:3
**schools**
37:17
**screen**
19:12 25:4
**screenshot**

**31:8,14 42:16**
**screenshotted**
42:23
**scroll**
19:18 20:15 33:9
38:14
**seek**
9:23
**sense**
6:20
**September**
23:4
**sergeant**
44:10
**serve**
29:15 44:16
**served**
41:14 44:10
**service**
9:2 45:6
**services**
46:6
**serving**
13:19
**set**
15:15,18 43:21
**settings**
15:16 31:16 42:15,
17,20
**severity**
10:18
**shield**
31:10
**short**
6:11
**shot**
41:21
**show**
23:11 38:1
**showing**
34:15
**sick**
24:16
**side**
27:14 32:22 35:2
**sign**
6:18
**signing**
6:19
**simply**
9:23 14:4

**sir**
6:24
**sit**
14:9 15:17 18:16,20
22:4,16 24:19 28:16,
19 31:19 33:1 42:19,
22
**sitting**
39:8
**situation**
43:8
**SIU**
47:18,23 48:6
**so-called**
36:21
**social**
16:16,17,18,21,23
17:1,10 18:4 23:5
41:14 46:1,12
**sole**
39:12
**Someday**
7:11
**Somerville**
32:23 33:7,12 34:7
**sounds**
32:16
**source**
31:12
**speak**
49:12
**speaks**
36:23 49:2
**Special**
46:8 47:19
**specific**
15:3 30:17
**specifically**
16:9,13 41:5 49:1
**specifics**
49:8
**spell**
48:18
**spent**
41:8,24 42:4
**spoke**
30:23
**sports**
37:17
**standards**
11:2,7 12:4,8,10
23:22 27:19 28:9,11,

12 29:4 34:23,24
35:15,23
**start**
6:14
**state**
6:23
**state--**
23:20
**statement**
14:17 39:19
**stating**
5:16
**stayed**
44:19
**stop**
20:16
**stories**
14:23
**story**
27:14 34:22 35:3
**strides**
45:24 46:11
**structural**
8:12
**structure**
8:7
**stuck**
49:3,5
**stuff**
19:3
**submit**
48:9,11
**substance**
27:7 30:19 40:6,8,11
41:19 45:20 46:10
47:21 48:2,3
**suffer**
27:6 40:11 47:21
**suffered**
30:19 46:10
**suggests**
35:17
**superintendent**
12:21,23,24 13:5
14:2,3,6,13 20:8
32:23
**superior**
10:8
**supportive**
38:19
**suspend**
9:1 21:12

**suspended**
13:21,22 14:14
**suspension**
13:12,20 28:22
**suspensions**
8:24
**swear**
5:17
**sworn**
6:3
**system**
41:12 46:14

———————
**T**

**takes**
42:1
**taking**
24:19 41:21
**talk**
11:14 25:14 26:8
45:21
**talked**
44:2 47:7
**talking**
14:2 16:11 21:23
34:11 43:3
**tear**
42:2,4 45:18
**telling**
14:12 22:19
**ten-minute**
42:9
**tenure**
9:17 11:7
**term**
40:10,14,16 47:10,
16
**terminology**
40:15
**testifies**
6:4
**testimony**
5:12 21:7 22:21,22,
23 28:20
**thief**
30:5 40:9
**things**
15:20 19:8,9 26:1
37:24
**threaten**
39:13

**time**
6:9,11 8:24 9:9,12,
14 10:8 12:4,6,12
13:1 22:16 24:16
25:6 27:14 28:21
33:6 38:8,12 41:8
42:1,5
**times**
16:19
**title**
7:3 8:9
**today**
7:12 14:9 18:20 21:7
22:4,16 24:19 28:16,
20 33:1 39:8 42:19,
22 43:3
**top**
9:11
**tore**
41:8,24
**total**
31:15
**traditional**
41:15 46:2,13
**traditionally**
41:12
**trafficking**
47:20
**training**
37:24 38:2,5,12
**trigger**
10:13,15
**true**
14:3
**Trump**
19:7
**trust**
34:1 39:14,17 41:8,
24 42:1,4 45:18,21,
24 46:15 48:6,8
**trustworthy**
46:18
**Truth**
16:22
**truthful**
38:24
**turn**
37:6
**Turning**
45:17
**tweet**
20:18,20 21:14,19

22:2,6 45:7
**tweeted**
21:1
**Twitter**
14:15 15:6,7,8,9,11,
13,15,17,19,21,22
16:22
**type**
20:12 48:12

———————
**U**

**understand**
6:12 15:5 22:20
29:20,23 30:10,14
31:24 32:5 37:23
**understanding**
5:8 9:3 19:4 30:1
49:8
**understood**
30:8,15,16,18,20
**unfit**
19:7
**uniform**
11:12
**uniformed**
43:14
**union**
20:19 21:15,17,18
22:3 27:13
**Unit**
11:2 12:4,10 28:11
29:4 46:9 47:19
**university**
7:5,8
**unjust**
39:3
**upset**
29:10
**Upton**
32:15,22 33:2,12,15,
21,22
**Upton's**
33:6
**urgent**
25:15 49:12
**users**
48:2

———————
**V**

**vacations**
14:4

**verbally**
5:12
**verbiage**
29:17
**verbose**
29:13 49:2
**vice**
7:4 25:13 36:3
**video**
11:13
**viewed**
41:9
**violence**
23:7
**visible**
47:24 48:2

———————
**W**

**wait**
21:4
**waive**
5:14 6:18
**wanted**
26:8 31:12 36:18
**ways**
47:11
**wearing**
22:13 45:8
**WEBSTER**
17:18 19:14 23:13
34:11 37:7 38:16
49:24 50:3
**week's**
45:5
**weeks**
28:22
**weird**
47:4
**who've**
30:19
**willingly**
48:11
**word**
41:3 47:7,8
**words**
35:10
**work**
9:6 13:23 16:19
24:15 38:1 40:10
43:7,8
**work-related**



24:12,14
**worked**
43:1 46:9
**working**
41:17,18
**works**
11:2
**world**
7:9
**wraparound**
46:6
**writer**
19:2
**written**
24:9
**wrote**
22:5

**Y**

**year**
7:24 13:4
**years**
8:2 15:6 44:6,16
**young**
46:4

**Z**

**Zoom**
26:10,11 47:4

# EXHIBIT 4

EXHIBIT
Hussey
/
4-6-23

Jenn Mac

Elmas Que Jode ✓

Tricia Sylva

Brian Blackie Black

Lindsay DiGiovanni Hussey

Pamela DiGiovanni Ferrara

Shauna Diggins

Michele Firicano Maier

Larry Stead ✓

Michael Martins

Kevin O'Connor

Chris Ciampa

Melanie Santa

Larry Clarke ✓

Gus Desousa

Phil Tammaro

Kevin McManus

Tim O'Brien ✓

Michael Medeiros ✓

Ryan Matthew

Julia Pilleri

Colin Walsh

Peg Dwyer

Lisa Cardinale Scimemi

Justine Bavaro

Daniel Patrick Burroso ✓

Steve Geary

Jason McMaster ✗

Dawn Spellman

Timothy Smith

Jeannette DiPietro

Frank Greenidge ✓

Robert Cooper

Charlie McNeill Jr. ✓

John Henry

Jeff Freedman

Kevin Michael

Margaret Gentile

Jason Beek

Christopher Fielding

Frederick Hart

Danny Mac ✓

Sandra DeBrito

Pattie Segalla Mercier ✗

Michelle Brown

Michael Halley

Christine Frazier Halley

Mary Abigail Washington ✓

Saki Manias ✗

Patrick Grogan

Steven Magalhaes ✓

Jay Charles

D. Julia Sullivan DeLuca

Mark Ford

Eric Helberg ✓

Kathy Tink Murphy ✓

Ed Costa Jr. ✓

Christine Prendergrast

Nicole McLaughlin

Ameer Moustafa

Lisa Lima-Soares

Kristie Harvey Wagner

Natalie Rodriguez

Raphael Ordinola

Deborah Martin

Aprille LaVoie

Jessie Acevedo Soto

Charlene Donofrio-Skelly

John Collins

Dan Moore

Susan Koutalakis

Susana Quelha Santos

Kelly Flynn Unger

Monica Ferreira Azevedo

Stephanie Medeiros-Pomeroy

Garrett Tingle

Lisa Podesta Coombs

Stephen Raneri

Daniel Wagner ✓

Ryan McCusker

Michelle Maranta

J Rod

Jennifer Mochi Chernisky

Jamie Michele

Casimir Maziarz ✓

Radu Brestyan

Beth Krudys

Robert Doherty ✓

Ann Twofoursix ✓

Michelle Griffin

Julie E. Ray

Angela Harotunian ✗

Bob Ahern

James Greene ✓

Lorraine Centola

TeeMomma Frangos

Chuck Mottola ✓

John Corcoran

Ricky Pedrini

Kelly Bombino ✓

Thomas Edward

Paul Tavares

Kelley King Folger ✓

Matthew John ✓

Christine Donofrio

Maureen Flavin

Steve Wenzel ✓

Kevin E Youkilis ✗

Neal Mullan Jr.

Jenn Teng Batchelder ✗

Ashley Kmiec ✓

Moreen Heath Caliri

Tom Fagan

Tee Cano

Andrew Topouzoglou ✓

Ryan Ference

Christine Savioli O'Connor

Dave Norton

Ben Brown

Brenda L. Gilchrist

Brian Levins ✓

Matt Kelly

Renee Daniliuk

Donald Bombino ✓

Carl Jones ✓

Katie McDaid

JB Bellisimo ✓

Bobby Pasco ✓

Sheila Gendrolius

Cliff Harsh

Melissa Savioli

Dennis O'Connor ✓

David Porter ✓

Megan Kathleen

Anna Walsh

Clifford Harsh

Lester Sullivan ✓

Matt Wescott

John Sofis Scheft

Brian Corcoran

Stephen Ahern ✓

Joseph Cozza ✓

Dan Rea ✗

Stephen Fiveohone ✓

Danny Geddes

Dayna Martin

Ronnie Ferrara

Paul Jay ✓

Lauren Chhor

Joseph Wilson III ✓

Fred Fantini

Fatima Ferreira ✗

Nicky Fabz

Stuart Grifkin

Rick Daily ✓

Mike CE

Jason Foti

Peter Bacci

Bob Pacheco

Shannon Shannon

Allison Bonvie

Mickey McPhee ✗

Michele R. McPhee ✗

Tony Bongiorno ✓

Kate Brooks

Bobby Pacheco

Richard Moschner

Dee Michelle

Al Maier

David Smith

Michelle Dam

Lola DiGiovanni

Linda Boschetti ✗

Micky Ward ✗

Brian OConnor ✓

Stephen Lyons ✓

Marybeth Ray

Melissa Cunha

Lenny DiPietro ✓

Nicole Bernier

Greg Scapicchio

Kenny Talent

Jackie Peterson

Adam Gentile

Michael Wilton ✗

Dennis Martin

Ella Fue

David Han

Chhaya Kem

Dave Szeto ✓

Brenda Bella

Gina Reitano Torcasio ✗

Tim Warner

Kara A. Grant

Taylor Marie

Jennie Hannah ✗

Alyson Gould

Marc DesRoches

Stephanie Marlar

Kimberly Splaine Moran

Patrick Haggerty

Nikki Medeiros

David Allen

Jenn Martignetti

C. A. Shay

Lyssa Santolucito

Mike Savitkas

Katie Shea

Joanna Duffy

Michelle Shields

Lindsay Carroll

EL DA

Linda Dwyer Baer

Jan Etlo Pez

Ric Deignan

Brian Mushlin ✓

Gypsy Melanie

Michael Dwyer

Jason Dust

Jennifer Freyman Baviello

Kevin Drinan

Lisa Marie DeLisle Rizzuto

Chyna Onembo

Pauline Wells ✓

Daniella Grico

Chuck Ciccarello

Joy Carter King

Krstn Mchd

Lisa Sullivan

April Lynne

Brenda Hagen Gonzalez

Pete Loran ✗

Elaine Marchant

Angela Hirtle-Falzarano ✗

Lisa DeFeudis

Joe Delaney

Lisa McCullough

Michael P. Mahon ✗

Shawn Dolan

Delise Sciacca

Lee Anderson Schwartz

Alison Smith

Mark Doherty

Patricia Sheets

Christie Blake

Mark McCabe

Stephen Burke

Garry L. Rizzuto

Suzan Boudreau ✗

Lucas Carr

Tony Schwartz ✓

Jim Georgaklis ✗

Mark Pacheco

joe Gittelman

Lou Neal ✓

Christine O'Connor

Budahisang Comsukits

Feedl Nitro

Serenity Allen

Robert Mullis

Barry Ward

Mit Norton

Christopher James ✓

Sabrina Vogelin DiDomenico

Peter "Simo" Simonelli

Kristen Cokely ✓

John Boyle ✓

Miranda Pelletier Campbell

Connie Tammaro

Steven Szathmary

Johnny Solinger ✗

Vicky Zambi Vivenzio

Matthew Gentile

Renee Kelley

Brian Duffy

Paul Gargano ✗

Philip Trainor

Laurie Schneider

Betsy Vicente

Oswaldo R. Ortiz ✓

Mary Ehler Davenport

Terry Sullivan

John Lopes ✓

Katelynne Cambria

Patrick Munroe

Maggie Nora

Marc Orrell

Rich Martins

Stacey Lewicki-Mota

Noel Camelio

Mark Donovan ✓

Mary Wright Hoots

Patti Dwyer Epps

Javier Benzan

Mary Gentile

Doreen Giles McCaul

Justin Brennan

Jesse Cody

Laura Murphy

Emily Bonacci

Jack Crowley ✓

Jaimelyn Harsh

Shannon Giffin

Brian Kelley

Christina Foley

Amanda Jean

Jeff Blando ✗

Tom Fleming

Tom Flynn ✓

Linda Dove Mochi

Dorothy Nardone

Ry Cal ✓

Pho Scho

Lana Mills

Susan Goforth Gentile

Erica Lynne

Danny Marshall ✓

Blanta Claus

Mark Zepf

Heather Picking

Ashley Thorpe

Brielle Leigh ✓

Lorena DiLorenzo Lanza

Brenda Burke ✓

Jerry Kantor ✓

Chantal Leavitt

Teresa Licciardi Rinaldi

Jodi Indorato

Scott Gould

Becky Joy

Catherine McCarthy ✓

Mike Pelletrino

Kelly Wright

Jim Crowley ✓

Michael Miceli ✓

Paul McDonough

Michael Alpers ✓

Angie DiPrizio D'Amore

Courtney Proch

Jason DaSilva

So Sasigant O'Neil

Dave Fimiani ✓

Devon Abbott

jay Monty

Matt Vaitiskis

Iliana Maria Hinds

Pj Zag

Erin Ciccone

Mikey Adams

Cheryl Rainville Brunetti

Shawn Flores

Belladonna Beekeeper

Pamela Morris

Garrett Warren

Nicole Costa Moustafa

Jennifer Fontaine

Balele H. Shoka

Nadine Francis-Silva

Matt Shea

Al M Trigs

Katerina Kupkova Lima

Jessica Marte

Danielle Murr

Peter Krudys

Jane Erickson

Alex DiPietro

Olivia Mahoney

Mikey Splaine

Brian Joyce

Nicole VanHorn

Megan Rebecca

Tim Decker

Brendan Pasco

Leigh Schneider

Michael Carter

Fil DaSilva

Dan Grady

Kim Smith

Rochelle Doyle

Heather Rourke

Kevin Mitrano

Kevin Cavanagh

Nicole Tammaro

Teruo Takahashi

Carey Kaprelian

Sara Mascroft

Julie O'Hanlon

Rajah Hockley

Robert Doc Welby

Chris M. Pon-e

Rachel Baptista

Nick Mochi

Erica Jean

Devon G. Brooks

Angela Alexopoulos

Sheila Colon

Maribeth Sgroi

Dan Crowley

Mai Tai

Liliana Hedrick

Deb Gaffney

Tammie Lavallee

Jennifer Pitts

JJ Sutherland

Cheryle St Armand-Lombardo

Rachel Kate

Audrick Mayers

Anastasia Stanitsas

Emmanuel Felina

Jessica Domaingue

Gabrielle Tammaro

Matt Fraumeni

Alexis Sullivan

Deb Bercovitch

Nicole Walsh

Stephanie Lyons

Gianna Passa

Jaclyn Burke DaSilva

Sam Black

Kirk Wornum

Nelia Claudino Braga

Jennifer Carney Wallace

Taylor Rossano

Cheryl Bondi

Frank Bacci

OC Bluth

Taylor Burns

Jeff Nelson

Christina Morrissey Cotter

Kelly Ann

Grant F. Casassa

Kevin James

Tim Burton

Katie Masse

Marc Nicoletti

Audrey Zaremba Drinan

Brian Matthew ✓

Joy Bruno

Doug Brioso

Laua Jean Reardon

Mike Mike

Catherine Dello Russo

Carol Ann

Bobby Travers

Jacob Bunton ✗

Meredith Sever

Christina Cara ✓

Christine GE ✓

Angelina Marie

Anne Dulong ✗

Julie D'Andrea McCollem

Christine Roxanne Belini

Daniela I. Visita

Matthew Gleason

Jennifer Maria

Toph O'Callaghan ✓

Andy Hepner ✓

Tommy McCollem

Paul Burke ✓

Les Sullivan ✓

Sky Labresh

Kelley Costello

Rebecca Buxbaum

Lisa Pacheco

Lee Vieira ✓

Vanessa R. Wanderlingh

Jen Baum

Frederick Leung ✓

Kr Rabs

Peter Anthony ✓

Jennifer Kalos

Amy Kelley

Jason P. McManus

Trevor Doiron

Kelly Sava-What

Nicole JT

Kim Harris

Stevie Rachelle ✗

Shayna Shirazi

Mandy Aroyan

Judd Sherman

Jilly Duffy

Fitzie Cwng

Nicole Fredericks

LJ DiPietro

Ashley Pugliares

Frank Gee ✓

Leah Fraumeni

Frank Lange ✓

Alyssa Donovan

AK Vermont

Brian Peterson

jasa Onembo

Mike LeVecque ✓

Caitlyn Marie

Sharon Cloran Dineen

Kimberline Marie

Merry Fay Baldwin

Graham Morrison

Evan Tolonen

Marcy Newhall

Rebecca Salvatore

Daniel Robert ✓

Rebecca Burbank Leonard

Karen L. McManus-Carreiro

Will Mateo

Nancy Nitsch

Erin Christine

Dic Donohue

Joe Pontak

Asif Ali ✓

Sandra Mulrey

Nicole Erwin

Melissa Jaclyn

Casey Turner Beckford

Mike Gentile

Taylor Janedy Medeiros

Danny O'Brien

Amanda Cuddy

Loren Michelle

Lisa Dorsey DiFava

Lindsay Burgess

Jon Edward ✓

Missy Rothman Ahern

Ceara Mahoney

Kristina Tamirova

Jeff Boosh

Alicia Tribble Warner

Caitlin Bisceglia

Diana Kardashian

Rob Ciriello ✓

Erica Cifarelli McDavitt

Melissa Fiske

Danielle Liddell

John Thomas

# EXHIBIT 5

*Chapter 43: Section 103. City manager; appointment; qualifications; compensation; removal*

**Section 103**. The city council shall appoint a city manager who shall be sworn to the faithful performance of his duties and who shall be the chief administrative officer of the city and shall be responsible for the administration of all departments, commissions, boards and officers of the city, whether established before its adoption of this plan or thereafter, except that of the city clerk, city auditor, any official appointed by the governor or any body elected by the voters of the city. He shall be appointed on the basis of his administrative and executive qualifications only, and need not be a resident of the city or commonwealth when appointed. He shall hold office during the pleasure of the city council and shall receive such compensation as it shall fix by ordinance. No member of the city council shall during his term of office be chosen as city manager, and no person who has within two years been elected to or served in any elective office in the city or in the county in which the city is located shall be chosen as city manager.

Before the city manager may be removed, if he so demand, he shall be given a written statement of the reasons alleged for his removal and shall have the right to be heard publicly thereon at a meeting of the city council prior to the final vote on the question of his removal, but pending and during such hearing the city council may suspend him from office. The action of the city council in suspending or removing the city manager shall be final, it being the intention of this provision to vest all authority and fix all responsibility for such suspension or removal in the city council. In case of the absence, disability or suspension of the city manager, the city council shall designate the head of some department to perform the duties of city manager during such absence, disability or suspension, and, in case the office of city manager becomes vacant, the city council shall designate the head of some department to serve as acting city manager until a new city manager is appointed.

*Chapter 43: Section 104. Powers, rights and duties of city manager*

**Section 104**. Except as otherwise specifically provided in this chapter, it shall be the duty of the city manager to act as chief conservator of the peace within the city; to supervise the administration of the affairs of the city; to see that within the city the laws of the commonwealth and the ordinances, resolutions and regulations of the city council are faithfully executed; and to make such recommendations to the city council concerning the affairs of the city as may to him seem desirable; to make reports to the city council from time to time upon the affairs of the city; and to keep the city council fully advised of the city's financial condition and its future needs. He shall prepare and submit to the city council budgets as required of the mayor by section thirty-two of chapter forty-four and, in connection therewith, may, to the extent provided by said section thirty-two in the case of a mayor, require the submission to him, by all departments, commissions, boards and offices of the city, of estimates of the amounts necessary for their expenses. He shall make all appointments and removals in the departments, commissions, boards and offices of the city for whose administration he is responsible, except as otherwise provided in this chapter, and shall perform such other duties as may be prescribed by this chapter or be required of him by ordinance or resolution of the city council. The city manager shall have and possess, and shall exercise, all the powers, rights and duties, other than legislative, had, possessed or exercised, immediately prior to the adoption of this plan, by the mayor, board of aldermen, common council and all other boards, commissions and committees of the city and their members, severally or collectively, except such as are by this chapter conferred upon the school committee or are otherwise provided for thereby.