## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRIAN HUSSEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | Civil Action No. 1:21-CV-11868-AK |
| v. ) | |
| ) | |
| CITY OF CAMBRIDGE and ) | |
| BRANVILLE BARD, in his capacity as ) | |
| Commissioner of the Cambridge Police ) | |
| Department ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**ANGEL KELLEY, D.J.**

On February 25, 2021, nine months after George Floyd's murder by a police officer, while the nation was still in a heated debate over racism and police brutality, Cambridge Police Officer Brian Hussey ("Hussey") reposted an article about a police reform bill called "the George Floyd Act" on his personal Facebook page. His comment accompanying the post said: "This is what its come to 'honoring' a career criminal, a thief and druggie . . . the future of this country is bleak at best." [Dkt. 1 ("Compl.") at ¶ 11]. Despite the post being deleted shortly thereafter, it was brought to the attention of then Police Commissioner Branville Bard ("Bard") by officers of the local National Association of Advancement of Colored People ("NAACP") chapter and a local community activist. Hussey was then placed on leave.

After being disciplined, Plaintiff Hussey brought this action pursuant to 42 U.S.C. § 1983, against the City of Cambridge and Bard (together "the Defendants"), alleging that the

1

Defendants retaliated against him in violation of his First Amendment right to freedom of speech.  [Compl.].  The Defendants then filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  [Dkt. 9].  This Court denied the Defendants' Motion to Dismiss, except as to the claim brought against Commissioner Bard in his individual capacity.  [Dkt. 25].  While the Court found that Hussey's post could have had a detrimental impact on the perception of the Cambridge Police Department internally and in the community, the Court could not dismiss the case on the question of whether the department's interest outweighed Hussey's interests without a more developed factual record.  [Id. at 13].  The Court therefore allowed Hussey's claims to proceed against the City of Cambridge and Commissioner Bard in his official capacity.[1]  [Id.].

On June 8, 2023, the City of Cambridge filed their Motion for Summary Judgment.  [Dkt. 37].  The same day, Plaintiff filed his Motion for Partial Summary Judgment on the question of the Defendants' liability for violating his First Amendment right to free speech.  [Dkt. 41].  The Court heard oral argument on January 29, 2024 and took the matter under advisement.  [Dkt. 60]. The Court, having considered both of these motions, the parties' oppositions, and reply briefs, finds that Plaintiff has failed to create a material dispute of fact to survive Defendants' Motion for Summary Judgment.  The Court also finds that because it has determined that Hussey's speech was not protected and because there is no factual dispute for a jury to resolve, the Defendants' Motion for Summary Judgment [Dkt. 37] is **GRANTED**, Plaintiff's Partial Motion for Summary Judgment [Dkt. 41] is **DENIED**, and his case is accordingly **DISMISSED**.

---

[1] In August 2022, after this lawsuit had already commenced, Hussey was promoted to the rank of Sergeant.  [Dkt. 54 at II at ¶ 5]. The Court therefore denied as moot Plaintiff's request to amend his complaint to add a retaliation claim related to his denial of a promotion, after counsel reported his intentions to withdraw the motion.  [Dkts. 14, 24].

I.    **BACKGROUND**

In evaluating the cross-motions for summary judgment, the Court relies on the parties' statements of material facts, responses thereto, and any attached exhibits the parties have submitted.  [See Dkts. 39, 43, 52, 54, 58-1].  The Court accepts as true each material fact to the extent it has not been disputed by the opposing party and considers contested each material fact that either party has disputed.  Unless otherwise noted, the facts below are undisputed.

Giving due respect to George Floyd, the Court notes he was born in North Carolina in 1973 and moved to Houston shortly thereafter.  [Dkt. 43 at ¶ 53].  He grew up in the Third Ward—one of Houston's most economically disadvantaged neighborhoods.  [Dkt. 44-10 at 2-3].  Floyd was a star athlete, briefly playing collegiate basketball at Texas A&M University-Kingsville, but returned to his old neighborhood in Houston without completing his degree.  [Id. at 3].  Thereafter, Floyd experienced a string of arrests and periods of incarceration.  Between 1997 and 2005, he served eight jail terms on charges that included drug possession, theft, and trespass.  [Dkt. 43 at ¶ 54].  In 2007, he was charged with aggravated robbery with a deadly weapon and was sentenced to five years in prison.  [Id. at ¶ 55].  He was released on parole in 2013.  [Id.].  Floyd thereafter turned his life around and appeared to live a law-abiding life.  [Dkt. 44-10 at 4].  In 2014, he had a daughter.  [Dkt. 44-12 at 9].  He became more involved in his church's program, which took men from Houston's Third Ward neighborhood to Minnesota to provide them with drug rehabilitation and job placement services.  [Dkt. 44-10 at 4].

Floyd soon made the permanent move to Minneapolis, Minnesota.  [Dkt. 44-11 at 8].  He found work first as a security guard for the Salvation Army and later as a bouncer for a nightclub.  [Id.].  When the pandemic forced the nightclub to close, Floyd was out of work.  [Id. at 9].  On Memorial Day 2020, Floyd was at a convenience store when one of the store

employees thought he had paid for cigarettes with a counterfeit $20 bill and called the police. [Id.].  The events that followed are known to all due to the widely circulated cellphone video capturing Minneapolis Police Officer Derek Chauvin kneeling on Floyd's neck for 8 minutes and 46 seconds, Floyd's pleas that he could not breathe, and his body eventually going limp.  [Dkt. 44-12 at 3].  Floyd's last words "I can't breathe" echoed those of Eric Garner and the Black Lives Matter movement's call to action.  [Dkt. 44-9 at 4].  His killing ignited a national reckoning on issues of racism, police brutality, and accountability for police misconduct, in addition to local, national and global protests.  [Id.].  Officer Chauvin was subsequently convicted of second-degree murder; the three other officers who participated in the arrest were likewise convicted on related charges.[2]

**The National Climate**

The impact of Floyd's death was felt here in Massachusetts where, as in the rest of the country, protesters filled the streets by the thousands demanding an end to such violence. The City of Cambridge saw over 3,500 people in the streets in one such protest.[3]  In the neighboring City of Boston, the alleged wanton use of pepper spray and riot batons against protesters led to a

---

[2] Kiara Alfonseca, Derek Chauvin sentenced to 21 years on federal charges for violating George Floyd's civil rights, ABC news (July 7, 2022), https://abcnews.go.com/US/derek-chauvin-sentenced-federal-charges-violating-george-floyds/story?id=86366456. The Court takes judicial notice of the updated details of the criminal trial following Floyd's murder under Fed. R. Evid. 201(b).

[3] Marc Levy, Protest draws thousands to hear the challenges of reforming police, education, other institutions, Cambridge Day (June 7, 2020), https://www.cambridgeday.com/2020/06/07/protest-draws-thousands-to-hear-the-challenges-of-reforming-police-education-other-institutions/. The Court takes here and elsewhere judicial notice under Fed. R. Evid. 201(b) of articles describing the unrest that occurred in the aftermath of George Floyd's killing within Massachusetts between May 2020 and March 2021. See United States v. Griffin, 525 F.2d 710 (1st Cir. 1975) (taking judicial notice of the fact that forced busing in Boston "received substantial publicity and aroused widespread resentment.").

lawsuit accusing the Boston Police Department of using excessive force.[4]  Protests were ongoing when Hussey made his Facebook post, and many continued for months thereafter.[5]

**Officer Brian Hussey**

Plaintiff Brian Hussey began working as a Cambridge police officer in 1998 and spent 10 years in the Special Investigations Unit (SIU) where he conducted roughly "a couple hundred" drug crime investigations.  [Dkt. 43 at ¶ 4].  For the first decade of his career, he worked as a patrol officer in lower Cambridge.  [Dkt. 39 at ¶ 12].  In June 2009, he applied to and joined the SIU where he investigated drug and vice crimes.  [Id. at ¶ 14].  Hussey worked in the SIU for ten years, taking part in hundreds of drug crime investigations, where he worked with confidential informants and spoke to drug users throughout the City of Cambridge.  [Id. at ¶¶ 15-16].  To secure the cooperation of these informants, Plaintiff had to reassure them that the police were "going to protect them" and that "the police would do whatever [they] could to help them."  [Id. at ¶ 17].  Much of Hussey's time in the SIU was spent convincing drug users to trust him.  [Id. at ¶ 18].

**The Facebook Post**

On February 25, 2021, Hussey shared on his Facebook page a WHDH news article titled, "House Democrats reintroduce police reform bill in honor of George Floyd."  [Dkt. 43 at ¶ 5].  In a comment he shared alongside the article, Hussey wrote, "This is what its [sic] come to 'honoring' a career criminal, a thief and druggie . . . the future of this country is bleak at best."

---

[4] Huffman v. City of Bos., No. 21-CV-10986-ADB, 2022 WL 2308937 (D. Mass. June 27, 2022).

[5] Associated Press, Protesters at Boston Rallies Call for Justice for George Floyd, Action on Police Killing Cases (Mar. 6, 2021), https://www.nbcboston.com/news/local/rally-in-boston-to-call-for-action-on-police-killing-cases/2321508/.

[Id. at ¶ 7].  The bill in question, which never passed,[6] proposed reforms to increase accountability for police misconduct, enhance transparency and data collection, and to eliminate discriminatory policing practices.  [Dkt. 44-3 at 4].  Hussey reports that the day he made that Facebook post was a training day, and since he had previously completed his training online, he spent the day taking his children to the New England Aquarium instead.  [Dkt. 43 at ¶ 12].  He made the post at 8:08 AM using his personal phone while at home.  [Id. at ¶¶ 14, 18; Dkt. 44-3 at 3].  Around an hour after his post, two comments were posted, neither of which Hussey replied to.  [Dkt. 43 at ¶¶ 15-16].  Hussey claims that he deleted the post a couple of hours after he posted it.  [Id. at ¶ 17].

The parties dispute whether the word "druggie" is inherently derogatory, but at minimum it refers to someone who is a drug addict, and the parties agree that the term itself does not have any racial connotation.  [Dkt. 43 at ¶¶ 50-51].  In Hussey's post, he did not identify himself as a Cambridge police officer or reference his position in the police department.  [Dkt. 43 at ¶ 8].  Most of the people on his Facebook though would have been aware that he was a police officer.  He estimates that around 91 of his Facebook friends as of 2023 were either retired or active members of the Cambridge Police Department, while only 30 may have been unaware of his involvement with the Cambridge Police Department.  [Dkt. 39 at ¶ 10].  In April 2021, at the time he made his post, Hussey had around 674 friends on his Facebook, of which a significant number were Cambridge police officers.  [Id. at ¶ 10].[7]  His Facebook account is restricted;

---

[6] George Floyd Justice in Policing Act of 2020, H.R. 7120, 116th Cong. (2020).

[7] Plaintiff states that as of 2023, he has 535 Facebook friends. [Dkt. 54 at ¶ 9].

therefore, only those who have accepted his "friend requests" are able to see his posts.  [Id. at ¶ 9].  Hussey does not accept friend requests from people he does not know.  [Id.].

**The Complaints**

Approximately six days later, on or around March 3, 2021, Commissioner Branville Bard became aware of Hussey's Facebook post after Richard Harding, who was then either the President or Vice-President of the Cambridge NAACP, contacted him.  [Dkt. 43 at ¶ 19; Dkt. 44-5 ("Bard Tr.") at 25:11-15].  According to Bard, the post was less than an hour old when a screenshot was shared with the NAACP, who then shared it with Bard.  [Bard Tr. at 31:2-15].

Bard was the police commissioner for the City of Cambridge from mid-2017 to August 2021.  [Dkt. 43 at ¶ 34].  Bard and Cambridge City Manager Louis Depasquale met with Harding, community activist Mo Barbosa, and former Mayor Ken Reeves (who was then an Officer with the Cambridge NAACP) to discuss Hussey's Facebook post via videoconference.  [Id. at ¶ 20; Bard Tr. at 26:17-24].  The group wanted to speak urgently.  [Bard Tr. at 49:1-14]  Bard described the three community leaders as "alarmed and concerned about the post."  [Id.].  The identity of the person who initially brought the post to the NAACP's attention was not disclosed to Bard in order to protect that person's anonymity.  [Bard Tr. at 31:7-12].  Former Mayor Reeves expressed his concern that Hussey's post called into question the ability of the Cambridge Police Department to serve in a biased-free manner and ran afoul of what the Department should embody.  [Dkt. 52 at ¶ 68].  At that meeting, Bard obtained a copy of the

Facebook post and shared it with the Professional Standards Unit (PSU) for investigation.  [Id. at ¶ 69].

**Bard's Explanation**

Bard considered the post "damaging to the reputation of the Cambridge Police Department" because it was "insensitive to individuals who've suffered from substance use issues." [Dkt. 43 at ¶ 22].  He considered the use of the word "druggie" derogatory and "dehumanizing" to people with substance abuse issues.  [Id. at ¶ 26].  He did not think that race played a role in Hussey's post.  [Id. at ¶ 27].  Still, Bard felt that the post disparaged George Floyd and would cause irreparable harm to the Cambridge Police Department's reputation.  [Dkt. 39 at ¶ 24].  The Cambridge Police Department, as Bard describes it, disciplined Hussey for his Facebook post because:

> [I]t had negative connotations and it tore at the fabric of trust that we spent a long time building in the community. Folks viewed the Cambridge Police Department as one who favors prevention, intervention, and diversion over more serious or more punitive methods traditionally associated with the criminal justice system . . . we pride ourselves on the fact that we believe that individuals are better served through a social justice approach than through your traditional criminal justice approaches. And when you have that approach, that often means that you're often working hand in hand with individuals who have . . . fallen in life and are working towards better outcomes. Some of those individuals have substance use issues.

[Id. at ¶ 25].  Bard considered the post especially harmful "in the context of the national climate."  [Id. at ¶ 26].  He added that "trust takes a lifetime to build and just a moment to tear down" and that "any individual associated with the Cambridge Police Department could in a moment tear down . . . trust we've spent a long time building with community."  [Id.].  Bard asserts that the Cambridge Police Department needs to have the public's trust because the only way the police department can function and do its job is "to be seen as trustworthy and legitimate and bias free."  [Id. at ¶ 27].  Bard could not recall whether he received any additional calls or

complaints about the Facebook post, or if he received any additional complaints from Hussey's

fellow employees at the Cambridge Police Department.  [Bard Tr. at 31:2-5; 43:1-12].

**The Investigation**

During the police department's investigation of the post, the Professional Standards Unit

("PSU") investigators only interviewed Brian Hussey.  [Dkt. 52 at ¶¶ 31, 45].  Hussey made the

following statement where he attempted to put his words into context:

> I have had many discussions with both coworkers and people in my personal life
> regarding the George Floyd incident and the subsequent police reform that has
> come about as a result of that incident. My thoughts and views are consistent and
> have never wavered.[] What happened to George Floyd on May 25, 2020 never
> should have happened . . . he did not deserve to die.  Derek Chauvin is a disgrace
> to the badge and probably never should have worn one in the first place. The same
> goes for the officers who stood by and did nothing. I am 100% in favor of police
> reform. I will be the first person to say there absolutely are rogue, questionable
> and dishonest police officers who are an embarrassment and a disgrace to the
> profession. That being said, the one thing I disagree with is naming a police
> reform bill in "honor" of George Floyd. I understand that this incident, the
> proverbial straw that broke the camel's back, led to the calls for police reform,
> hence the naming of the bill in his "honor." While George Floyd did not deserve
> to have his life taken away that day, he was still a violent criminal. I feel that
> attaching the name of a violent career criminal, in "honor," to a reform bill aimed
> at the betterment of policing is a disservice to the spirit of the bill. To take it a
> step further, I would feel this way if any career criminal of any race were to be
> "honored" in a such a manner. It wouldn't matter to me if the person were Black,
> White, Hispanic, Asian, or any other race – my feelings would still be the same. A
> police reform bill should not be named after a violent career criminal. There are
> many other people of honor who could have been memorialized in the naming of
> this bill.
>
> I am the author of my words and I am fully aware of their meaning and intent. My
> comment in no way endorses the manner in which the Minneapolis Police
> Officers dealt with George Floyd. Regardless of his background, he deserved to
> be treated with respect and with no more force than was necessary to gain
> compliance with lawful orders.
>
> Rather, my words reflect my opinion that legislators should have considered a
> more appropriate name for their bill. Any undertaking to interpret or portray them
> any differently than my intended meaning is misguided . . . As an American

citizen, I should be able to voice an opinion and have constructive discussions on
a wide variety of topics, covering many aspects of life.

[Id. at ¶ 32].  When asked about the above statement, in particular Hussey's condemnation of

Derek Chauvin's actions, Bard said "I wish that was the content of his Facebook post because

then we wouldn't be sitting here today." [Bard Tr. at 39:2-8].  At the same time, Hussey reported

that he received text messages of support from around a dozen fellow Cambridge police officers.

[Dkt. 52 at ¶ 33; Dkt. 44-7].

PSU conducted an investigation into the Facebook post and determined that it violated

Cambridge Police Department Rules and Regulations Chapter 2, Section III, Paragraph B, which

prohibits "discourtesy, rudeness, or insolence, to any member of the public" and Cambridge

Police Department Policies and Procedures Policy 230, Section V, Paragraph A, Part 1, which

requires officers to "be courteous and act professionally at all times."  [Dkt. 52 at ¶ 70].  After

two months of being placed on administrative leave, on April 30, 2021, Commissioner Bard

informed Hussey that he was suspending him without pay for four days based on his Facebook

post and the violation of Cambridge Police Department Rules and Regulations that it entailed.

[Dkt. 54-1].  The letter from Bard announcing the suspension also stated that the suspension was

"an appropriate sanction for what I view as a violation of Department policy, but more

importantly, to caution you against similar conduct."  [Id.].

**Other Social Media Posts and Statements Regarding Substance Abuse**

No policy prohibits Cambridge Police officers from posting on social media, although

they are prohibited from posting on social media about non-work-related matters during work

times.  [Dkt. 43 at ¶ 35].  In a number of instances, the Cambridge Police Department is alleged

to have disciplined officers differently than it did Hussey for provocative or offensive postings.

For example, Jack Albert, a Deputy Superintendent with the Cambridge Police Department,

posted a comment on the department's official Twitter page that Congressmen Joe Kennedy III was "another liberal [****]ing jerk." [Id. at ¶ 36-37]. Albert received a five-day suspension for his post, although Bard did not recall whether he was placed on administrative leave or whether he served his suspension. [Id. at ¶ 39]. Albert's post about Congressmen Kennedy was reported in the news. [Bard Tr. 14:17-24].

In July 2020, in response to a proposed bill redirecting police department funds toward social services, the Cambridge Police Patrol Officers' Association tweeted, "If you think seven civilians killed in seven days in Boston is bad, just wait for the purge that will come." [Dkt. 43 at ¶ 40]. The Cambridge Police Department did not investigate who wrote or posted the tweet. [Id. at ¶ 41]. Bard could not recall either whether the Cambridge Police Department disciplined another police officer who made a "deeply disturbing" social media post in praise of political violence while out on extended leave. [Id. at ¶ 43].

In April 2022, the Cambridge Police Department received a complaint from a community member that Hussey had said he "was tired of crackheads thinking they can get away with everything." [Id. at ¶ 46]. He was not placed on administrative leave following that complaint and was not the subject of any discipline as a result of the complaint. [Id. at ¶ 47]. Hussey asserts that in July of 2022, while he and now Commissioner Elow were on duty planning the arrests of drug users in Central Square via the use of informants, Elow said something along the lines of, "well they are just crackheads." [Id. at ¶ 48]. Elow admitted using the word "crackheads" to describe drug users in Central Square and conceded to Hussey that it was an inappropriate word to use. [Dkt. 44-6 ("Elow Tr.") 10:20-13:11]. Hussey recalled, and Elow disputes, that when Hussey brought up the fact that he was being investigated for using the

word "crackheads" that Elow said "you just can't call them that to their face." [Dkt. 43 at ¶ 49; Elow Tr. 11:17-19].

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law. Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted). The Court must consider (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence;" and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001); see also Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006). Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving parties." Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183-84 (1st Cir. 1999)). A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted). When evaluating cross-motions for summary judgment, the court must "view each motion, separately, through this prism," and "may enter summary judgment only if the record, read in this manner, reveals that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Hevia, 602 F.3d at 40 (internal citations omitted).

## III.   DISCUSSION

The constitutional right to free speech is protected by the First Amendment's guiding principle that debate on public issues should be "uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).  The public interest in that "free and unhindered debate on matters of public importance" is "the core value of the Free Speech Clause of the First Amendment." Pickering v. Bd. of Educ., 391 U.S. 563, 573 (1968).  There is "universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs." Mangual v. Rotger-Sabat, 317 F.3d 45, 64-65 (1st Cir. 2003) (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)).  This principle also protects, albeit to a more limited degree, the speech of public employees. Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) ("Public employees do not lose their First Amendment rights to speak on matters of public concern simply because they are public employees . . . [s]till, those rights are not absolute.").  "In general, government officials may not subject an individual to retaliatory actions . . . for speaking out." Gilbert v. City of Chicopee, 915 F.3d 74, 81 (1st Cir. 2019) (internal citations and quotations omitted).  However, when a citizen enters a public role, they must accept certain limitations on their freedoms. Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."); Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) ("Government employees undoubtedly walk a tight rope when it comes to speaking out on issues that touch upon their fields of work and expertise.").  A government employee speaking as a citizen on a

matter of public concern can only be subject to "those speech restrictions that are necessary for their employers to operate efficiently and effectively." Garcetti, 547 U.S at 419.

Plaintiff brings his First Amendment claim pursuant to 42 U.S.C. § 1983 which provides that "[e]very person" acting "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia" who subjects or causes to subject someone "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" shall be liable to the injured party. 42 U.S.C. § 1983. An individual asserting a Section 1983 claim must show that the challenged conduct is "attributable to a person acting under color of state law" and that the conduct was a "denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).

The First Circuit requires a three-step inquiry to determine whether an adverse employment action violated a public employees' First Amendment right to free speech. Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 135 (1st Cir. 2022). This inquiry is modeled after the balancing test initially articulated in Pickering. First, the Court must evaluate whether the employee "spoke as a citizen on a matter of public concern." Gilbert, 915 F.3d at 82 (quoting Curran, 509 F.3d at 45). If the Court finds that the speech in question was made pursuant to the speaker's official duties, then there is no First Amendment claim as "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties." Id. (quoting Garcetti, 547 U.S. at 421-22). Second, if the employee did speak as a citizen on a matter of public concern, the Court must look to whether the government entity involved had an adequate justification, based on the impact to its own operations, for the action it took towards that employee. Bruce, 34 F.4th at 135 (quoting Curran, 509 F.3d at 45). Third, the

14

Court looks to whether the protected speech was a substantial or motivating factor in the adverse employment action.  Id.

There is no dispute as to the first and third prong.  Hussey v. City of Cambridge, No. 21-CV-11868-AK, 2022 WL 6820717, at *2 (D. Mass. Oct. 11, 2022); [Dkt. 53 at 2 n.2].  Therefore, the Defendants' liability turns on balancing the interest of Hussey, as a citizen speaking on a matter of public concern, with the interests of the Defendants in restricting that speech to aid "the effective and efficient fulfillment of its responsibilities to the public." Connick v. Myers, 461 U.S. 138, 150 (1983).  The Court must "consider (1) 'the time, place, and manner of the employee's speech,' and (2) 'the employer's motivation in making the adverse employment decision."  Bruce, 34 F.4th at 138 (quoting Decotiis, 635 F.3d at 35).  If these factors demonstrate that the employee only faced those speech restrictions that were "necessary for his employer to operate efficiently and effectively" then "the defendants' restrictions on speech were adequately justified."  Id.  How cautious an employee must be with the words they use "will vary with the extent of authority and public accountability the employee's role entails." Rankin v. McPherson, 483 U.S. 378, 390 (1987).

Since only the second prong is in dispute, and because the balancing of interests is a question of law the Court must decide, there is not a triable question of fact left for a jury.  See id. at 386 n.9 (describing test for whether speech is of public concern wherein "the ultimate issue—whether the speech is protected—is a question of law") (quoting Connick, 461 U.S. at 148 n.7); Davignon v. Hodgson, 524 F.3d 91, 100 (1st Cir. 2008) (describing Pickering balancing test's assessment of what the First Amendment protects as subject to de novo review whereas question of causation in retaliation claim presents a question of fact).  But see Moser v. Las Vegas Metro. Police Dep't, 984 F.3d 900, 905 (9th Cir. 2021) ("While the Pickering

balancing test presents a question of law for the court to decide, it may still implicate factual disputes that preclude the court from resolving the test at the summary judgment stage.”); Weaver v. Chavez, 458 F.3d 1096, 1101 (10th Cir. 2006) (describing how “it is well-settled that the balancing assessment must be performed by the court, not the jury” although noting that circuits are split as to when Pickering test turns on disputed questions of fact).  Although there may be some factual disputes that remain outstanding, such as disagreements about how to interpret the words used and the degree to which the Facebook post was shared, the Court is not aware of any whose resolution is necessary to resolve the balance of interests.  Even if the Court resolved any such disputes in Plaintiff’s favor, it would still find that Defendants’ interest outweighed Plaintiff’s here.

### A.  Interest in Hussey’s Speech

At the motion to dismiss stage, this Court stated that “the value of Hussey’s speech, including his use of derogatory, pejorative labels, was not particularly high, though it was also not without any value.”  Hussey, 2022 WL 6820717, at *5; [Dkt. 25 at 10].  While the Court’s determination at this stage is not dependent on its earlier assessment, the development of the factual record has not altered that conclusion.  Hussey’s post was undoubtedly about a matter of public concern: the naming of an official act of Congress and his objections to the name chosen for it.  [Dkt. 43 at ¶¶ 5-7].  The proposed act sought to address police reform and racial inequality—issues of tremendous importance to the public.  [Dkt. 44-3 at 4].  Moreover, given the galvanizing role George Floyd’s murder played in the widespread protests in 2020 and

thereafter, there is value in the public's continued discussions of his life and legacy.  [See Dkt. 44-9 at 4].

The fact that Hussey is employed as a police officer is relevant as well, given that his comments were about the nature of a police reform bill.  Discouraging Hussey and other officers from participating as citizens in discussions about public safety, police brutality, and racial profiling would deprive the public of a valuable viewpoint.  Garcetti, 547 U.S. at 419 (acknowledging "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion" given the "the necessity for informed, vibrant dialogue in a democratic society" and "the widespread costs may arise when dialogue is repressed"); see also Pickering, 391 U.S. at 573 (rejecting attempt by school administrators to limit teachers' ability to participate in public debate partly because it was essential that teachers be able to speak freely given that they were more likely than members of the general public to have informed opinions on school operations and funding).

Hussey's post was made on his personal Facebook account from his personal phone. [Dkt. 43 at ¶¶ 14, 18].  However, the reach of his statement was amplified by it being on a social media platform.  Writing on Facebook is accurately compared to "writing a letter to a local newspaper" and "suggests an intent to 'communicate to the public or to advance a political or social point of view beyond the employment context.'"  Liverman v. City of Petersburg, 844 F.3d 400, 410 (4th Cir. 2016) (quoting Borough of Duryea v. Guarnieri, 564 U.S. 379, 398 (2011)).  Hussey argues that the post could not have had a disruptive impact since the post was only up for a couple of hours on his private Facebook profile.  [Dkt. 42 at 13].  This argument is not persuasive.  The post was screenshotted, its content was shared beyond Hussey's network, and it had begun to attract attention.  An individual like Hussey takes a "gamble . . .  in posting

content on the internet" as there is a "lack of control one has over its further dissemination." Duke v. Hamil, 997 F. Supp. 2d 1291, 1300, 1302 (N.D. Ga. 2014) (dismissing a veteran police officer's claim that his government employer violated the First Amendment by demoting him after he posted an image of the Confederate flag accompanied by the phrase, "It's time for the second revolution," on his private Facebook page). Hussey also shared his post with all his Facebook friends, who number in the hundreds, and most of whom were aware he was employed as an Officer in the Cambridge Police Department. [Dkt. 39 at ¶ 10]. Social media use in this context can be a double-edged sword. On one hand, social media can make any citizen "a town crier with a voice that resonates farther than it could from any soapbox," increasing the message's reach and Hussey's First Amendment interest along with it. Packingham v. North Carolina, 582 U.S. 98, 107 (2017) (quoting Reno v. Am. Civ. Liberties Union, 521 U.S. 844, 870 (1997). At the same time, such increased exposure amplifies the potential consequences to employers.

The value of Hussey's speech is lessened by the inflammatory and insulting manner in which his post was written. "Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balance." Curran, 509 F.3d at 49 (citing Jordan v. Carter, 428 F.3d 67, 74 (1st Cir. 2005); see also Hernandez v. City of Phx., 43 F.4th 966, 979 (9th Cir. 2022) (police officer's social media posts that insulted racial and religious minorities occupied "a much lower rung on the First Amendment hierarchy" and "touched on matters of public concern in only the most limited sense" (citations omitted)). The post called George Floyd "a career criminal, a thief and druggie." [Dkt. 43 at ¶ 7]. The term "druggie" may be subject to differing interpretations; however, in both its common understanding and in the manner it was used in the Facebook post, the term is employed as a pejorative to disparage its subject as a person

struggling with drug addiction.  [Id. at ¶ 50].  Even if the term itself is not inherently derogatory, here it was used in a derogatory fashion.  The terms "thief" and "a career criminal" are similarly insulting, even though they reflect the fact that, for a ten-year period in Floyd's life from 1997 until 2007, he participated in criminal activity that included offenses related to theft and robbery.  [Dkt. 43 at ¶¶ 54-55].  More relevant than the particular terms used was the fact that the thrust of the message disparaged George Floyd as being unworthy of being honored in that manner because of his past criminal conduct and substance abuse issues.  It dismissed the reasons why George Floyd's life and tragic death inspired the legislation.

However, the value of Hussey's post is not as diminished as it would have been had Hussey used lewd, vulgar, or obscene terms.  See Curran, 509 F.3d at 49; see also Hernandez, 43 F.4th at 979; Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 977 F.3d 530, 538-39 (6th Cir. 2020) (use of n-word in social media post did not receive "highest rung" of protection and consequently required a lower showing of disruption to justify employer's adverse action).  The term "druggie" may be a pejorative and offensive term, but it is neither profane nor obscene.  Notably, both Commissioner Bard and Elow agreed that the term does not have any racial connotation.  [Dkt. 43 at ¶ 51].  The other words used by Hussey are commonplace terms.

Hussey's speech could be categorized as insensitive, disparaging, or dehumanizing (as Bard described it) [id. at ¶ 26], particularly by those concerned with helping individuals with substance use challenges or those who sought to honor Floyd as an emblematic Black victim of police brutality.  However, even if the Court agreed with that assessment, it would not diminish Hussey's interest in being able to share his opinion on the topic.  Offensive speech can still be protected speech if an employer retaliates against the employee because of their objections to the content of that speech, rather than their concern for the speech's impact on public functions.  See

Hayes v. Mass. Bay Transp. Auth., 498 F. Supp. 3d 224, 234 (D. Mass. 2020) ("[V]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.") (quoting Rankin, 483 U.S. at 384).

However, the Court does not find in Hussey's favor because, even if it viewed his post in the light most favorable to him and resolved any factual disputes about its content or context in his favor, his interest would be outweighed by the strong interest the Cambridge Police Department had here in restricting his speech.  The Court explains below.

**B.  Cambridge Police Department's Interest in Restricting Hussey's Speech**

While evaluating the government's interest, the Court considers "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388 (citing Pickering, 391 U.S. at 570-573).  Plaintiff asserts there is no indication Hussey's speech would disrupt the functioning of the police department because of the lack of objections within the Cambridge Police Department, the Defendants' failure to address similarly offensive speech, and the lack of controversy in the public sphere that followed the post.  [Dkt. 42 at 11-15].  The Defendants argue instead that Hussey's comments threatened the Cambridge Police Department's functions because his public disparagement of Floyd, who struggled with substance abuse and had a criminal history, could have jeopardized public trust in

the Department.  [Dkt. 38 at 5-9].  Defendants' concerns are underscored by a national climate which placed a magnifying glass on the issue of bias within every police department.

The focus of the Court's inquiry here is whether the Cambridge Police Department and Commissioner Bard's "predictions of disruption" to the Department flowing from Hussey's post were "reasonable," rather than whether Hussey's comments caused "an actual adverse effect." Curran, 509 F.3d at 49.  The nature of the inquiry reflects the fact that government employers must have "wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."  Connick, 461 U.S. at 146.  The Court must give "substantial weight to government employers' reasonable predictions of disruption" and gives "greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large."  Waters v. Churchill, 511 U.S. 661, 673 (1994).  Still, the Defendants' judgment must be based on some evidence and cannot rely on speculation alone to justify its actions.  Moser, 984 F.3d at 909 ("[A]n employer must provide some evidence for the court to evaluate whether the government's claims of disruption appear reasonable" such as "evidence that the community it serves discovered the speech or would inevitably discover it."); Fenico v. City of Phila., 70 F.4th 151, 166 (3d Cir. 2023) ("[A]n employer must still establish likely disruption through record support, and courts have long required more than 'unadorned speculation as to the impact of speech.'") (quoting Hall v. Ford, 856 F.2d 255, 261 (D.C. Cir. 1988)).

Here, the Court is persuaded that the Defendants' strong interest in maintaining public trust outweighs the interest Hussey had in making his Facebook post.  The timing here is a crucial factor—Hussey's statements came mere months after Floyd's killing galvanized public criticism of policing and racial disparities, including in the City of Cambridge and the greater

Boston area.[8]  The vast majority of protests were peaceful, yet departments across the country met many of those same protests with tear gas, arrests, flash grenades, and more—sometimes with fatal consequences for demonstrators.[9]  Some of the protests turned violent and the ensuing riots set ablaze local businesses, restaurants, news buildings, and even a police department building.[10]  A number of police officers sustained injuries during such incidents.[11]  In the weeks that followed, as the names of more Black persons, like Breonna Taylor, became synonymous with police brutality and impunity, it poured fuel on the collective fury against police departments and ignited new rounds of protests.[12]  These demonstrations were often accompanied by calls to reform, defund, and even abolish police departments.[13]  It is thus understandable that in the months that followed, the Cambridge's Police Department's sensitivity to public perception was heightened, especially regarding discussions related to victims of police violence.

The effectiveness of the Cambridge Police Department, and any police department, depends on the maintenance of public trust.  Acting in a biased manner, or creating a perception

---

[8] *Supra* note 3; Huffman, 2022 WL 2308937, at *1.

[9] Olalekan N. Sumonu, Shot in the Streets, Buried in Courts: An Assault on Protester Rights, 52 Seton Hall L. Rev. 1569 at 1573, 1575 (2022).  Around 570 of the 10,600 protests resulted in violence.  Id.  In Kentucky, the police response to a demonstration led to the death of a photographer named Tyler Gerth and a cook named David McAtee. Id.

[10] Id. at 1571-74.

[11] Id.

[12] Id.

[13] Id.

thereof, undermines that trust.[14]  Locurto v. Guiliani, 447 F.3d 159, 182 (2d Cir. 2006).  In

Locurto, the Second Circuit articulated this challenge:

> The effectiveness of a city's police department depends importantly on the respect
> and trust of the community and on the perception in the community that it
> enforces the law fairly, even-handedly, and without bias. If the police department
> treats a segment of the population of any race, religion, gender, national origin, or
> sexual preference, etc., with contempt, so that the particular minority comes to
> regard the police as oppressor rather than protector, respect for law enforcement is
> eroded and the ability of the police to do its work in that community is impaired.
> Members of the minority will be less likely to report crimes, to offer testimony as
> witnesses, and to rely on the police for their protection. When the police make
> arrests in that community, its members are likely to assume that the arrests are a
> product of bias, rather than well-founded, protective law enforcement. And the
> department's ability to recruit and train personnel from that community will be
> damaged.

Locurto, 447 F.3d at 178 (quoting Pappas v. Giuliani, 290 F.3d 143, 146-47 (2d Cir. 2002)

(citations omitted)); see also Bennett, 977 F.3d 530, 544 (6th Cir. 2020) ("[D]iverse

constituents . . . need to believe that those meant to help them in their most dire moments are

fair-minded, unbiased, and worthy of their trust.").[15]  The centrality of trust is highlighted by the

---

[14] The facts in cases like Locurto and Bennett, and other cases that the Defendant relies upon, such as Grutzmacher v. Howard Cnty., 851 F.3d 332, 338 (4th Cir. 2017) feature speech that is significantly more likely to offend and cause disruption in a workplace than Hussey's Facebook post.  However, this Court does not cite those cases for their factual similarity but rather for their proposition that the effectiveness of a Police Department depends on their ability to build trust in the communities they serve and that incidents that undermine that trust, particular among communities where relationships with law enforcement is historically strained, can hamper a Police Department's ability to carry out its duties.

[15] In resolving this question, the Court finds that community members' objections regarding Hussey's post are not analogous to a "heckler's veto." A "heckler's veto" occurs when offensive speech is curtailed to prevent public disorder; the Supreme Court has held that the "heckler's veto" is an impermissible justification for the restriction of speech.  Bachellar v. Maryland, 397 U.S. 564, 567 (1970) ("it is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers, or simply because bystanders object to peaceful and orderly demonstrations" (internal citations omitted)). Previously, the Fourth Circuit and Tenth Circuit have extended this logic to prevent restrictions on the speech of police officers that were motivated by potential community backlash.  Berger v. Battaglia, 779 F.2d 992, 1001 (4th Cir. 1985) (rejecting community concerns about an officer's music performance in blackface because "the perceived threat of disruption [was] only to external operations and relationships, it was caused not by the speech itself but by threatened reaction to it by offended segments of the public"); Flanagan v. Munger, 890 F.2d 1557, 1566-67 (10th Cir. 1989) (citing Berger in its finding that the community's objections to a police officer's ownership of a video

Cambridge Police Department's Mission Statement, which describes the Department's mission as partnering "with the community to solve problems and improve public safety in a manner that is fair, impartial, transparent, and consistent."[16]

The Court must also provide greater deference to the Cambridge Police Department's assessments of the risk of disruption because of its status as a law enforcement agency.  See Curran, 509 F.3d at 50; see also Hughes v. Whitmer, 714 F.2d 1407, 1419 (8th Cir. 1983) ("More so than the typical government employer, the Patrol has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution.'") (quoting Gasparinetti v. Kerr, 568 F.2d 311, 315-16 (3rd Cir. 1977)); Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) ("In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers."); O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998) (describing stronger government interest in regulating speech of police officers).  Following the national reckoning

---

store that included adult films was not a sufficient rationale to justify restrictions on his speech).  In both matters, these complaints were analogized to a "heckler's veto."  Berger, 779 F.2d at 1001; Flanagan, 890 F.2d 1567.  The Ninth Circuit and Second Circuit have found that such objections are permissible to consider when assessing disruption to an employer's function, such as 'an officer's job to safeguard public opinion of the police force. Locurto, 447 F.3d at 179 (2d Cir. 2006) (rejecting the analogy to a 'heckler's veto' because "[w]here a Government employee's job quintessentially involves public contact, the Government may take into account the public's perception of that employee's expressive acts in determining whether those acts are disruptive to the Government's operations"); Dible v. City of Chandler, 515 F.3d 918 n.4, 7 (9th Cir. 2008) (acknowledging Flannagan and Berger, but finding that they have both been undermined by subsequent case law, including City of San Diego, Cal. v. Roe, 543 U.S. 77 (2004)). This Court similarly declines to follow Flannagan and Berger because of the now demonstrated connection between a police departments' efficiency and its public perception and because the social context, including as to importance of the relationship between police and the communities they serve, has changed since those cases.

[16] Mission Statement and Core Values, City of Cambridge Police Department, https://www.cambridgema.gov/Departments/cambridgepolice/missionstatementandcorevalues (last visited Mar. 5, 2024).

sparked by George Floyd's murder, [17] while police departments sought to rebuild trust in their communities, the need for this deference was even greater. [18]

The community complaints about the Facebook post provide the necessary evidence to justify Defendants' perception that Hussey's comments could have undermined public trust. Less than one week after Hussey shared his Facebook post, Richard Harding of the Cambridge NAACP, brought the post to Commissioner Bard's attention. [Dkt. 43 at ¶ 19]. The NAACP had been made aware of the post when a screenshot was shared with them by another individual whose identity remains undisclosed. [Bard Tr. at 31:7-12]. Bard and the Cambridge City Manager then met with Richard Harding, Mo Barbosa, and former Mayor Ken Reeves—all of whom were either in the leadership of the Cambridge chapter of the NAACP or involved community figures in other capacities. [Dkt. 43 at ¶ 20; Bard Tr. at 26:17-24]. Even though Bard only met with three individuals, at least two were part of a larger organization, and one was a former Mayor of that very city. The political clout of those individuals made it reasonable for Bard to assume that the post could cause damage to the Department's reputation in the eyes of

---

[17] See Huffman, 2022 WL 2308937, at *1 ("[Floyd's] unjust death at the hands of police sparked protests around the country that called attention to the disparate treatment of people of color by law enforcement and demanded justice and police reform.").

[18] This deference is why the Court is not persuaded by the counter-factual proposed by Plaintiff about an Officer suspended for a social media post criticizing the naming of a bill after President Donald Trump who also is the subject of several criminal misconduct allegations. [Dkt. 58 at 3]. The distinction drawn here is not in regard to the speech's content, but rather its context. Even in the context of government employees, the First Amendment is particularly sensitive to speech restrictions that target speech solely based on its content. See Rankin, 483 U.S. at 384. However, the broader context regarding policing in America supports a heightened concern about breakdown of trust and disruption to the Department's functions, and thus justifies such a restriction. The example Plaintiff provides is distinguishable as it does not indicate how such a post would detrimentally impact police operations.

many others, especially among those who were concerned about bias within the Cambridge

Police Department.  [See Dkt. 52 at ¶ 68].[19]

Since the primary question is whether the Police Department's prediction of disruption

was reasonable, the level of community feedback that is sufficient to justify such a prediction is

necessarily context dependent.  The case law does not identify any magic marker or bright line

wherein the level of community feedback is sufficient to justify a speech restriction.  The Court

also notes that the matter was presented to Bard as an urgent matter, with community members

"alarmed and concerned about the post."  [Bard Tr. at 49:1-14].  As Bard put it: "trust takes a

lifetime to build and just a moment to tear down" and "any individual associated with the

Cambridge Police Department could in a moment tear down . . . trust we've spent a long time

building with community."  [Dkt. 39 at ¶ 26].  With this in mind, Bard's actions appear

reasonable given the importance to the Department of maintaining the trust of its community

members and the concern, especially given the "context of the national climate," that the

Facebook post could have detrimentally impacted that trust.  [Dkt. 39 at ¶ 26]; see Locurto, 447

F.3d at 182; Bennett, 977 F.3d at 541.  The focus on the community impact renders it less

relevant that Hussey received messages of support from his peers in the police department.

[Dkt. 43 at ¶ 33; Dkt. 44-7].  The Court is also not persuaded by the fact that there is no evidence

that any drug users or individuals with loved ones struggling with substance abuse complained as

---

[19] The fact that the organization that Bard met with was the NAACP is noteworthy as it is an organization whose chapters advocate against bias in policing. The NAACP's mission is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." Mission-Vision, NAACP, https://naacp.org/about/mission-vision (last visited Mar. 5, 2024). In the wake of George Floyd's killing, the organization called for measures to be put in place to impose strict accountability for police misconduct. NAACP, Joint Statement by NAACP and The Links, Incorporated on Collective Outrage Regarding the Police Murder of George Floyd and other Victims of Law Enforcement, NAACP, https://naacp.org/articles/joint-statement-naacp-and-links-incorporated-collective-outrage-regarding-police-murder (last visited Mar. 5, 2024).

Commissioner Bard was entitled to rely on his own judgment given the "significant weight" allotted to an employers' "reasonable predictions of disruption." Curran, 509 F.3d at 49.

Hussey's post was subject to multiple interpretations—including some which could undermine the non-punitive and rehabilitative approach that Bard and the Cambridge Police Department aimed to have. Bard saw it as "dehumanizing" and insensitive to individuals with substance abuse histories. [Dkt. 43 at ¶ 26]. The community members Bard met with saw it as evidence of bias within the Cambridge Police Department and counter to the spirit the Department should embody. [Dkt. 52 at ¶ 68]. The City of Cambridge's conclusion in its final report of its investigation was that Hussey's Facebook post implied he "does not believe in rehabilitation . . . is disrespectful of people suffering from substance abuse" and that it "can be interpreted that the Cambridge Police have a bias against people who have committed felony crimes or have a substance abuse disorder." [Dkt. 44-3 at 12]. Hussey, for his part, asserts that his post had nothing to do with race, that his only objection was the naming of the bill (whose objectives he otherwise supported) in "honor" of someone who had a violent criminal past. [Dkt. 43 at ¶ 32]. The Defendants' arguments do not focus directly on concerns about an appearance of racial bias—even though George Floyd's death is inseparable from issues of racial bias in policing and the post was brought to the Department's attention by the NAACP, a racial justice organization.

The focus of the Court's inquiry, however, is not what the right interpretation of Hussey's language is, or even whether it was offensive or its conclusions objectionable, but rather whether its impact "impedes the performance" of or "interferes with the regular operation" of the Cambridge Police Department's work. Rankin, 483 U.S. at 388. In that regard, the Department's concerns are substantiated by the language Hussey used, the reasonable

interpretation of the implications of his words, and by the objections Bard, and other community members, raised in response.

Bard was not obligated to wait until the issue developed into a broader controversy, particularly given his concerns about the backlash the Facebook post could generate and his assessment that its characterization of George Floyd undermined the Department's goals.  [See Dkt. 43 at ¶ 25; Bard Tr. at 40:7-19]; see Curran, 509 F.3d at 45 ("An employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'") (quoting Connick, 461 U.S. at 152).  According to Bard, the goals of the Cambridge Police Department when addressing drug abuse was to prefer "prevention, intervention, and diversion over more serious or more punitive methods traditionally associated with the criminal justice system," which often meant that officers had to work with individuals struggling with substance abuse issues.  [Dkt. 39 at ¶ 25].  Hussey, as a member of the SIU, would have been one of the officers working to implement those goals by attempting to build trust within communities where drug use was a widespread and serious challenge.  [Dkt. 39 at ¶¶ 11-16].  Bard's assessment is supported by the fact that Hussey's comments undermined the Department's stated goals.

The heightened scrutiny on Hussey's public comments is connected to the fact that a police officer is an especially public-facing role, and "[t]he more the employee's job requires . . . public contact, the greater the state's interest" in disciplining them for comments that are offensive.  Grutzmacher v. Howard Cnty., 851 F.3d 332, 346 (4th Cir. 2017) (quoting McEvoy v. Spencer, 124 F.3d 92, 103 (2d Cir. 1997) (citation omitted)).  The Fourth Circuit noted this in Grutzmacher, wherein a firefighter was terminated for several offensive comments he made on his Facebook page.  Grutzmacher, 851 F.3d at 346.  The court dismissed plaintiff's claim therein,

in part, because the plaintiffs' job required him to safeguard public opinion about his role; by making comments which jeopardized the public's trust in firefighters, he frustrated the Fire Department's public safety mission.  Id.  This difference is also what separates Hussey's case here from the District of Massachusetts' decision in Hayes v. Mass. Bay Transp. Auth., which also addressed restrictions on government speech.  498 F. Supp. 3d at 236.[20]  Hayes concerned comments made in the workplace by a 911 operator, rather than someone in a public-facing role. As a police officer, Hussey's work is public-facing and thus more scrutiny is placed upon his comments that are made in public, or in the semi-public sphere of social media.  Hussey's post may have been on his private Facebook page, but it was shared online with hundreds of people. While he may have believed his post was only shared among his friends, it led to a community response, through NAACP officers, which then reached his police commissioner.

This Court's conclusion is reached as a matter of law, after weighing Hussey's interest in his post against his employer's interest in the potential damage it could have caused.  See Curran, 509 F.3d at 50.  Maintaining the public's confidence in the Cambridge Police Department is part of Hussey's job responsibilities; therefore, the Departments' objections to the content of Hussey's statement is invariably linked to their concern about its impact on their image.  On that issue, with greater deference afforded to law enforcement and with the record clear regarding the

---

[20] Additional factual differences further separate this case from Hayes.  In Hayes, 911 call center operator Mark Hayes was overheard saying "she should go back to Africa" in response to a news broadcast in which a naturalized citizen from the Democratic Republic of Congo criticized US immigration policy.  498 F. Supp. 3d at 227.  The remark caused a "ruckus" in the call center and plaintiff was fired thereafter; Hayes then sued alleging his First Amendment rights had been violated.  Id.  The court therein held that there was a jury question as to whether the motivation of the employer in terminating the employee was either based on their personal objection to his statement or on their concern for the workplace disruption it could cause.  Id. at 234.  The possibility that it was the former was supported in part by the fact that the manager did not speak with other employers before terminating Hayes and because Hayes did not receive an opportunity to apologize to his coworkers who heard the comment—which could have impacted the degree of workplace disruption.  Id.  Additionally, there was a question of fact as to whether Hayes's statement was made to himself or to others, which would have altered the degree of First Amendment protection it would have received.  Id. at 233.

objections raised about Hussey's post by both Bard and members of the public, this case does not present a factual dispute which a jury need resolve.

Plaintiff draws an analogy here to Ninth Circuit and Third Circuit authority, but the cases he highlights do not control here because of the differences in procedural posture and the evidence demonstrating potential disruption.  In <u>Moser</u>, a Las Vegas SWAT sniper was dismissed from his team because of a comment he made on his Facebook page, including that "it was a 'shame' that a suspect who had shot a police officer did not have any 'holes' in him."  984 F.3d at 902.  The Ninth Circuit reversed the District Court's decision because there was a factual dispute over the meaning of his Facebook comments and because the Defendant did not provide sufficient evidence to show the comments would have caused disruption.  <u>Id.</u> at 908, 910.  However, there was no indication of disruption either internally or externally.  <u>Id.</u> at 909-11.  The post was brought to the department's attention through an anonymous comment, but otherwise the record failed to show that anyone else saw the comment.  <u>Id.</u> at 910.  Therefore, in <u>Moser</u>, "the public did not see or hear the offending comment, which lessen[ed] the potential impact on the agency's reputation or mission."  <u>Id.</u> at 911.  Not so here.  Hussey's post may have been up for a short time, but it was put into the public sphere long enough to attract a controversy that could have negatively impacted the Cambridge Police Department.  [<u>See</u> Dkts. 43 at ¶¶ 17, 19-21; 52 at ¶ 68; 39 at ¶¶ 24-26].

 In <u>Fenico</u>, the Third Circuit reversed the dismissal of a First Amendment retaliation claim brought by a group of police officers who had made social media posts that were clearly "offensive, racist, and violent."  <u>Fenico</u>, 70 F.4th at 153.  That initial dismissal came at the motion to dismiss stage with an undeveloped factual record and wherein the appellate court had to view the allegations in the light most favorable to the officers.  <u>Id.</u> at 155.  Thus, the court had

to assume "that their posts had not and *would not* disrupt [Philadelphia Police Department] operations." Id. at 167 (emphasis in original). This Court used similar reasoning when it denied the Defendants' Motion to Dismiss. [Dkt. 25 at 13]. While the Court here must still evaluate Defendant' Motion for Summary Judgment by viewing "the record and [drawing] all reasonable inferences therefrom in the light most favorable" to Plaintiff, the facts it is evaluating are based on a developed factual record which details the reaction from community members. Hevia, 602 F.3d at 40. As such, the Court is no longer required to presume that no disruption would take place.

**Cambridge Police Department's Failure to Address Other Comments**

Finally, the government's claims are not weakened by their failure to take action in other instances where officers made similar comments. Such evidence of the "failure to target equally disruptive speech is probative" of the legitimacy, or lack thereof, of Defendants' predictions of disruption. Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty., 39 F.4th 95, 107 (3d Cir. 2022) (quoting Lodge No. 5 of Fraternal Ord. of Police ex rel. McNesby v. City of Phila., 763 F.3d 358, 384 (3d Cir. 2014)). In other words, if Plaintiff demonstrates that Defendants failed to address similar comments by other employees, it calls into question whether the motivation for the disciplinary action was for reasons other than those provided—such as their personal disagreement with the Plaintiff's message. The issue here, however, is that the examples cited by Plaintiff either differ in terms of the Department's authority over them or show that some disciplinary measures were indeed taken. Jack Albert, who posted a tweet on the department's official Twitter page calling Congressmen Joe Kennedy III a "liberal [****]ing jerk" received a five-day suspension for his post, although he was not placed on administrative leave initially. [Dkt. 43 at ¶¶ 37-39]. The Cambridge Police Department did, in fact, fail to

investigate who wrote a tweet on the Cambridge Police Patrol Officers Association's account warning about a "purge" of killings it predicted would follow the passing of a proposed police reform bill.  [Dkt. 43 at ¶¶ 40-41].  However, the Patrol Officers Association is a separate and distinct entity.  Plaintiff has not persuaded the Court that the Police Department's failure to investigate the anonymous Association's tweet is comparable to Hussey's Facebook post, as there is no evidence provided in the record of any backlash, internally or externally, to the Association's tweet.  The same is true of an unnamed officer who made a "deeply disturbing" social media post in praise of political violence.  [See Dkt. 43 at ¶ 43].  These parallel examples the Plaintiff highlights are notable, but because details about them are so limited they are not sufficient to create a material dispute of facts as to the legitimacy of Defendants' predictions of disruption.  The Court reaches the same conclusion regarding the facts about both Hussey and Commissioner Elow using derogatory language, such as "crackheads," to describe drug users. [Dkt. 43 at ¶¶ 46, 48-49].

## IV.    CONCLUSION

Ensuring the free participation of the people in discussions of public affairs is of paramount importance—including for individuals who are employed by the public.  The Court recognizes a limited exception to that principle here because the Defendants' disciplinary actions were reasonably calculated to prevent disruption to the Cambridge Police Department, via a further breakdown of trust from community members, that Plaintiff's comments could have caused.  For this, and the additional reasons stated above, the Defendants' Motion for Summary Judgment [Dkt. 37] is **GRANTED** and Plaintiff's Partial Motion for Summary Judgment [Dkt. 41] is **DENIED**.  This matter is **DISMISSED**.

**SO ORDERED.**

Dated: March 12, 2024                                    /s/ Angel Kelley
                                                         Hon. Angel Kelley
                                                         United States District Judge